IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| AUTO-OWNERS INSURANCE COMPANY, | ) ) | |
| Plaintiff, | ) | |
| v. | ) | No. |
| TOMBERLIN, YOUNG | ) | 2:11-cv-00468-WHA-SRW |
| & FOLMAR INSURANCE CO. | ) | |
| d/b/a | ) | |
| SOUTH CENTRAL AGENCY, | ) | |
| JOHN S. TOMBERLIN | ) | |
| and | ) | |
| HAROLD W. YOUNG | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| TOMBERLIN, YOUNG | ) | |
| & FOLMAR INSURANCE CO. | ) | |
| d/b/a | ) | |
| SOUTH CENTRAL AGENCY, | ) | |
| JOHN S. TOMBERLIN | ) | |
| and | ) | |
| HAROLD W. YOUNG | ) | |
| Counter-claimants | ) | |
| v. | ) | |
| AUTO-OWNERS INSURANCE | ) | |
| COMPANY, | ) | |
| Counterclaim Defendant | ) | |

DEFENDANTS'/COUNTER-CLAIMANTS'
TOMBERLIN, YOUNG & FOLMAR INSURANCE CO.
d/b/a SOUTH CENTRAL AGENCY'S,
JOHN S. TOMBERLIN'S AND HAROLD YOUNG'S
MOTION TO EXCLUDE AUTO-OWNERS' EXPERT TESTIMONY ON
AGENTS AND AGENT DUTIES AND REQUIREMENTS

COME NOW, South Central Agency, John Tomberlin and Harold Young

(Defendants) and respectfully request this Court to exclude expert testimony proffered by Auto-Owners on insurance agent issues. As grounds for their Motion, Defendants submit the following.

## Summary of Grounds

Auto-Owners has no expert agent, yet all of its experts appear to want to describe what an agent does, knows and was legally required to do. One of the experts is an accountant. Another is a lawyer. The only one who appears to have been employed in the insurance industry worked for an insurance company his entire career, has never worked as an agent (or for Auto-Owners), and never sold a insurance policy.

Because the experts all lack the proper experience, have never worked as agents, and for other reasons set out herein, each of their opinions as to the requirements and duties of agents (as well as their testimony in the form of inadmissible legal conclusions[1], and as to the agent's state of mind, etc[2].) are due to

---

[1] *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)(finding reversible error in admission of expert testimony as to a duty under a contract).

[2] In addition to the fact that the purported experts are not insurance agents, several of the other reasons for this preliminary motion are best explained by the following:

> The Eleventh Circuit has stated: "We will only reverse a district court's ruling concerning the admissibility of evidence where the appellant can show that the judge abused his [or her] broad discretion and that the decision affected the substantial rights of the complaining party." *Wood v. Morbark Indus.*, Inc., 70 F.3d 1201, 1206 (11th Cir.1995).
> *2 However, a district court's discretion "is dramatically narrowed where a party

2

be excluded.

## I.   The Experts Fail to Qualify Under The Most Basic Requirement of Rule 702:  None Have Ever Worked As An Insurance Agent, and Each Lacks Demonstrated "Knowledge, Skill, Experience, Training or Education" Involving Agents.

Rule 702 requires either, "knowledge, skill, experience, training, or education"

as a threshold requirement for experts:

> A witness who is <u>qualified as an expert by knowledge, skill, experience, training, or education</u> may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  As stated, none of the experts has ever worked

as an insurance agent.  Thus, there is no "experience" here that would qualify any of

the proposed experts to testify about insurance agents.

Failing to qualify as an expert based on "experience", one would think that the

---

seeks to admit expert testimony purporting to offer legal conclusions." *Travelers Indem. Co. of Ill. v. Royal Oak Enter., Inc.*, 5:02-cv-58-OC-10GRJ, 2004 WL 3770571 at *2 (M.D.Fla. Aug.20, 2004). The extent of coverage under an insurance policy, **the legal obligations of parties to a contract** and the legal implications of the parties' conduct are questions of law to be decided by the court. *Id.*

*Ziolkowski v. Landmark Am. Ins. Co.*, 8:09-CV-776-T-33TGW, 2011 WL 3715080 (M.D. Fla. Aug. 24, 2011)(emphasis added).

proffered experts would demonstrate some inherent "knowledge," "skill," "training," or "education." However, as shown below for each expert, there is no such characteristic for any of them. As a result, these experts do not even meet the initial threshold of admissibility under Rule 702 of the Federal Rules of Evidence so as to be allowed to testify in the form of opinions:

**A.   Plaintiff's Expert Accountant Jack Nicholson Lacks Knowledge, Experience, Skill, Training and Education to Testify as An Expert Insurance Agent.**

Plaintiff's expert Jack Nicholson is an accountant by education, experience and trade and relied *only*[3] upon those qualifications as an accountant to form his opinions. Though the accountant claimed to be discussing accounting measures, the scope of his report was clearly about what an agent was "aware" of in surety underwriting and had a duty to report, and was based primarily on premium notice reports he admitted he had never seen, but only assumed existed based on his experience in one other case.[4]

The accountant is not an agent and did not speak with an agent prior to forming

---

[3] Deposition of Jack Nicholson, p. 259, line 21 through p. 260, line 3.

[4] See, e.g., Nicholson, p. 89, line 9 through p. 118, line 1 (discussing that his opinion of what the agents were aware of assumes that the agents were sent a copy of premium and cancellation notices from the same Lansing, Michigan Auto-Owners' offices that the agents were supposed to have reported this same information back to, but admitting (p. 110, lines 16-21, p. 115, lines 15-18, p. 117, lines 23-24)he does not know if such notices actually existed and that the only basis for his opinion is from one previous engagement involving a different type of insurance agency.)

4

his opinions.[5] He has not sold insurance policies or bonds. He has no specialized experience, knowledge, education, training or trade in anything related to an agent's duties[6]. His testimony as an expert on any issues regarding the duties and supposed knowledge of an agent (based on documents he himself admitted he had not seen and did not know to exist) is unreliable, uninformed and inadmissible under Fed. R. Evid. 702.

### B. Plaintiff's Attorney Expert, DeWitte Thompson, Esquire, Lacks Knowledge, Experience, Skill, Training and Education To Testify as An Expert Insurance Agent.

Mr. Thompson – a lawyer - is being proffered by Auto-Owners as an expert witness to testify specifically on the "Surety Agent Standard of Care" and duties he claims were breached by the Agents. Deposition of Dewitte Thompson, Esquire, Exhibit 167: "Plaintiff Auto-Owners' Insurance Company's Expert Report of DeWitte Thompson Concerning Surety Agent Standard of Care." Mr. Thompson is a practicing attorney focused on litigation in the construction and surety industries

---

[5] Deposition of Jack Nicholson, p. 254, lines 5-16 (or on any case that he can ever recall). See also; p. 256, lines 11-15 (did not consult any formal insurance agency standards prior to forming his opinions).

[6] Deposition of Nicholson, p. 20, lines 12-14 (only license held is an accounting license), p. 242, lines 4-12 (no other special skills or licenses other than accounting), p. 252, lines 11-13 (never held any insurance license), p. 254, lines 1-4 (never licensed or registered in Alabama), p. 254, line 17 through p. 255, line 20 (never taken insurance education courses other than CPA course or an insurance company sponsored seminar, but has never attended any insurance agent convention).

outside of Alabama[7].

This proffered expert on the duties owed by an Alabama insurance agent has never:

a)    "held any form of insurance license";

b)    "sold any kind of insurance; or

c)    "been registered or licensed with any professional or governmental body within the state of Alabama.".

Deposition of Thompson, p. 131, line 21- p. 132, line 5. Prior to forming his opinions in this case on the duties of agents, the expert did not consult with any such agents. Thompson, p. 132, lines 6-9, p. 133, lines 12-16.

Thompson has spent his entire career as a lawyer, and has no formal training or education[8] or skills[9] or knowledge gained from employment within the insurance or surety industry. Likewise, despite the lack any actual experience as an insurance

---

[7] Thompson has worked at his current law firm in the greater metropolitan Atlanta area since 1976. He litigates "construction disputes," has pursued "about five" cases against surety agents (never defending any such agents) , and has spent his entire career as a lawyer in private practice since graduating from the University of Georgia School of Law in 1975. Thompson, p. 16, lines 5-24, p. 39, lines 3-6, 23-25, p. 40, lines 1-6.

[8] Q. "... other than the risk management class you had in college and seminars you may have attended as a lawyer, you had no formal insurance training?" A. "I believe that's correct." Thompson, p. 117, lines 11-15.

[9] Thompson deposition, p. 118, lines 6-23 (discussing no special skills).

agent or even any job held with an insurance or surety company[10], Mr. Thompson claims that "virtually" the "entirety" (p. 90, lines 10-14, excluding only the first page) of his report is based on his "experience" within such industry: He even attempted to cite "industry standards" he claims exist within the industry he has admittedly never been a part of. P. 87, line 11, through p. 90, line 4. (See also; p. 91, lines 4-8: Q. "Okay. So those industry standards, then, are based on your experience as it appears in your report?" A. "Yes.").

Thompson further testified in deposition that his experience in dealing with agents (which all of his opinions on the agent standard of care would appear to be based upon) involved "about five" cases where he sued agents on behalf of an insurance company. Thompson, p. 16, lines 5-24.[11]

Thus, the lawyer lacks the requisite "knowledge, skill, experience, training, or education" to testify as an expert under Rule 702.

---

[10] Mr. Thompson has only previously testified once before as an expert. In that case, Auto-Owners was also the client suing its former lawyers. Thompson testified as a legal expert regarding the surety's rights towards its retained counsel. Deposition of Thompson, p. 31, line 17 through p. line 38, line 5. This was his first expert deposition involving surety and insurance issues. Thompson, p. 117, lines 16-23.

[11] Though Mr. Thompson claimed to have been consulted on "between eight and 1,200" surety claims and underwriting decisions, those involved contact only with the surety company, and generally involved claims and "underwriting/legal issues," questions about contractors, an "unusual bond form" or similar circumstances. Thompson, p. 51, line 5 through p. 52, line 13.

## C.   Auto-Owner's Surety Underwriting Expert Dan McCurdy Lacks Knowledge, Experience, Skill, Training and Education to Testify as An Expert Insurance Agent.

Plaintiff's lone expert who has actually been employed in the insurance and surety industry is Daniel McCurdy. The expert worked for insurance companies[12] in "surety underwriting and management" from 1958 until his retirement in 2007. Deposition of Dan McCurdy, Exhibit 168, p. 1 (resume). However, like the other experts, he never worked as an agent, and his supervisory "staff" included only "underwriters, field and clerical." *Id.*, p. 2 (of resume).

Moreover, rather than experience, the expert uses a dictionary for his personal legal interpretation of what was required of the agents under the contract[13] referred

---

[12] However, he has never worked for Auto-Owners, and as previously set out in Defendants' Motion for Summary Judgment Auto-Owners did not have a standard list of underwriting items specifically required to determine if a project should be bonded. Even within Auto-Owners' own bond underwriting department, different underwriters might require different types of information. Deposition of Jim House, p. 52, line 9 through p. 53, line 23. Thus, even assuming this expert had underwriting expertise, there is no demonstrated familiarity with Auto-Owners' underwriting guidelines at issue here, nor could there ever be, since they were unwritten.

[13] As discussed below, and as well known in the Eleventh Circuit, expert testimony about required conduct under a contract is inadmissible:

> An expert may testify as to his opinion on an ultimate issue of fact. Fed.R.Evid. 704. An expert may not, however, merely tell the jury what result to reach. *Id.* at committee notes (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony). A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law. *United States v. Poschwatta*, 829 F.2d 1477, 1483 (9th Cir.1987); *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir.1980). Donaldson testified that in his opinion Aetna had a duty to hire tax counsel in this case. .... This was a legal conclusion, and therefore should not have been admitted. The district court abused its discretion by allowing Donaldson to testify about the scope of Aetna's duty under

to in Count I of the Complaint. (Exhibit 169 to the Deposition of McCurdy, hereafter "Report", p. 1 and 2). Using the dictionary definitions, and without demonstrating either a legal background for interpretation of contracts or any experience as an actual agent, the expert goes on to opine that "In the case of a contract surety account, an agent is responsible for..." followed by a list of standardized underwriting items of information that, in the experts' opinion, the agents were required to provide to the surety underwriter when submitting an application for a surety bond. Exhibit 169, McCurdy Report, p. 2.

While such a list of standard underwriting items may have existed at surety companies where this expert was previously employed, it is undisputed in this case that such a standardized list never existed at Auto-Owners: Auto-Owners did not provide its agents with a list of items specifically required to determine if a project should be bonded, and even within Auto-Owners bond underwriting department, different underwriters might require different types of information. Deposition of Jim House, p. 52, line 9 through p. 53, line 23. If they did not receive the information they needed, Auto-Owners underwriters would ask the agent for it. Deposition of House, p. 53, lines 2-3. Thus, the standardized list proposed by the expert of what an

_____

the policy.
*Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

9

agent should send to a surety never existed and was never made known to any party to this lawsuit. It has no bearing on this case.

The expert compounds this error further (assuming that the agents were trained and had been provided the standardized list of items he would require as a surety underwriter) by using his list as the measuring stick for the shortcomings of the agents. Doing so, he comes to the further (legal) conclusion that "neither [of the agents] performed in the best interests of AOIC, but rather violated the trust." These conclusions are premised on the same non-existent list (as well as the dictionary based legal interpretation of the contract).[14]

The expert (who again, has no experience as an agent [15] and worked at a different surety company) concludes his opinion by stating that "both Harold Young and John Tomberlin clearly have violated their obligations and expectations of an

---

[14] The expert also discussed (in his report, attached) a letter written in May of 2006 (mentioned nowhere in the complaint) as evidence of lack of trust. The letter is neither actionable nor relevant. Why the expert felt the need to spend three paragraphs discussing it (Report p. 2) is unclear.

[15] In his report, the expert spent three pages discussing his interpretation of the deposition testimony of several witnesses. The facts and evidence in this case stand on their own and should not be offered through an expert.

Moreover, much of this portion of the report dealt with events that happened after the bonds were issued on January 10, 2007. Because underwriting (the only area where this expert may have any actual experience) would not involve claims (and no experience with claims appears to exist for this expert), there is no experience, skill, knowledge or training that would come into play there either. (In addition, such testimony would be irrelevant, since Auto-Owners has admitted the agents had no claim responsibility whatsoever.)

Agent..." In forming this (legal) conclusion, the expert does not rely on any generally recognized standards or guidelines for insurance agents. Rather, he relies entirely upon his subjective experience working at a completely different surety, with a different set of standardized guidelines he assumes (incorrectly) were communicated to the agents here. He offers only legal conclusions that are unsubstantiated (except by dictionary definitions) and which are otherwise inadmissible on their own. While Mr. McCurdy's experience and background could perhaps make him qualified to testify as to the requirements of an underwriter (or underwriter manager) doing his job for a surety, he is not qualified to testify as an expert as to the duties of an agent in the insurance industry, particularly in a case where no such standardized guidelines or training materials were ever provided to the agents.

Because of his inexperience as an agent and obvious unfamiliarity with Auto-Owners' own surety underwriting process (as best evidenced by his referral to a list of items that Auto-Owners has testified never existed), the expert fails to meet the requirements of Rule 702.

## II.    Even if the Experts Had The Proper Qualifications, Expert Opinions Involving Legal Conclusions or a Party's State of Mind Are Inadmissible.

While the Court ordinarily has considerable discretion in deciding whether expert testimony is to be admitted, the Eleventh Circuit has held it to be reversible

11

error to allow an expert to testify on the duty required under a contract, or as to the legal implications of conduct by a party. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir.1990) ("A witness also may not testify to the legal implications of conduct[16]; the court must be the jury's only source of law."). Additionally, with respect to equally inadmissible testimony about a party's or witness' "state of mind" this Honorable Court has recently pointed out:

> ... the expert "may not render any opinions regarding the state of mind, intent, motives or ethics of [the Defendant] ... These matters are not the proper subject of expert opinion; they are matters to be argued by counsel based on the evidence."

*Ray v. Ford Motor Co.*, 3:07CV175-WHA-TFM, 2011 WL 6183099 (M.D. Ala. Dec. 13, 2011) quoting; *In re Seroquel Products Liability Litigation*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806436, *5 (M.D.Fla. July 20, 2009).

Legal conclusions and "state of mind" expert opinions seem to go hand in hand, as noted by one court:

---

[16] Rule 704 (frequently referred to as the "Opinion on Ultimate Issue" Rule) does allow the admission of opinions on ultimate fact issues. However, as noted by the Committee at enactment, other hurdles continue to exist, including the prohibition of opinions which merely "tell the jury what result to reach":

> The abolition of the ultimate issue rule does not lower the bar so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Fed. R. Evid. 704, 1972 Committee Comments.

> In the instant case, the expert reports are replete with examples of impermissible legal conclusions; i.e., opinions that a statute imposing a certain "standard of care" was violated. Plaintiffs' proposed experts also state impermissible opinions on Defendants' state of mind. ([see] *Lohrenz v. Donnelly*, 223 F.Supp.2d 25, 36 (D.D.C.2002) ("courts have generally disfavored expert testimony in determining actual malice, which is essentially a determination of defendants' subjective state of mind") and *S.E.C. v. Johnson*, 525 F.Supp.2d 70, 78 (D.D.C.2007) (excluding opinions as to intent because "[d]eterminations of individuals' intent is a quintessential jury question.")).

*Iacangelo v. Georgetown Univ.*, 560 F. Supp. 2d 53, 60-61 (D.D.C. 2008)(footnotes and record citations omitted) adhered to, CIV.A. 05-2086 PLF, 2010 WL 4807082 (D.D.C. Nov. 19, 2010). And relatedly, in the Eleventh Circuit: "This court has consistently held that conclusory allegations without specific supporting facts have no probative value." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) citing; *Gordon v. Terry*, 684 F.2d 736, 744 (11th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir.1976). [17]

---

[17] As one Court also recently explained:

> An interested witness's conclusory opinion about what is or is not "wrongful" and what does or does not constitute a "breach of fiduciary duties" is of no moment for summary judgment purposes. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir.1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."); *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So.2d 839, 852 (Ala.2002) ("Generally, a witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition.");...

*Middlegate Dev., LLP v. Beede,* CIV.A. 10-0565-WS-C, 2011 WL 3475474 (S.D. Ala. Aug. 9, 2011).

As noted by the Eleventh Circuit, conclusory testimony does not come in

merely because "a party has produced an expert to support its position:"

> Appellant attempts to save the deficient affidavit of expert Thelin
> through Rules 703 and 705 of the Federal Rules of Evidence. Rule 703
> permits an expert to base opinions or inferences on facts or data not
> admissible in evidence if they are of a type reasonably relied upon by
> experts in the field. Rule 705 permits an expert to give opinion
> testimony without prior disclosure of the underlying facts or data.
> At least two other circuits have addressed this issue and found that
> Rules 703 and 705 do not alter the requirement of Fed.R.Civ.P. 56(e)
> that an affidavit must set forth specific facts in order to have any
> probative value. *See United States v. Various Slot Machines on Guam*,
> 658 F.2d 697, 700-701 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler
> Corp.*, 569 F.2d 666, 672-73 (D.C.Cir.1977). As noted by the court in
> *Merit Motors*, Rule 703 "was intended to broaden the acceptable bases
> of expert opinion, but it was not intended, as appellants seem to argue,
> to make summary judgment impossible whenever a party has produced
> an expert to support its position." *Merit Motors*, 569 F.2d at 673
> (footnote omitted).

*Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Thus, at any stage

of the proceedings[18], expert opinions in the form of conclusory allegations are

---

[18]   Expert opinions involving legal conclusions pose an inherent risk of error, further justifying
exclusion:

> Spurlock's testimony as to the applicable legal standard was plainly erroneous,
> thus demonstrating the danger in allowing experts to testify as to their
> understanding of the law. See *Torres* [*v. County of Oakland*, 785 F. 2d 147-150
> (6th Cir. 1985)"(holding that expert testimony couched in terms of legal
> conclusions cannot properly assist the trier of fact in either respect, and thus is not
> 'otherwise admissible')" *Burkhart* at 1212], 758 F.2d at 150. Each courtroom
> comes equipped with a "legal expert" called a judge, and it is his or her province
> alone to instruct the jury on the relevant legal standards. *See Marx & Co. v.
> Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2nd Cir.), cert. denied, 434 U.S. 861, 98
> S.Ct. 188, 54 L.Ed.2d 134 (1977).

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir.

inadmissible.

Auto-Owners' experts prepared expert reports detailing the substance of their testimony to be offered in this case and were examined regarding these reports during each of their depositions. Without exception, each of these experts -Nicholson, Thompson and McCurdy- opined in their expert reports:

a)    what was legally required of the Defendants; and

b)    their own opinions that Defendants were "aware" or "knew" or "had knowledge" of various items they deem relevant.

Specific examples of the experts' opinions that would be inadmissible under the above authorities include the following:

<u>Expert Accountant Jack Nicholson</u>

"The scope of our engagement was centered on four general points:
...
2) Express an opinion as to whether S & S's insurance agent, South Central Agency, **was aware of** the financial condition of S & S as of December 31, 2006, but failed to provide that information to Auto-Owners.
...
4) Express an opinion as to whether S & S's insurance agent, South Central Agency, **was aware of** the subsequent events that had a material impact on the financial condition of S & S subsequent to December 31, 2006, but failed to

1997)(reversing jury verdict on grounds that admission of expert testimony containing legal conclusions was error serious enough to justify reversal). See also; *Lloyd v. Hous. Auth. of the City of Montgomery, Ala.*, 2:10-CV-1103-MEF, 2012 WL 1466561 (M.D. Ala. Apr. 27, 2012) (striking partially witness affidavits, granting summary judgment and noting: "...'conclusory allegations without specific supporting facts have no probative value' at the summary judgment stage.") quoting: *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985).

report same to Auto-Owners."

Expert Report of Jack Nicholson, Exhibit 158 (only pages 1-20 -the actual report have been submitted here) p. 2, (unnumbered) lines 1, 5-7, and 10-13 (emphasis added)

"...where the agent **knew of** the strained financial condition of its client..."

*Id.* at p. 15, lines 12-13 (emphasis added).

"The insurance agent **was aware of** cash flow issues arising out of non-payment of premiums due."

*Id.* at p. 15, lines 21-23 (emphasis added)

"It is apparent Mr. Tomberlin **had knowledge of** the information Mr. House **expected**."

*Id.* at p. 17, lines 1-2 (emphasis added)

"Mr. Tomberlin **knew** S & S was late in paying their insurance premiums for Workment's Comp and general liability."

*Id.* at p. 17, lines 3-5 (emphasis added).

"The insurance agent was **obviously aware** of these events, **and, accordingly, was aware of** a critical cash-flow financial issue shortly after the inception of the bonds on the Drywall subcontract.

*Id.* at p. 17, lines 12-15 (emphasis added).

"It is our understanding from the testimony of Michael Smith, that Mr. John Tomberlin **was aware of** the letter of credit."

*Id.* at p. 18, lines 12-13 (emphasis added).

"It is also my opinion that South Central Agency **knew** S & S was insolvent."

*Id.* at p. 19, lines 23-24 (emphasis added).

> "… it is my opinion that South Central Agency presented S & S as a solvent contractor for surety bonding to Auto-Owners, when in fact they **knew** S & S was insolvent…"

*Id.* at p. 20, lines 8-10 (emphasis added).

Auto-Owners' Attorney Expert DeWitte Thompson

> "…after having been apprised of the **material information** that was **known by** the Defendant Surety Agents…"

Expert Report of Dewitte Thompson, Exhibit 167 to his deposition,   p. 5, (unnumbered) lines 6-7.

> "Because **I presume that AOIC would have acted in its own best interests, as a reasonable, prudent surety**, in evaluating and acting upon information provided to AOIC by the Defendant Surety Agents, I therefore conclude that, **but for** the **failure of Defendant Surety Agents to disclose** to AOIC the **material information that was known to them** concerning S & S…"

*Id.* at p. 5, lines 8-12 (emphasis added).

> "**Material** information that the Defendant Surety Agents **were aware of** that **should have been revealed** prior to the issuance of the bonds, but which the Defendant Surety Agents did not disclose to AOIC, includes but may not be limited to the following:…"

*Id.* at p. 5, lines 16 – 19 &  all of p. 6 and p. 7 lines 1-22 (which is a list of 15 items that Expert contends Defendants **"were aware of"**, thereby offering fifteen additional inadmissible opinions (omitted here in the interests of judicial economy) testifying as to their state of mind.

"It is my opinion that the Surety Agents **negligently**[19] **failed to perform** their responsibilities in accordance with industry standards."

*Id.*, p.7, lines 23-24 (emphasis added).

"They further **failed to perform their duties in an ordinary reasonable and prudent manner by failing to provide** the surety, AOIC, with **material information**…"…of **which they were aware** (and listed above) that, undoubtedly, **would have resulted in AOIC's refusal**…" "

*Id.* at p. 7 lines 24-27 (emphasis added)

"The Surety Agents in this case **either did not know what information was** important or **material** or **were negligent in their failure to convey that information t**o the Surety."

*Id.* at p. 8, lines 14-16 (emphasis added).

"…**it is clear from the letters of instruction that** it was **the intention of the parties that** Defendants' Surety Agents assess the risk which the Surety Agents propose that AOIC may undertake…"

*Id.* at p. 9, lines 3–5 (emphasis added).

"The **failure on the part of the Surety Agents to advise AOIC that they were not thoroughly satisfied** that the surety bonds to be issued for S & S were a "proper risk for the company to assume **fails to comply with standards within the industry**[20]."

*Id.* at p. 9, lines 6-9.

---

[19] Though Auto-Owners' broad complaint alleges many things, negligence is not one of them (and would be barred by a two year statute of limitations). Thus, in addition to being a legal conclusion, the determination of negligence by the expert is irrelevant.

[20] Further, as noted above, the Attorney has been engaged in private practice his entire career, did not consult with any agents, but somehow bases his opinion on "industry standards" on his limited experience in representing surety companies in a few suits ("about five") suing agents.

"The failure to properly advise the surety was **inconsistent with the conduct
of an ordinary reasonable and prudent Surety Agent**."

*Id.* at p. 9, lines 9 – 10 (emphasis added).

"The failure to advise to surety that **this risk should not be undertaken**, given
**all the facts that the Surety agents were aware of** was **negligence** and a
**violation of their duty to comply**…"

*Id.* at p. 9, lines 11–13 (emphasis added).

<u>Auto-Owners' Expert Underwriter Daniel McCurdy</u>

"It is also **appropriate to establish the definition** of **two words that are at
the heart and soul of the obligations** of the Agents appointed by AOIC,
Messrs. Young and Tomberlin. Agent and Trust." (Quoting and referring to
the Agency Contract and Dictionary definitions for terms he uses in
interpreting the Agency Contract).

 McCurdy Expert Report, Exhibit 169 to his deposition, p. 2, lines 1-2 (emphasis
added).

"**We see evidence in the depositions** taken of Young and Tomberlin that
**neither performed in the best interest of AOIC**, but rather **violated the trust
AOIC had a right to expect** of their agents.

*Id.* p.2, lines 20-21 (emphasis added).

"What I consider as the first act of **violation of trust** is the letter of May 23,
2006[21] (Exhibit #2) which was authored and signed by Young as attorney-in-
fact."

*Id.* at p.3, lines 1-2.

---

[21] As with other experts, this expert offered opinions on matters appearing nowhere in the
Complaint (i.e., the letter referred to here), and testimony on this issue would appear irrelevant.

"That statement was **a clear misrepresentation of fact**, and it was faxed to Kelly Baxter on June 12, 2006, which was prior to the account being accepted for surety credit by AOIC."

*Id .* at p.3, lines 4-6 (emphasis added).

"That letter was faxed to Kelly Baxter, Vice President, Peoples Bank of Coffee County, to help the account obtain a bank line of credit. Certainly, this was **self-serving** for Agent Young."

*Id.* at p. 3, lines 11-13 (emphasis added).

"It is obvious that even **the contractor considered** the agent to be the same as the company whom he represented, AOIC."

*Id.* at p. 4, lines 7-9 (emphasis added).

"Not revealing this information to AOIC was **clearly a violation of the obligation** the Agent had to AOIC."

*Id.* at p. 4. Lines 17-18 (emphasis added).

The above are merely examples of the state of mind testimony and legal conclusions that Auto-Owners has improperly attempted to submit to this point. Auto-Owners should not be allowed to have experts argue evidence that their attorney should be arguing. Nor should the experts be allowed to instruct the jury on the law or legal conclusions they may draw from evidence, functions exclusively reserved for the trial court and jury.

## Conclusion

Auto-Owners cannot use experts to supply missing evidence to support its claims, nor to testify as to matters involving agents- areas that the experts lack any experience or actual expertise concerning. Based on the foregoing, and Auto-Owners' failure to provide any expert with actual agent experience to testify as an expert, Defendants request an Order instructing Auto-Owners that such testimony will not be allowed at trial, striking such testimony that may already exist in the record of this case, and prohibiting the introduction of inadmissible expert opinion from these experts on these issues from this point forward.[22]

---

[22] Because the improper attempt to testify as to agent requirements, state of mind, practices and duties is common to all experts of Auto-Owners and now appears to be central to Auto-Owners' case, Defendants have presented this collective motion at the earliest opportunity following the close of discovery and in advance of the pretrial hearing to bring it to the Court's attention prior to such hearing. As to each of the experts individually, pending the ruling on this motion, Defendants respectfully reserve their right to challenge any remaining expert opinions prior to trial as allowed pursuant to the Pretrial Order (and any rulings made at the upcoming pretrial hearing) through properly filed and supported *Daubert* motions for each expert.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that the Court enter a pretrial Order excluding such proposed testimony from admission at trial, and prohibiting plaintiff or any of its experts from referring to any such testimony or opinions at trial.

Respectfully Submitted,

/s Edward M. Weed
Edward M. Weed WEE007
Martin Weed, LLC
100 Union Hill Drive
Suite 150
Birmingham, Alabama 35209
(205) 443-6661
emweed@martinweedllc.com

Counsel for Defendants, along with:

Richard Burton Bush, Esquire
Audra M. Bryant, Esquire
BUSH & AUGSPURGER, P.A.
3375-C Capital Circle N.E.
Suite 200
Tallahassee, Florida 32308
(850)386-7666/(850)386-1376 fax
Rbb@BushLawGroup.com

## CERTIFICATE OF SERVICE

I certify that I have this day, May 11th, 2012, electronically filed the foregoing with the Court which will simultaneously cause a copy of same to be served upon the following attorneys of record:

Roger S. Morrow, Esquire
Wesley Romine, Esquire
Morrow, Romine & Pearson P.C.
122 South Hull Street
Montgomery, AL 36104
334-262-7707
Fax: 334-262-7742
rsmorrow@mrplaw.com

Thomas Crafton, Esquire
Wendell Lloyd Jones, Esquire
Maureen Taylor, Esquire
Alber Crafton PSC
9300 Shelbyville Road; Suite 1300
Louisville, KY 40222
502-815-5000
Fax: 502-815-5005

/s Edward M. Weed
Edward M. Weed WEE007
Martin Weed, LLC
100 Union Hill Drive
Suite 150
Birmingham, Alabama 35209
(205) 443-6661
emweed@martinweedllc.com

Page 3

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

1  APPEARANCES CONTINUED:
2
3
4
5      LAW OFFICES OF MARTIN WEED, LLC
6      (BY: Edward M. Weed, Esq.)
       100 Union Hill Drive
7      Suite 130
       Birmingham, Alabama 35209
8

AUTO-OWNERS INSURANCE
COMPANY,
     Plaintiff,

v.              NO.
              2:11-cv-00468-WHA-SRW

TOMBERLIN, YOUNG &
FOLMAR INSURANCE CO.
d/b/a
SOUTH CENTRAL AGENCY,
JOHN S. TOMBERLIN
and
HAROLD W. YOUNG,
     Defendants.

9
10          Attorneys for the Defendants.
11
12
13
14
15
16
17

TOMBERLIN, YOUNG &
FOLMAR INSURANCE CO.
d/b/a
SOUTH CENTRAL AGENCY,
JOHN S. TOMBERLIN
and
HAROLD W. YOUNG
     Counterclaimants

v.

AUTO-OWNERS INSURANCE
COMPANY,
     Counterclaim Defendant

18
19
20
21
22
23
24  REPORTED BY:
25  TAMMY L. GARDNER
    CERTIFIED COURT REPORTER

Page 2

1        Deposition of JACK NICHOLSON, CPA,
2   taken at 500 Sun Valley Drive, Suite H-4, Roswell,
3   Georgia, 30076, on Monday, April 26, 2012,
4   beginning at 10:10 A.M. and concluding at 4:25
5   P.M.
6
7
8
9   APPEARANCES:
10
11
12       LAW OFFICES OF ALBER CRAFTON PSC
         (BY: Thomas Crafton, Esq.)
13       9300 Shelbyville Road
         Suite 1300
14       Louisville, Kentucky 40222
15
16
17          Attorneys for Auto-Owners
            Insurance Company
18
19
20       LAW OFFICES OF MORROW, ROMINE & PEARSON P.C.
         (BY: Roger S. Morrow, Esq.)
21       122 South Hull Street
         Montgomery, Alabama 36104
22
23
24          Attorneys for the Defendant
            (PRESENT BY TELEPHONE)
25

Page 4

1      E X A M I N A T I O N   I N D E X
2
3
4
5  MR. EDWARD M. WEED                    6
6  MR. THOMAS CRAFTON                  259
7
8
9
10       E X H I B I T   I N D E X
11
12
13  EXHIBIT 158                  11
14  EXHIBIT 159                  29
15  EXHIBIT 160                  31
16  EXHIBIT 161                  31
17  EXHIBIT 162                  40
18  EXHIBIT 163                  59
19  EXHIBIT 164                 109
20
21
22
23
24
25

**Jack Nicholson, CPA**

Page 257

1 CPA's involved who reviewed your work?
2   A.  Ms. McNulty.
3   Q.  Okay.
4       Once you formed your opinions and
5 conclusions, did you do any tests or any sort of
6 emperical analysis to determine is there a way we
7 could be wrong here?
8   MR. CRAFTON:
9       Objection.
10 EXAMINATION BY MR. WEED:
11   Q.  Play devil's advocate on yourself?  You
12 understand what I'm asking?
13   A.  I do understand what you're asking, and
14 I do that on a routine basis, m'mm, because I
15 don't want to hold out to you that -- I presume
16 the reason for your question is was I directed to
17 come up with a conclusion and support it, and that
18 was not the case here.  I formed my own opinion,
19 my own conclusion, and I do sit there and say
20 well, could I be wrong about this point or that
21 point.  It's part of the process.
22   Q.  So as you were putting your opinions
23 together over the course of November 1st through
24 March 7th or whenever this was prepared, you did
25 that on a continuous basis?

Page 258

1   A.  Yes, sir, on a continuous basis.
2   Q.  And there was no formal, at the end of
3 this challenge -- what's the word I'm looking
4 for -- validation session?
5   MR. CRAFTON:
6       Objection.
7   THE WITNESS:
8       No, sir.  M'mm, I mean, my resource
9       of bouncing ideas off of Ms. McNulty,
10       who's a CPA who's a little bit older
11       than I am --
12   MR. WEED:
13       M'mm-H'mm.
14   THE WITNESS:
15       -- m'mm, and we did engage in
16       that -- those type conversations, but
17       the conclusion I reached at the end is
18       the one you have in front of you.
19   MR. WEED:
20       Okay.
21 EXAMINATION BY MR. WEED:
22   Q.  And is -- that would be the limit of
23 measures, I guess, taken to ensure that your
24 findings were accurate with those discussions with
25 her?

Page 259

1   A.  Yes, sir, because, again, it's my
2 opinion that I'm writing, so that is my point of
3 reference.
4   Q.  Let me have one short break.  Very close
5 to getting done.
6       (A break is taken.)
7   MR. WEED:
8       Mr. Nicholson, at this time, I have
9       no further questions.  I thank you for
10       your time here today.
11   THE WITNESS:
12       Yes, sir.  Absolutely.
13   MR. CRAFTON:
14       I just have one thing.
15   THE WITNESS:
16       Yes, sir.
17   MR. CRAFTON:
18       And I apologize, Mr. Weed, if
19       you've already done this.
20 EXAMINATION BY MR. CRAFTON:
21   Q.  But I'm going to hand you, Mr.
22 Nicholson, Exhibit 158, and have you identify that
23 as your report that you submitted in this matter.
24   A.  Yes, sir, that's correct.
25   Q.  And is it fair to say that your

Page 260

1 qualifications for submitting that report are
2 contained within the report, itself?
3   A.  Yes, sir.  That's correct.
4   MR. CRAFTON:
5       That's all I have.  Thank you.
6   MR. WEED:
7       No follow-up on that.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Jack Nicholson, CPA**

1 Corporation?

2    A.  Yes, sir.

3    Q.  Okay.

4        With that last exhibit and a couple of

5 the others, was it your opinion as to was aware in

6 Scope 2 related to December 31st, 2006 financial

7 condition?

8    A.  Yes, sir.

9    Q.  As far as them being aware of it, don't

10 you have to assume that they actually read and

11 reviewed and understood that information in all

12 the exhibits you've just talked about?

13    MR. CRAFTON:

14       Object to form.

15    THE WITNESS:

16       Can you -- can you explain your

17       question?

18    MR. WEED:

19       Yeah.

20    THE WITNESS:

21       Because I'm not sure that we are

22       talking about the same thing.

23 EXAMINATION BY MR. WEED:

24    Q.  Scope 2 of your engagement says you're

25 to express an opinion as to whether S&S's

1 insurance agent, South Central Agency, was aware

2 of the financial condition, and I'm focusing on

3 the was aware part of that --

4    A.  Yes, sir.

5    Q.  -- particular task.

6    A.  Yes, sir.  Would you go to the --

7 because I deal with it in my report.  Would you go

8 to the last -- the first paragraph of the last

9 page on my report.

10    Q.  I would like an answer to my question.

11    A.  Yes, sir, and I'm going to give it to

12 you.

13    Q.  Is that in the report?

14    A.  Yes, sir, it is.

15    Q.  Okay.  Okay.

16    A.  And it's the paragraph that starts

17 solvency is the ability to pay debts as they

18 become due.

19    Q.  Okay.

20    A.  And, so, the answer to your question is

21 that they knew that they were having solvency

22 problems.

23    Q.  How did they know?  And going back to my

24 question --

25    A.  Yes, sir.

1    Q.  -- doesn't your opinion in the scope

2 that you were tasked with, as far as the was aware

3 in Part 2, assume that the agents read and

4 reviewed and understood all of the information

5 you've just referred to?

6    MR. CRAFTON:

7       Objection to form.

8    THE WITNESS:

9       It does infer that they read and

10       understood all the exhibits that I just

11       cited to you.

12 EXAMINATION BY MR. WEED:

13    Q.  Have you -- and you've read the

14 depositions of the parties in this case, right?

15    A.  Yes, sir, I have.

16    Q.  And you read John Tomberlin's deposition

17 testimony that it was a monkey see, monkey do

18 situation.  He did not review financial statements

19 and merely sent them to Auto-Owners?

20    A.  Yes, sir.

21    MR. CRAFTON:

22       Objection.

23    THE WITNESS:

24       Finan --

25    MR. CRAFTON:

1       Hold on.

2    THE WITNESS:

3       I'm sorry.

4    MR. CRAFTON:

5       Objection to form.

6    THE WITNESS:

7       And I think, correct me if I'm

8       wrong, I think we are having a

9       miscommunication between each other.

10       Are you asking me did they look at a

11       12/31/2006 financial statement?  Is that

12       what you're asking me?

13    MR. WEED:

14       Not that particular thing.

15 EXAMINATION BY MR. WEED:

16    Q.  I'm asking your opinion, were they

17 aware?  Doesn't it assume that they read,

18 reviewed, and understood all the information just

19 referred to?

20    MR. CRAFTON:

21       Objection.

22    THE WITNESS:

23       I think it infers that they knew

24       they were having financial problems that

25       were --

**Jack Nicholson, CPA**

Page 93

1  MR. WEED:
2      But that's not my question.
3  THE WITNESS:
4      Okay. Then can you ask it again,
5  because I'm not trying to --
6  MR. WEED:
7      Yeah.
8  THE WITNESS:
9      Because I'm not trying to be
10     invasive --
11 MR. WEED:
12     I understand.
13 THE WITNESS:
14     -- with you.
15 EXAMINATION BY MR. WEED:
16 Q.  But as far as the scope of your report,
17 express an opinion as to whether S&S's insurance
18 agent, South Central Agency, was aware of the
19 financial condition, you rendered an opinion.
20 A.  Yes, sir.
21 Q.  And doesn't that opinion assume that
22 those agents read, reviewed, and understood all
23 the information you've just outlined in your
24 deposition?
25 MR. CRAFTON:

Page 94

1      Objection.
2  THE WITNESS:
3      I don't know if it -- all is the
4      appropriate word, but enough to know
5      that Michael Smith was insolvent at
6      12/31/2006.
7  MR. WEED:
8      Okay.
9  THE WITNESS:
10     He was not able to pay his bills.
11 EXAMINATION BY MR. WEED:
12 Q.  As far as the -- that's your opinion?
13 A.  Yes, sir.
14 Q.  It's your opinion that there were -- not
15 only that that was true, but these agents were
16 aware?
17 A.  Yes, sir. And the easiest -- the
18 easiest thing to look at is the fact that Michael
19 Smith couldn't pay his workmen's comp and general
20 liability premiums.
21 Q.  Okay.
22     I want to get into that in a minute, but
23 as far as was aware, you're assuming, and you've
24 testified, that there are several documents
25 attached as exhibits to your report --

Page 95

1  A.  Yes, sir.
2  Q.  -- that made the agents aware?
3  A.  Yes, sir.
4  Q.  Don't you agree that in order for the
5  agents to have been aware of each of those, they
6  would have had to review each of those?
7  MR. CRAFTON:
8      Objection.
9  THE WITNESS:
10     Each is not the -- they would had
11     to review some or -- one or some. I
12     don't know that each or all, and maybe
13     that's where we are getting hung up. I
14     don't know that each or all is the
15     appropriate adjective.
16 EXAMINATION BY MR. WEED:
17 Q.  Well, isn't your opinion in the scope of
18 your task based upon an assumption that they read
19 everything that was sent to them?
20 MR. CRAFTON:
21     Objection.
22 THE WITNESS:
23     So you're asking me that they --
24     and I'm trying to understand your
25     question -- you're asking me they -- did

Page 96

1      they receive information and not review
2      it? Not look at it? Is that --
3  MR. WEED:
4      Right.
5  THE WITNESS:
6      -- what you're asking? Well, I
7      don't know if they read it or didn't
8      look at it.
9  EXAMINATION BY MR. WEED:
10 Q.  You don't know, do you?
11 A.  No, sir.
12 Q.  Okay.
13     Your opinion, though, that they were
14 aware, is in Part 2, though, is based on
15 documents, though, isn't it?
16 A.  That were provided to them, yes, sir.
17 Q.  Okay.
18     In some cases did they generate -- and I
19 think John Tomberlin actually sent one of those
20 E-mails that we talked about, didn't he?
21 A.  Yes, sir.
22 Q.  So clearly he might have been aware of
23 that or that might have been his understanding of
24 that E-mail, but as far as documents generated by
25 third parties, your opinion is based on the

Page 97

1  assumption that they reviewed that information
2  sent by those third parties, right?
3      MR. CRAFTON:
4          Objection.
5      THE WITNESS:
6          That's part of it. We also have
7      deposition testimony, and I assume
8      you're not asking about dep -- you're
9      just asking about documents.
10     MR. WEED:
11         I'm asking were aware, where did
12     this awareness come from? How did you
13     determine their awareness of these
14     issues?
15     MR. CRAFTON:
16         Objection.
17     THE WITNESS:
18         From deposition testimony, as
19     well.
20     MR. WEED:
21         Okay.
22  EXAMINATION BY MR. WEED:
23     Q. Did you read John Tomberlin's deposition
24  where he said he did not review financial
25  information and merely forwarded?

Page 98

1      A. I have --
2      MR. CRAFTON:
3          Objection.
4      THE WITNESS:
5          -- read that.
6      EXAMINATION BY MR. WEED:
7      Q. Do you understand that for your
8  testimony as to his awareness of financial
9  information to be correct, that possibility could
10 not exist?
11     A. No, sir --
12     MR. CRAFTON:
13         Objection.
14     THE WITNESS:
15         -- I do not agree with that
16     statement.
17     MR. WEED:
18         Okay.
19  EXAMINATION BY MR. WEED:
20     Q. Well, if he never read the financial
21 information that you're saying made him aware of
22 something, how did he become aware of it?
23     A. If he went to the bank with Michael
24 Smith to get a million dollar line of credit, he
25 becomes aware that Michael Smith needs financing

Page 99

1  to pay his bills. If he went with Michael Smith
2  to the bank to get an irrevocable letter of
3  credit, he becomes aware that Michael Smith has
4  gone into debt for another million dollars. If
5  he's aware that the bank is going that the Dick
6  Corporation is going to draw on that million
7  dollar letter of credit, he's aware that there's
8  another million dollar liability being incurred.
9      Q. We are talking to December 31st, 2006,
10 and I think you're getting way into 2007. I want
11 to back --
12     A. We are getting into -- the line of
13 credit was not in 2007.
14     Q. Correct.
15     A. And the E-mail that he wrote telling Mr.
16 House that he had a $2,000,000.00 line of credit
17 in place was in 2006.
18     Q. That's correct.
19     A. So I think what I -- where I'm -- you
20 and I are at odds with each other, and I don't
21 mean it combative at odds --
22     Q. No.
23     A. -- but misunderstanding is to just say
24 well, he received financial information, but he
25 didn't look at it. It just sat on his desk or

Page 100

1  forwarded on, fine and good. Maybe that's the
2  case, I don't know, but I do know that he was
3  aware Michael Smith was having to borrow money and
4  was not able to pay his bills, so just to say
5  didn't review financial information, m'mm, is only
6  a half truth.
7      Q. When you say he was having to borrow
8  financial information -- m'mm, excuse me was
9  having to borrow money --
10     A. Yes, sir.
11     Q. -- there was an E-mail that referred to
12 a $2,000,000.00 line of credit as being set up.
13     A. Yes, sir.
14     Q. Was there a problem with that?
15     MR. CRAFTON:
16         Objection.
17  EXAMINATION BY MR. WEED:
18     Q. Well, don't businesses borrow money all
19 the time?
20     A. M'mm, businesses do borrow money all the
21 time, but you've represented to a surety in a set
22 of financial statements that June 30, 2006,
23 there's no $2,000,000.00 line of credit on that
24 June 30, 2006 financial statement. Subsequent to
25 June 30, 2006, and prior to December 31st, 2006,

Page 101

1  he's telling the surety wait a minute, here's
2  another $2,000,000.00 that we borrowed in the form
3  of a line of credit, so why would he -- why would
4  Mr. Smith go and set up a $2,000,000.00 line of
5  credit?
6      Q.  Did he set up a $2,000,000.00 line of
7  credit?
8      A.  No, sir.  It was only a million dollars.
9      Q.  Okay.
10         And how do you know that?
11     A.  How do I know it was only a million
12  dollars?
13     Q.  Right.
14     A.  Because I saw the document.
15     Q.  From where?
16     A.  From Peoples Bank.
17     Q.  And where was that located?
18     A.  I don't know.
19     MR. CRAFTON:
20         Objection.
21  EXAMINATION BY MR. WEED:
22     Q.  Is it something that was provided to you
23  by Auto-Owners?
24     A.  No, sir.  I think it was something that
25  was provided to me by Michael Smith.  I just don't

Page 102

1  remember, but --
2      Q.  You don't remember it being part of the
3  underwriting file that you reviewed or somebody in
4  your office reviewed in 2011?
5      A.  Well, I looked in the underwriting file
6  as recent as this morning, and I just can't
7  remember.  I remember a hundred thousand dollar
8  line of credit.  I just don't remember about the
9  million dollar line of credit.
10     Q.  Let's backup to this.  You just made a
11  statement that, m'mm -- several statements.  First
12  of all, that John Tomberlin took Michael Smith
13  over to the bank.
14         Do you know if that actually occurred?
15     A.  According to Michael Smith, that did.
16     Q.  John Tomberlin took him over?
17     A.  Yes, sir.  It's in Michael Smith's
18  deposition.
19     Q.  Okay.
20         And you're as sure of that as everything
21  else in your opinion?
22     MR. CRAFTON:
23         Objection.
24     THE WITNESS:
25         Well, that's my recollection as I

Page 103

1      sit here.
2      MR. WEED:
3          Okay.
4  EXAMINATION BY MR. WEED:
5      Q.  Well, let me ask you this, once they got
6  to the bank, what happened?
7      A.  Seems like Michael Smith represented
8  that the letter of credit -- you know, I get
9  confused with the letter of credit and line of
10  credit, because it's my understanding Mr.
11  Tomberlin was involved in both of them, but
12  Michael -- I think Michael Smith's recollection in
13  his deposition was that it already had been set
14  up, already had been taken care of.  He showed up
15  that morning and walked out with a million dollar
16  line of credit that day.
17     Q.  They didn't ask him any questions?
18     A.  Well, I don't know if they asked him any
19  questions.
20     Q.  Who was at this meeting?
21     A.  You know, I don't remember.  We'd have
22  to look at the deposition.
23     Q.  Well, you're saying that your -- the --
24  part of your testimony in this case about their
25  awareness of the financial condition is based on

Page 104

1  this meeting that you say occurred.
2          What took place in this meeting?
3      A.  You know, rather than sit here and try
4  to recollect, let's just go to the report and see
5  what it said.
6      Q.  Okay.
7      A.  And I think that's the easiest thing to
8  do, as opposed to --
9      Q.  If that will help you, sure.
10     THE WITNESS:
11         -- a memory test.  Sure.
12     MR. CRAFTON:
13         Can we take a break?
14     MR. WEED:
15         Sure.
16         (A break is taken.)
17  EXAMINATION BY MR. WEED:
18     Q.  Mr. Nicholson, you were looking to your
19  prior report to something in there that you think
20  would help you?
21     A.  Yes, sir.  If you look at Page 16,
22  please.
23     Q.  Okay.  M'mm-H'mm.
24     A.  This is the deposition of Michael
25  Smith.

**Jack Nicholson, CPA**

Page 105

1    Q.  Okay.

2    A.  The second paragraph.

3    Q.  M'mm-H'mm.

4        And that's what you're relying upon for

5    your understanding that they were aware?

6    A.  Yes, sir.

7    Q.  Okay.

8        And that's obviously an excerpt from Mr.

9    Smith's deposition, right?

10   A.  Yes, sir, that's correct.

11   Q.  But you did review the entire

12   deposition?

13   A.  Yes, sir.

14   Q.  Okay.

15       So your awareness from -- you say that

16   the awareness that John Tomberlin had of the

17   situation or Harold Young had of the situation,

18   for that matter, came from this meeting and this

19   need for the loan that you referenced in Page 16

20   of your report?

21   MR. CRAFTON:

22       Object to form.

23   MR. WEED:

24       Okay.

25   THE WITNESS:

Page 106

1        Would you ask the question again,

2        please?

3    EXAMINATION BY MR. WEED:

4    Q.  You're saying this awareness of the

5    financial condition came from the deposition

6    excerpts that you've referenced in your report on

7    Page 16?

8    MR. CRAFTON:

9        Objection.

10   THE WITNESS:

11       That was part of my opinion, yes,

12       sir.

13   MR. WEED:

14       Okay.

15   EXAMINATION BY MR. WEED:

16   Q.  And the other part is the exhibits that

17   you referred to earlier?

18   A.  Yes, sir.

19   Q.  And as far as those exhibits, just for

20   the record, someone would have to review each of

21   those exhibits in order to be aware of their

22   contents, is that right?

23   MR. CRAFTON:

24       Objection.

25   THE WITNESS:

Page 107

1        I would expect someone would have

2        to review those, yes, sir.

3    EXAMINATION BY MR. WEED:

4    Q.  In other words, if they never reviewed

5    the documents, they would not be aware of their

6    contents, is that right?

7    MR. CRAFTON:

8        Objection.

9    THE WITNESS:

10       Would you ask the question again,

11       please?

12   EXAMINATION BY MR. WEED:

13   Q.  If someone had not reviewed each of the

14   exhibits that you referred to earlier, as far as

15   information that formed an awareness in the minds

16   of the agents of the financial condition of

17   Michael Smith and his companies in December

18   2000 -- or December 2006, they would not be aware

19   of the contents of those particular documents?

20   MR. CRAFTON:

21       Objection.

22   THE WITNESS:

23       If they didn't look at them, didn't

24       review them, didn't open them, that's --

25       they would -- if they did not look at

Page 108

1        that document, would they not be aware

2        what was in it?

3    MR. WEED:

4        Correct.

5    THE WITNESS:

6        I understand your question.  Yes.

7    MR. WEED:

8        Okay.

9    MR. CRAFTON:

10       Object to the question.

11   EXAMINATION BY MR. WEED:

12   Q.  As far as the understanding, that was

13   another part of the question.  Do you have any

14   information that would indicate to you that, m'mm,

15   the agents had accounting backgrounds like you

16   do?

17   MR. CRAFTON:

18       Objection.

19   THE WITNESS:

20       I have no indication they have an

21       accounting background, no.

22   MR. WEED:

23       Okay.

24   THE WITNESS:

25       But I don't think it's that

**Jack Nicholson, CPA**                                                                            **28**

Page 109

1      simple. I mean, I got a guy that's not
2      paying his insurance premiums, and I
3      have to be an accountant to know that
4      he's having financial problems?
5      MR. WEED:
6          Okay.
7   EXAMINATION BY MR. WEED:
8      Q.  Well, let's flip to that page you seemed
9   to rely on and referred to earlier.
10     A.  Yes, sir.
11     Q.  Let's go ahead and mark it as an
12  exhibit. I think what I prefer to do is go to
13  the source data that you appear to use and mark
14  that as 164.
15     A.  Yes, sir.
16     MR. WEED:
17         And I do have an extra copy for
18     you, Tom.
19     MR. CRAFTON:
20         Okay.
21  EXAMINATION BY MR. WEED:
22     Q.  Take a look at 164.
23     A.  Yes, sir.
24     Q.  Let me know if you've seen that document
25  before.

Page 110

1      A.  (Witness peruses document.) I have.
2      Q.  Does part of that document form Exhibit
3   27 --
4      A.  Yes, sir.
5      Q.  -- of your report? Okay.
6          Let's start with Page 1, which is NPCI
7   10 thou -- or NPCI 8034.
8      A.  Yes, sir.
9      Q.  What is that?
10     A.  This appears to be a history, a payment
11  history, of insurance premiums for S&S
12  Construction Company to Auto-Owners.
13     Q.  Who is it prepared by?
14     A.  Since it's on Auto-Owners letterhead, I
15  presume it's Auto-Owners.
16     Q.  You see on this statement where it's
17  ever been sent to the agents? The defendants in
18  this case?
19     A.  No, sir, I don't see that this
20  particular document's been sent to the agents,
21  no.
22     Q.  Okay.
23         Where is Auto-Owners department that
24  generated this report located? Do you know?
25  Geographical?

Page 111

1      A.  I presume it's in Lansing, Michigan, but
2   I don't know the answer.
3      Q.  Have you ever been to their Lansing,
4   Michigan offices?
5      A.  I have not.
6      Q.  And where is Michael Smith's business
7   located?
8      A.  It's in Alabama.
9      Q.  What part of Alabama?
10     A.  I think it's Gulf Shores or Orange
11  Beach.
12     Q.  Would this have been something that was
13  sent to S&S Construction Company, 203A, W 13th
14  Street, Gulf Shores, Alabama, that we are looking
15  at?
16     A.  That would appear to be the case, yes.
17     Q.  Can you show me on this document where a
18  copy of it was ever sent to the agent?
19     A.  No, sir, I cannot.
20     Q.  Were you aware that this policy was
21  direct bill?
22     A.  I'm not aware of that.
23     Q.  Do you know what direct bill means?
24     A.  I presume direct means directly billed
25  to Michael Smith.

Page 112

1      Q.  By who?
2      A.  By Auto-Owners.
3      Q.  In other words, the agents were not
4   involved in the payment, were they?
5      MR. CRAFTON:
6          Objection.
7      THE WITNESS:
8          So what you're -- and I understand
9          the point that you're trying to make.
10         So you're telling me that if the policy
11         was cancelled, that the agent would not
12         know the policy was cancelled?
13     MR. WEED:
14         I'm not talking about --
15     THE WITNESS:
16         That's the bottom line to all this,
17         though.
18     MR. WEED:
19         No, I'm not talking about the
20         cancellation. I'm talking about the
21         direct bill.
22     THE WITNESS:
23         Yes, sir.
24  EXAMINATION BY MR. WEED:
25     Q.  Who sends the premium notices?

**Jack Nicholson, CPA**

Page 113

1    A.  I understand that, but --
2    Q.  Where are they sen --
3    A.  I'm sorry, I didn't mean to interrupt
4   you.  That was inappropriate.
5    Q.  Geographically, as far as the premium
6   notices, the past due notices, what city and state
7   do those originate in?
8    A.  I presume they originate in Lansing,
9   Michigan, but I don't know the answer.
10    Q.  From within the offices of Auto-Owners
11   Insurance Company?
12    A.  That's what I would presume --
13    Q.  Okay.
14    A.  -- but I don't know the answer.
15    Q.  Based on this statement that you've
16   relied upon for your report, is that Bond
17   Underwriting Department of Auto-Owners also
18   located in Lansing, Michigan?
19    A.  I presume that they are.
20    Q.  Would they be located, in fact, within
21   the same building within Auto-Owners?
22    A.  I don't know.
23    Q.  But the same city?  Lansing, Michigan?
24    A.  I presume that's the case.
25    Q.  Okay.

Page 114

1        In this information that was sent from
2   Lansing, Michigan to Gulf Shores, Alabama, you're
3   saying should have been communicated from
4   Andalusia, Alabama, where the agents are located,
5   back to Lansing, Michigan, and the Bond
6   Underwriting Department?  Is that what you're
7   saying?
8    MR. CRAFTON:
9        Object to form.
10    THE WITNESS:
11        No, sir, that's not what I'm
12     saying.
13   EXAMINATION BY MR. CRAFTON:
14    Q.  Well, help me out, then.
15    A.  The point that I'm trying to make with
16   this document is they do not believe that the
17   agents did not know that the policy was cancelled
18   by Auto-Owners.
19    Q.  When was it cancelled?
20    A.  Well, the first one I see is 12/1/06.
21   Let me make sure I haven't missed one.  I don't
22   think I've missed one.  I think the first one I
23   see is on Page 2 at the very top.
24    Q.  Okay.
25    A.  At 12/1/06.

Page 115

1    Q.  M'mm-H'mm.
2    A.  And the point that I was trying to make
3   with this exhibit is they don't understand how the
4   agent could not have known that the insurance
5   policy was being cancelled.
6    Q.  Because you think it's important for the
7   agent to know that?
8    A.  Yes, sir, I do.
9    Q.  Okay.
10        So you think they would have sent some
11   sort of information?
12    A.  Yes, sir, I do.
13    Q.  But that's not in here, is it?
14    A.  No, sir, I don't have that document.
15    Q.  So you're inferring or speculating that
16   Auto-Owners actually sent something to the agent,
17   and we don't have that in front of us, do we?
18    A.  No, sir, we don't have that document.
19    Q.  And you did not rely on any type
20   information like that, other than speculation, to
21   form your opinion that they're aware of this?
22    MR. CRAFTON:
23        Objection.
24    THE WITNESS:
25        Well, it's my experience that the

Page 116

1        agent is aware when a policy gets
2        cancelled.
3    MR. WEED:
4        Okay.
5   EXAMINATION BY MR. WEED:
6    Q.  And what's that based on?
7    A.  That's based on, if nothing else, from
8   the prior expert work that I did with the Shaw
9   case.  I know that the agent receives notification
10   of cancellation of policies.
11    Q.  Okay.
12        And that was -- you mentioned Shaw was a
13   pretty large broker?
14    A.  Yes, sir.
15    Q.  What was the size of this agency?
16    A.  I don't know.
17    Q.  And, m'mm, it's pretty common, though,
18   for insurance to get their policies cancelled for
19   nonpayment, isn't it?
20    MR. CRAFTON:
21        Objection.
22    THE WITNESS:
23        I don't think it's pretty common,
24     no, sir.
25   EXAMINATION BY MR. WEED:

**Jack Nicholson, CPA**

Page 117

1    Q. It happens sometimes, doesn't it?
2    MR. CRAFTON:
3        Objection.
4    THE WITNESS:
5        Well, I mean, foreclosures and
6    repossessions happen, but I don't think
7    it's common.
8    EXAMINATION BY MR. WEED:
9    Q. Looks like it was cancelled on December
10   1st, 2006, is that right?
11   A. That's correct.
12   Q. And then when was it reinstated?
13   A. Says rewrite policy 12/7/2006.
14   Q. So within a week after it was cancelled,
15   it was rewritten?
16   A. That's correct.
17   Q. And, again, you're relying on this
18   document, copy of which it never appears to exist,
19   was sent to the agent?
20   MR. CRAFTON:
21       Objection.
22   THE WITNESS:
23       This document does not have any
24   indication it was sent to the agent.
25   MR. WEED:

Page 118

1        Okay.
2    EXAMINATION BY MR. WEED:
3    Q. And as far as the next cancellation,
4    when was that?
5    A. 9/4/2007.
6    Q. So would have been --
7    A. Yours looks different than mine.
8    Q. -- nine months, and after the, m'mm --
9    A. No. Something's not right. Just a
10   second.
11   Q. I'm looking at NPCI 8035.
12   A. But your document is different than
13   mine. The one that's in my report.
14   Q. Yep.
15   A. Where did this -- where did you -- where
16   did this 8034 come from?
17   Q. Your attorney produced it in response
18   for my Request for Production.
19   A. This is a completely different document
20   than the exhibit to my report. The address is
21   different. M'mm, it's a completely -- it's not
22   the same document.
23   Q. Okay.
24       So you did not rely upon NPCI 8034 and
25   NPCI 8035 at all?

Page 119

1    MR. CRAFTON:
2        Objection.
3    THE WITNESS:
4        The document I relied upon is
5    the one that's Exhibit 27 attached to my
6    report.
7    EXAMINATION BY MR. WEED:
8    Q. I'm going to ask you to look at NPCI
9    1008038 attached to Exhibit 164.
10   A. (Witness complies.) Yes, sir.
11   Q. Does that appear to be the same
12   document?
13   A. That appears to be the same document.
14   Q. Okay.
15       As far as the document appearing on the
16   first page in Exhibit 27 to your report --
17   A. Yes, sir.
18   Q. -- NPCI 1008038, is part of Exhibit 164,
19   when does it indicate to you that the policy for
20   Michael Smith's company was cancelled?
21   A. 12/1/2006.
22   Q. And when was it reinstated?
23   A. Unless you just see it, I don't see a
24   reinstatement. I see a payment at 12/12/2006.
25   Q. M'mm-H'mm.

Page 120

1    A. So I -- I would infer from that that if
2    they accepted a payment at 12/12, it must have
3    been reinstated.
4    Q. In fact, payments continued, m'mm,
5    through the end of 2000 -- or up to at least
6    October of 2007, correct?
7    A. Yes, sir, but I also see, m'mm, NSF fee
8    charge in March of 2007. I see a cancellation
9    invoice fee in March of 2007. See a cancellation
10   invoice sent in April of 2007. So I don't think
11   it's as simple as you first stated. I mean, it's
12   just -- it's filled with cancellations all through
13   the page.
14   Q. Sure.
15       While there are those entries, payments
16   were made, though, as late as October of 2007, is
17   the point I was trying to make, is that right?
18   A. Yes, sir, and I -- and I -- but I don't
19   think -- I just want to make sure you also see
20   that there's -- I see at least half a dozen
21   cancellations.
22   Q. In 2007?
23   A. But they started in December 1st of
24   2006.
25   Q. Okay.

**Jack Nicholson, CPA**

Page 253

1    Q.   Either one that is owned either by an
2  industry group or a group of corporations or some
3  sort of industry or trade association that's been
4  formed for the purpose of putting together an
5  insurance company they intend to run and operate.
6    A.   Oh, no, sir, and the reason I'm asking
7  the question is because I've done work for
8  insurance companies that have been taken over
9  by -- in receivership or by various other, but,
10  no, sir, not -- not like you're describing.
11    Q.   And that's what I meant.  The way I
12  described it, that term may have been used in
13  connection with some of those other entities, and
14  I don't mean an offshore entity or anything like
15  that.
16      But while we are on the subject, have
17  you ever worked with any offshore insurers?
18    A.   M'mm, there was one company called Nobel
19  that was -- I think they had offices in Dallas or
20  Denver, but I think they were actually an
21  offshore.
22    Q.   Where were they headquartered?  Do you
23  remember?
24    A.   I think they were in the Caymen
25  Islands.  I think that's correct.

Page 254

1    Q.   Have you ever been registered or
2  licensed with any professional or governmental
3  license within the State of Alabama?
4    A.   No, sir.
5    Q.   In forming your opinions, have you
6  consulted with any insurance agent licensed within
7  the State of Alabama or Florida?
8    A.   No, sir.
9    Q.   Have you run your opinions by any
10  insurance agent?
11    A.   No, sir.
12    Q.   Aside from this case, have you ever
13  consulted any insurance agent licensed in the
14  State of Alabama or Florida on any case?
15    A.   I can't think of one, so I think a fair
16  answer is no, sir.
17    Q.   Okay.
18      Have you ever taken any insurance
19  education courses, INS, things like that?  Does
20  that ring a bell?
21    A.   No, sir, m'mm, and I -- I don't think
22  it's -- I don't think it's the same thing you're
23  asking, but, you know, CPA's, we have to take 40
24  hours a year of continuing education --
25    Q.   M'mm-H'mm.

Page 255

1    A.   -- so we may have some course work
2  regarding or related to insurance, but I don't
3  think that's what you're asking.
4    Q.   Insurance industry sponsored courses.
5    A.   Well, then, in that case, yeah, there's
6  some miscellaneous courses that I know I've taken
7  in the past that were offered by or administered
8  by carrier.
9    Q.   Seminar or courses?
10    A.   Oh, a seminar would be a better
11  terminology.
12    Q.   Okay.
13    A.   It's a one day --
14    Q.   Three- or four-day event?
15    A.   One-day event or three- or four-day
16  event; but, no, not a CPU exam or something like
17  that or whatever they call those certifications.
18    Q.   Have you ever attended any insurance
19  agent convention?
20    A.   No, sir.
21    Q.   And I think I've asked you this already,
22  but have you ever -- I think I asked you about
23  authorship or publications.  You've not published
24  anything?
25    A.   No, sir.  We had that one terminology

Page 256

1  thing, but it was purely simple.
2    Q.   Right.
3    A.   You know, what's the definition of a
4  change order, what's the definition of midtab, or
5  something similar --
6    Q.   Where did that appear?
7    A.   Gosh, it's some -- it was some ABA
8  publication, but I just -- it was so
9  insignificant, or at least it seemed insignificant
10  to me, I didn't --
11    Q.   Did you consult any formal insurance
12  agency standards that are printed anywhere or
13  collected anywhere on the internet in forming your
14  opinion?
15    A.   No, sir.
16    Q.   As far as control and reliability
17  measures, did you consult with anybody within your
18  profession to determine the accuracy of your
19  opinions and findings and conclusions in this
20  case?
21    A.   Outside of my own group?  Myself and the
22  people working for me?
23    Q.   Yeah.
24    A.   Is that what you're ask -- no, sir.
25    Q.   Within your own group, were there other

**Jack Nicholson, CPA**

Page 17

1 office buildings or houses --
2    A. Oh, no, sir. It would be office
3 buildings similar to these. The ones we are in
4 today.
5    Q. Okay.
6       Which is a what? Less than 10,000
7 square foot office building?
8    A. Yes, sir, but we would do a series of
9 them. But no highrise construction or no bridges
10 and nothing, m'mm -- no large commercial
11 projects.
12    Q. Okay.
13       How much time was in the field versus in
14 the office?
15    A. M'mm, for -- gosh, for ten years that's
16 probably all we did, because I was a kid in high
17 school and a kid going to college, and then as I
18 got further along in college, transitioned from
19 working in the field to working in the office.
20    Q. Okay.
21       But your -- just so I'm clear, your
22 experience indicates '78 to '81, a three-year
23 period.
24    A. Yes, sir.
25    Q. So you worked like summer jobs and after

Page 18

1 school out in the field?
2    A. Yes, sir.
3    Q. When you were -- this 1978 to 1981
4 period, was that in the office, primarily?
5    A. Yes, sir.
6    Q. Okay.
7       As the, m'mm -- as a member -- well, I
8 guess, first of all, let me ask you, you are a
9 member in the AICPA, is that correct?
10    A. Yes, sir, I am.
11    Q. And what does that stand for?
12    A. American Institute of Certified Public
13 Accountants.
14    Q. Okay.
15       And are there any other professional
16 organizations that you're a member of?
17    A. M'mm, I have what they call an Associate
18 Membership in the American Bar Association, and
19 I'm also a member of the Georgia Society of
20 Certified Public Accountants.
21    Q. Do each of those or any of those publish
22 standards that govern your profession?
23    A. Yes, sir.
24    Q. Which ones?
25    A. The AICPA publishes standards. M'mm,

Page 19

1 the Georgia Certified Public Accountants has
2 standards. M'mm, I presume the American Bar
3 Association has standards, but I honestly don't
4 think they govern accountants, and then the State
5 of Georgia, through their licensing program, has
6 standards, as well.
7    Q. Okay.
8       M'mm, the standards under AICPA, could
9 you summarize those for the jury, please?
10    A. I truly don't know what they are. I've
11 been a member --
12    Q. Okay.
13    A. -- for so long, I don't -- I don't know
14 what the -- I know we can go on the website and --
15    Q. Sure.
16    A. -- print them off, but --
17    Q. There are numerous standards, I guess
18 would be a short way of saying it?
19    A. Yes, sir. That's a fair statement.
20    Q. And, for example, in a audit letter or
21 whatever, as you phrase it, there used to be, I'm
22 not sure it is anymore, generally accepted
23 accounting principles, GAP.
24    A. Yes, sir.
25    Q. Is that the standard?

Page 20

1    A. I'm familiar with those.
2    Q. FASFA, I think. Financial Accounting
3 Standards Forum.
4    A. Financial Accounting Standards Forum.
5 Yes, sir.
6    Q. And, then, m'mm, there's SOAS I've also
7 heard of. Is that a --
8    A. Statements on Auditing Standards --
9    Q. All right.
10    A. -- yes, sir. There's a whole
11 convolution of standards.
12    Q. M'mm, have you ever held any licenses
13 besides an accounting license?
14    A. No, sir.
15    Q. Have you ever been subjected to
16 disciplinary action by the County Board?
17    A. No, sir.
18    Q. Ever been arrested?
19    A. No, sir.
20    Q. Ever declared bankruptcy?
21    A. Oh, no, sir.
22    Q. Ever been a party in litigation?
23    A. Yes, sir.
24    Q. When was that?
25    A. M'mm, I think over the years we have had

Page 241

1    Q.  You think the industry changed much
2   between 2001 and 2011 --
3       MR. CRAFTON:
4           Objection.
5       MR. WEED:
6           -- 2012?
7       MR. CRAFTON:
8           Objection.
9       THE WITNESS:
10           I have no reason to think it has,
11      but I can't definitively sit here and
12      tell you yes or no.
13  EXAMINATION BY MR. WEED:
14      Q.  Have we covered all your experience,
15  m'mm, that would be relevant to the opinions that
16  you want to render in this case?
17      A.  What was the first part of your
18  question?
19      Q.  Have we covered all of your experience
20  that would be relevant to the opinions you intend
21  to render in this case?
22      A.  Yes, sir.
23      Q.  And what I'm looking for here, and it's
24  just a catch-all question, so don't take this
25  the wrong way, sometimes I've had some witnesses

Page 242

1   come back as expert and say oh, well, I'm a
2   licensed pilot, too, and I flew over the
3   property.
4           Do you have any sort of hidden skill
5   that we have not delved into today, like scuba
6   diver, pilot, or hobby geologist, who's done some
7   sort of underground soil studies, that are going
8   to blow this case apart at trial?  Is there any
9   other type of license you have besides a CPA
10  license, a driver's license, for example?
11      A.  No, sir.  I understand what you're
12  saying.  No, sir.
13      Q.  Did you refer to any standards -- well,
14  let me strike that.
15          I note in your report, especially on
16  paragraphs -- on Pages 19 through 20, you
17  obviously referred to some AICPA publications and
18  to some professional publications regarding
19  construction contracting and surety bonds,
20  correct?
21      A.  Yes, sir.
22      Q.  Was there any particular standard within
23  your profession that you relied upon or used
24  extensively in forming your opinions here today?
25      A.  Well, I think all the convolution of

Page 243

1   standard that we talked about in the very
2   beginning, the AICPA, the FASB's, the SARS, the
3   SAS's, all those combined, particularly in regard
4   to the preparation of that balance sheet at
5   12/31/2006.  M'mm, I did follow the standards of
6   my profession.
7       Q.  Okay.
8           Is there one in particular you think of,
9   you know, and I'm not an accountant --
10      A.  Yes, sir.
11      Q.  -- so pulling this out of the air --
12      A.  Yes, sir.
13      Q.  -- FASB 4327 just nails this?
14      A.  I understand what you're asking, and I
15  think that's probably, m'mm, well, the most
16  confusing parts about accounting is there are some
17  financial statements that apply to small, specific
18  items, like the calculation of income taxes is the
19  latest greatest, but for the work that we have
20  done here, it's just a journal of accounting
21  principles combined.  There's no -- and you can go
22  through and say well, here's the standard for
23  analyzing accounts receivable, here's the standard
24  for the statement of cash, but they're a
25  combination of financial directives or principles

Page 244

1   that all accountants follow.
2       Q.  Okay.
3           And there's no one in particular that
4   absolutely forms the crux of your opinion, is what
5   I'm asking?
6       A.  No, sir.  It's general accepted
7   accounting principles.  The whole package of
8   them.
9       Q.  Okay.
10          Isn't it true that your general opinion
11  testimony is going to be that the defendants knew
12  or should have known of certain things?
13      A.  Yes, sir.
14      Q.  Is there any basis for your factual
15  knowledge -- well, strike that.  I think we have
16  covered this already.
17          Mr. Nicholson --
18      A.  Yes, sir.
19      Q.  -- early on we talked about Exhibit 160
20  and 161 --
21          (Off the record to take phone call.)
22  EXAMINATION BY MR. WEED:
23      Q.  Back on the record, and I appreciate you
24  giving me the opportunity to take a break there,
25  but subsequent to you rendering the reports that

Jack Nicholson, CPA

**63**

Page 249

1  payment do you see in that report prior to January
2  10th, 2007?
3      A.  We have one at December 1st, 2006.
4      Q.  M'mm-H'mm.
5      A.  And that's the only one I see before
6  January 10th, 2007 --
7      Q.  Okay.
8      A.  -- on that document.
9      Q.  Do you know if this is for the workers'
10  comp or general liability?
11      A.  It was my understanding that this was
12  for workers' comp.
13      Q.  Worker' comp based on payroll?
14      A.  Yes, sir, it is.  And I want to say that
15  my understanding is correct.  If you look at Page
16  2 of Exhibit 27 --
17      Q.  M'mm-H'mm.
18      A.  -- you see about at the top third of the
19  page, January 26, 2007 --
20      Q.  M'mm-H'mm.
21      A.  -- refers to an audit, so I'm assuming
22  that's a workmen's comp audit.
23      Q.  General liability get audited?
24      A.  M'mm, I don't know of any general
25  liability audits that I can think of.  Workmen's

Page 250

1  comp audit is fairly common.  Usually general
2  liability's based on the amount of work you're
3  doing and the type of work you're doing.
4      Q.  In your experience?
5      A.  Yes, sir.
6      Q.  Do any of your opinions require you to
7  conclude facts that are directly contrary to what
8  some of the witnesses have stated?
9      MR. CRAFTON:
10          Objection.
11      THE WITNESS:
12          In any case?
13  EXAMINATION BY MR. WEED:
14      Q.  Well, let me just ask you this, John
15  Tomberlin has said he did not review this
16  information.  Doesn't part of your opinion require
17  you to conclude that he did in fact review
18  information that was sent to him?
19      MR. CRAFTON:
20          Objection.
21      THE WITNESS:
22          I'm operating under the assumption
23      that information was sent to him, and he
24      reviewed it, yes.
25      MR. WEED:

Page 251

1          Okay.
2  EXAMINATION BY MR. WEED:
3      Q.  Have you considered the possibility that
4  he may not have reviewed it in forming your
5  opinions to come out with alternative hypothesis?
6      A.  No, sir.  I presume that if he's running
7  an insurance agency and filing -- submitting
8  applications, that he's looking at the information
9  he's providing to the surety.
10      Q.  You mention that he's submitting.  Have
11  you reviewed the contract that existed between
12  Auto-Owners and these particular agents?
13      A.  No, sir, I have not.
14      Q.  And as far as -- as far as just some
15  ground things, and this goes back to being a pilot
16  and stuff --
17      A.  Yes.
18      Q.  -- and don't assume I'm picking on you,
19  have you ever been a licensed general contractor
20  or subcontractor?
21      A.  I've never been a subcontractor.  My
22  father's companies, I can't remember if I carried
23  the license on some of those companies.  No, sir,
24  I think he carried all the licenses, so, no, I
25  can't sit here and tell you that I've been a

Page 252

1  licensed general contractor.
2      Q.  Back in the time your dad might have
3  held these licenses, were they required to sit for
4  a general contractor's license exam like they are
5  in several states?
6      A.  No, sir.
7      Q.  Would it have been a license that was
8  given to him based on experience and application
9  and payment of the fee, pretty much?
10      A.  Yes, sir.
11      Q.  Have you ever held any form of an
12  insurance license?
13      A.  No, sir.
14      Q.  Either as a controller for any kind of
15  risk management company or anything like that?
16      A.  No, sir.
17      Q.  Okay.
18          Have you ever done any work for a
19  captive insurer?
20      MR. CRAFTON:
21          Objection.
22      THE WITNESS:
23          Captive insurer, what would you
24      define that as?
25  EXAMINATION BY MR. WEED:

**Jack Nicholson, CPA**

Page 253

1    Q. Either one that is owned either by an
2  industry group or a group of corporations or some
3  sort of industry or trade association that's been
4  formed for the purpose of putting together an
5  insurance company they intend to run and operate.
6    A. Oh, no, sir, and the reason I'm asking
7  the question is because I've done work for
8  insurance companies that have been taken over
9  by -- in receivership or by various states, but,
10 no, sir, not -- not like you're describing.
11   Q. And that's what I meant. The way I
12 described it, that term may have been used in
13 connection with some of those other entities, and
14 I don't mean an offshore entity or anything like
15 that.
16      But while we are on the subject, have
17 you ever worked with any offshore insurers?
18   A. M'mm, there was one company called Nobel
19 that was -- I think they had offices in Dallas or
20 Denver, but I think they were actually an
21 offshore.
22   Q. Where were they headquartered? Do you
23 remember?
24   A. I think they were in the Caymen
25 Islands. I think that's correct.

Page 254

1    Q. Have you ever been registered or
2  licensed with any professional or governmental
3  license within the State of Alabama?
4    A. No, sir.
5    Q. In forming your opinions, have you
6  consulted with any insurance agent licensed within
7  the State of Alabama or Florida?
8    A. No, sir.
9    Q. Have you run your opinions by any
10 insurance agent?
11   A. No, sir.
12   Q. Aside from this case, have you ever
13 consulted any insurance agent licensed in the
14 State of Alabama or Florida on any case?
15   A. I can't think of one, so I think a fair
16 answer is no, sir.
17   Q. Okay.
18      Have you ever taken any insurance
19 education courses, INS, things like that? Does
20 that ring a bell?
21   A. No, sir, m'mm, and I -- I don't think
22 it's -- I don't think it's the same thing you're
23 asking, but, you know, CPA's, we have to take 40
24 hours a year of continuing education --
25   Q. M'mm-H'mm.

Page 255

1    A. -- so we may have some course work
2  regarding or related to insurance, but I don't
3  think that's what you're asking.
4    Q. Insurance industry sponsored courses.
5    A. Well, then, in that case, yeah, there's
6  some miscellaneous courses that I know I've taken
7  in the past that were offered by or administered
8  by carrier.
9    Q. Seminar or courses?
10   A. Oh, a seminar would be a better
11 terminology.
12   Q. Okay.
13   A. It's a one day --
14   Q. Three- or four-day event?
15   A. One-day event or three- or four-day
16 event; but, no, not a CPU exam or something like
17 that or whatever they call those certifications.
18   Q. Have you ever attended any insurance
19 agent convention?
20   A. No, sir.
21   Q. And I think I've asked you this already,
22 but have you ever -- I think I asked you about
23 authorship or publications. You've not published
24 anything?
25   A. No, sir. We had that one terminology

Page 256

1  thing, but it was purely simple.
2    Q. Right.
3    A. You know, what's the definition of a
4  change order, what's the definition of midtab, or
5  something similar --
6    Q. Where did that appear?
7    A. Gosh, it's some -- it was some ABA
8  publication, but I just -- it was so
9  insignificant, or at least it seemed insignificant
10 to me, I didn't --
11   Q. Did you consult any formal insurance
12 agency standards that are printed anywhere or
13 collected anywhere on the internet in forming your
14 opinion?
15   A. No, sir.
16   Q. As far as control and reliability
17 measures, did you consult with anybody within your
18 profession to determine the accuracy of your
19 opinions and findings and conclusions in this
20 case?
21   A. Outside of my own group? Myself and the
22 people working for me?
23   Q. Yeah.
24   A. Is that what you're ask -- no, sir.
25   Q. Within your own group, were there other

**Nicholson**

Atlanta
Oklahoma City
Toms River, NJ
Lafayette, LA

March 7, 2012

Mr. Thomas E. Crafton, Attorney at Law
Alber Crafton, PSC
Hurstbourne Place, Suite 1300
9300 Shelbyville Road
Louisville, Kentucky 40222

Re:   Auto-Owners Insurance Company, Plaintiff,
      vs. Tomberlin, Young & Folmar Insurance Company, d/b/a South Central
      Agency, et al., Defendants

      In the United States District Court for the Middle District of Alabama
      Northern Division Civil Action No. 2:11-CV-00468-WHA-SRW

### <u>Initial Expert Report</u>

Nicholson Professional Consulting, Inc. ("NPCI") was engaged on behalf of Auto-
Owners Insurance Company ("Auto-Owners").

We understand the underlying circumstances of our engagement relate to South
Central Agency presenting a package of documentation to Auto-Owners, for
procurement of payment and performance bonds for Subcontract No. 21084-152
on NAS Pensacola – Aviation Rescue Swimmers School, Physical Fitness
Center, and Visitors' Quarters in the amount of $1,200,000. (Copies of Auto-
Owners Performance Bond and the Labor & Material Payment Bond Number
404170 are included in the accompanying exhibits. Please see Exhibit #'s 1 and
2.)

Nicholson Professional Consulting, Inc.
500 Sun Valley Drive, Suite H-4
Roswell, Georgia 30076
(770) 645-1171
FAX: (770) 645-6963


**EXHIBIT**
_158_

300 Verot School Road, Suite 201
P.O. Box 82003
Lafayette, LA 70508
(337) 237-8751
FAX: (337) 237-8778

The scope of our engagement was centered on four general points:

1) Analyze from an accounting perspective, the financial condition of M & B Smith Construction Management, Inc. d/b/a S & S Construction ("S & S"), as of December 31, 2006.

2) Express an opinion as to whether S & S's insurance agent, South Central Agency, was aware of the financial condition of S & S as of December 31, 2006, but failed to provide that information to Auto-Owners.

3) Express an opinion as to subsequent events that had a material impact on the financial condition of S & S subsequent to December 31, 2006.

4) Express an opinion as to whether S & S's insurance agent, South Central Agency, was aware of subsequent events that had a material impact on the financial condition of S & S subsequent to December 31, 2006, but failed to report same to Auto-Owners.

As a result of our engagement, we have prepared the following report and related accompanying exhibits. Our report is structured to provide a Comparative Balance Sheet as of June 30, 2006 and December 31, 2006, provide evidence of material subsequent events, and whether or not any of this information was forwarded on to Auto-Owners by the South Central Agency. (A copy of the Comparative Balance Sheet is included in the accompanying exhibits. Please see Exhibit #3.)

Our report is submitted as a result of our engagement in this matter. The analyses we present in this report are based upon my personal knowledge, education, training, and experience, and upon the documents and information provided for my review by counsel for Auto-Owners.

## Qualifications / Information

In the accompanying exhibits to this report are the following documents related to my qualifications:

1. Professional Resume
   (A copy of this resume is included in the accompanying exhibits. Please see Exhibit #4.)

2. Work History
   (A copy of this work history is included in the accompanying exhibits.
   Please see Exhibit #5.)

3. Depositions, Testimony, Mediations, and Arbitrations in the past four years
   (A copy of the schedule of these cases is included in the accompanying
   exhibits. Please see Exhibit #6.)

I have not authored any publications in the last ten years.

Compensation for this initial report, and any additional services that may be
required of our firm, is $175 per hour for me, and in a range of $95 to $150 per
hour for other professional staff support time. NPCI bills for time and expenses
on a monthly basis. NPCI does not mark up expenses. All expenses are billed
at direct costs.

## Background

We understand S & S was subcontracted by Dick Corporation to perform work on
the NAS Pensacola project under four (4) separate subcontracts:

1) Subcontract No. 21084-106 – NAS Pensacola Visitors Quarters – Building
   A 040200 – Masonry – Subcontract amount including change orders -
   $2,382,302.48, dated May 15, 2006. (A copy of this subcontract is
   included in the accompanying exhibits. Please see Exhibit #7.)

2) Subcontract No. 21084-132 – NAS Pensacola Aviation Rescue Swimmers
   School, Physical Fitness Center, Visitors Quarters – Building B 040200 –
   Masonry – Subcontract amount including change orders - $2,085,179.48,
   dated May 15, 2006. (A copy of this subcontract is included in the
   accompanying exhibits. Please see Exhibit #8.)

3) Subcontract No. 21084-139 – NAS Pensacola – Aviation Rescue
   Swimmers School, Physical Fitness Center, Visitors' Quarters – 090005 –
   Drywall, ceilings and accessories – Subcontract amount including change
   orders - $3,570,924.18, dated December 11, 2006. (A copy of this
   subcontract is included in the accompanying exhibits. Please see Exhibit
   #9.)

4) Subcontract No. 21084-152 – NAS Pensacola – Aviation Rescue
   Swimmers School, Physical Fitness Center, Visitors' Quarters – 090005 –
   Drywall installation and finishing labor, ceilings and accessories –
   Subcontract amount including change orders - $1,364,558.00, dated
   December 11, 2006. (A copy of this subcontract is included in the
   accompanying exhibits. Please see Exhibit #10.)

We understand that of the aforementioned four (4) separate subcontracts, Subcontract No. 21084-152, was specifically secured by the Auto-Owners Performance Bond and the Labor & Material Payment Bond Number 404170. (Copies of these bonds are included in the accompanying exhibits. Please see Exhibit #'s 1 and 2.)

We further understand that initially, Mr. John S. Tomberlin of South Central Agency submitted an Application for Contract Bond dated June 6, 2006 to Mr. James House, Manager Home Office Bond Underwriting with Auto-Owners to procure payment and performance bonds on the NAS Masonry Subcontracts – Subcontract Nos. 21084-106 and 21084-132 (Exhibit #'s 3 and 4). Included as part of the South Central Agency application package was additional information used as the presentation of the financial condition of S & S. (A copy of the Application for Contract Bond and the documents we understood were part of that application are included in the accompanying exhibits. Please see Exhibit #11.)

The specific subcontracts for which the bond was originally requested were for masonry work for the Naval Air Station, Buildings A and B for the total subcontract price of $4,260,000. The subcontracts were effective May 15, 2006, prior to the date the application for bonds was submitted by the South Central Agency to Auto-Owners.

On June 14, 2006, Mr. James House corresponded with Mr. Tomberlin stating that the review of the information submitted had been completed, and Auto-Owners would not be able to set the applicant up for Bid, Payment and Performance Bonds, due to the size of their required projects. A copy of the letter from Mr. House to Mr. Tomberlin dated June 14, 2006 is included in the accompanying exhibits. Please see Exhibit #17.)

On July 13, 2006, Mr. James House corresponded with Mr. Tomberlin and specified additional information to be submitted in order to continue the pre-qualification process. The first item listed was a CPA – Review or Audit. (A copy of the letter from Mr. House to Mr. Tomberlin dated July 13, 2006 is included in the accompanying exhibits. Please see Exhibit #12.) The resulting submission included a Review Report completed on August 1, 2006, by Kim K. Enikeieff, CPA, on M & B Smith Construction Management, Inc. as of June 30, 2006. (A copy of the Reviewed Financial Report as of June 30, 2006 by Kim K. Enikeieff, CPA is included in the accompanying exhibits. Please see Exhibit #13.)

Auto-Owners subsequently declined bonding for these two subcontracts on November 29, 2006. (A copy of the email correspondence from Mr. James House to Mr. John Tomberlin dated November 29, 2006 is included in the accompanying exhibits. Please see Exhibit #14.) Mr. House referenced a conversation regarding "the inability of the contractor to get this job split into smaller contracts."

[4]

On December 14, 2006, Mr. Tomberlin emailed Mr. House citing a reduced new subcontract for $1.2 million, and requesting the issuance of a bond for this amount on a subcontract dated December 11, 2006 on the NAS Pensacola – Aviation Rescue Swimmer School, Physical Fitness Center, Visitors Quarters specifically for Drywall Installation and Finishing, Labor, Ceilings and Accessories - Drywall Subcontract No. 21084-152 (Exhibit #6). (A copy of the email correspondence from Mr. Tomberlin to Mr. House dated December 14, 2006 is included in the accompanying exhibits. Please see Exhibit #15.)

Auto-Owners subsequently issued performance and payment bonds on this subcontract. The actual Performance and Labor & Material Payment Bonds display the contract date as December 28, 2006. The bonds were signed and sealed on January 10, 2007. (Copies of the Performance and Labor & Material Payment Bonds are included in the accompanying exhibits. Please see Exhibit #'s 1 and 2.) A Bond Application dated January 10, 2007 detailing South Central Agency's executing of the bond by power of attorney was provided to us as part of the underwriting file of Auto-Owners. A copy of the Bond Application is included in the accompanying exhibits. Please see Exhibit #16.)

## Documents and Source Information

The documents and other information that were reviewed and considered in the formulation of my opinions are listed as follows:

1. All exhibits previously identified and included in the accompanying exhibits marked as Exhibit #'s 1 through 17.

2. M & B Smith Construction Management, Inc. d/b/a S & S Construction Schedule of Receipts Entries of Contact Revenue for the Period from January 1 through June 30, 2006 – excerpted from the general ledger of M & B Smith Construction Management, Inc. marked as Exhibit #18.

3. Copy of email from John Tomberlin of South Central Agency to Sue Sweezey with Auto-Owners dated June 13, 2006 marked as Exhibit #19.

4. Copy of letter from Peoples Bank dated July 10, 2006 and marked as Exhibit #20.

5. M & B Smith Construction Management, Inc. d/b/a S & S Construction Schedule of Cash as of December 31, 2006 marked as Exhibit #21.

6. M & B Smith Construction Management, Inc. d/b/a S & S Construction Schedule of Accounts Receivable as of December 31, 2006 marked as Exhibit #22.

7. M & B Smith Construction Management, Inc. 2006 U.S. Income Tax Return for an S Corporation marked as Exhibit #23.

8. M & B Smith Construction Management, Inc. d/b/a S & S Construction Schedule of Contracts in Progress as of December 31, 2006 marked as Exhibit #24.

9. M & B Smith Construction Management, Inc. d/b/a S & S Construction Schedule of Accounts Payable and Accrued Expenses as of December 31, 2006 marked as Exhibit #25.

10. Copy of The Peoples Bank of Coffee County Official Check No. 4486006736 dated August 15, 2006 in the amount of $400,000.00 marked as Exhibit #26.

11. Copy of Auto-Owners Statement of Account Activity from December 7, 2005 through February 13, 2008 marked as Exhibit #27.

12. Copy of Letter of Credit No. 364 in the amount of $1,000,000 dated February 13, 2007 issued by Peoples Bank marked as Exhibit #28.

13. "A CPA's Guide to Accounting, Auditing, and Tax for Construction Contractors," AICPA by Michael J. Ramos, CPA, New York, 2000.

13. *PPC's Guide to Construction Contractors – Volume 1,* by Douglas R. Carmichael, Ph.D., CPA, CFE, Everett A. Roberts, PE, and J. Clifford Griffith, MPA, CPA. Thomson Reuters, Twenty-third Edition, Fort Worth, Texas. (June 2011).

15. *Accounting Principles,* by Roger H. Hermanson, PhD, CPA, James Don Edwards, Ph.D., CPA, and R. F. Salmonson, Ph.D., CPA. Business Publications, Inc., Plano, Texas. 1983.

16. Deposition of Harold Young, November 8, 2011, relative to Civil Action No. 2:11-CV-00468-WHA-SRW.

17. Deposition of Michael Smith, December 13, 2011, relative to Civil Action No. 2:11-CV-004568-WHA-SRW.

18. Deposition of Thomas E. Froman, December 15, 2011, relative to Civil Action No. 2:11-CV-00468-WHA-SRW.

19. Deposition of James House, December 16, 2011, relative to Civil Action
    No. 2:11-CV-00468-WHA-SRW.

20. Deposition of John Tomberlin, February 6, 2012, relative to Civil Action
    No. 2:11-CV-00468-WHA-SRW.

21. Deposition of Michael Smith, July 22, 2009, Case No. 3:08cv00056-MCR-
    MD.

## Methodology

NPCI began its analysis by reviewing the Application for Contract Bond dated
June 6, 2006 and submitted by John S. Tomberlin of South Central Agency to
James House, Manager Home Office Bond Underwriting, with Auto-Owners
Insurance. This Application was used in presenting a bond underwriting package
by South Central Agency in procurement of payment and performance bonds for
the NAS Masonry subcontracts. (Please see Exhibit #11.) This document
provided us with a starting point as to the potential items of financial information
submitted to the bonding company.

Second, NPCI reviewed all bank and loan application documents relating to any
bank lending dated from the beginning of 2006 through 2008. NPCI specifically
analyzed all known documents relative to bank debt during 2006, and in
particular as of December 31, 2006.

Next, NPCI reviewed any documents which included financial information relating
to the financial condition of M & B Smith Construction Management, Inc. or S & S
Construction, LLC during 2006 and the first half of 2007. Included in these
documents was any known information or correspondence applicable to the
relationships between and among the principals of South Central Agency, M & B
Smith Construction Management, bank officers and employees, and individuals
with Auto-Owners.

NPCI then reviewed other various elements of the documentation provided to
determine if those documents offered support for my analysis and subsequent
opinions.

## Application for Contract Bond

Mr. James Edward House, in his deposition, delineated specific information not
disclosed by South Central Agency, which had it been disclosed to him, would
have resulted in a declination by Auto-Owners of writing the bond. Mr. House
was asked, "What information do you say that is now in your possession would
you -- would have led you to decline to issue the bonds as written?"

His response followed, "That the contractor, Michael Smith, did not have 20 years of construction experience, running construction firm or being in the management of that firm. That the job was larger in scope than what we assumed. That we were not bonding a specific job all by itself, that it would be connected to other work. I would need to review the file to – or the applications or the rest of the file information to specifically know what other areas might be in questions." (James Edward House deposition - page 26 - line 20 through page 27 - line 11.)

NPCI was specifically asked to determine if any of the financial information included on the Application for Contract Bond was mis-stated. We determined there are a number of items included on the Application for Contract Bond for which NPCI questions the accuracy. These items and NPCI's findings follow:

1. Question No. 13 – Page Two. List below the four most important projects you have completed in the past five years. One of the projects listed is detailed as follows:

    a. Contract Amount: $5 million
    b. When Completed: 6-06
    c. Name and Address of Owner, Architect, or Engineer: Gates Builders

    The records of S & S indicate that one contract was completed as of June 30, 2006 for Gates Builders. This contract was Sea Chase in Orange Beach, Alabama. In questioning the size of any project with Gates Builders, NPCI scheduled all Receipts Entries of Contract Revenue for 2006. We determined that no revenue from Gates Builders, or potentially from Gates Builders, was close to $5 million. (A copy of the Schedule of Receipts Entries of Contract Revenue 2006 is included in the accompanying exhibits. Please see Exhibit #18.)

2. Question No. 15 – Page Two. What is the greatest amount, in dollars, of work on hand that you have ever had at one time? Answer - $1.5 million.

    The answer to this question further disproves the contract amount shown for the Gates Builders contract in Question No. 13. It is not logical for the principal to have had a $5 million contract when the greatest amount of work on hand was $1.5 million.

3. Question No. 16 – Page Two. Give information below about all your Contract Work Under Way, or for which you are committed. One of the contracts is listed as follows:

    a. Contract Price: $500,000
    b. Location of Work: Gulf Shores, AL
    c. Expected Completion Date: 9-06
    d. Name and Address of Engineer or Architect: Gates Builders

We determined that no revenue from Gates Builders, or potentially from Gates Builders, was close to $5 million. (A copy of the Schedule of Receipts Entries of Contract Revenue 2006 is included in the accompanying exhibits. Please see Exhibit #18.)

4. Question No. 24 – Page Two. Date work is to be commenced. Answer: June 1-06. (Copies of Subcontract Agreement Nos. 21084-106 and 21084-132 are included in the accompanying exhibits. Please see Exhibit #'s 7 and 8.) These subcontracts were effective May 15, 2006 and work had already commenced as of June 1, 2006.

Clearly there are a number of false statements included on the Application for Contract Bond. As stated above, this application was again utilized as the application submitted by South Central Agency for the Drywall subcontract bonds issued by Auto-Owners on behalf of S & S in December 2006.

## Other Information included by South Central Agency in the Application for Contract Bonds on Masonry Subcontracts

As part of his effort to obtain the contract bonds with Auto-Owners, John S. Tomberlin with the South Central Agency sent an email on June 13, 2006 to Sue Sweezey with Auto-Owners, Underwriting, stating, "I will be sending you a fax pm Wednesday ... and a letter from their (S & S's) banker stating an additional $2,000,000 line of credit that is now available if needed to draw on for this job." (A copy of this email is included in the accompanying exhibits. Please see Exhibit #19.)

Records include two letters dated July 10, 2006, one on The Peoples Bank of Coffee County letterhead, and one on plain paper, addressed to James House, Senior Bond Underwriter with Auto-Owners, stating that S & S had been approved for a line of credit in the amount of $1,000,000. Mr. Tomberlin's expectations as stated in his email are short by $1,000,000. (A copy of the letter is included in the accompanying exhibits. Please see Exhibit #20.)

## Other Information subsequently submitted by South Central Agency in the Application for Contract Bonds on Masonry Subcontracts

The first set of financial information I reviewed was accompanying a fax cover sheet from South Central Agency to Sue Sweezey of Auto-Owners, dated June 12, 2006 (SCA - 0137). They are titled M & B Smith Construction Mgt., Inc., Profit and Loss, April 1 through June 12, 2006 (accrual basis), pages 1 and 2 (SCA – 0133 and SCA – 0136); S & S Construction, LLC, Profit and Loss, January through April 2006 (cash basis), pages 1 and 2 (SCA – 0134 and SCA – 0135); and a letter from Rita R. Byers, CPA, PC, addressed to Mr. John Tomberlin, with detail of accounts receivable information related to M & B Smith Construction Management, Inc. as of June 12, 2006.

These statements reflect M & B Smith Construction Mgt., Inc. had net income of approximately $162,000 for the 42 days ended June 12, 2006, and S & S Construction, LLC, had a net loss of approximately ($125,000) for the four months ended April 2006. But, we noticed notations on these statements reflecting items were improperly classified. And, in general, these statements appeared incomplete and improperly prepared. They did not appear to be reliable to me.

In a subsequent meeting with Ms. Byers in November of 2011 in her office, I asked her about these same statements and their validity. Ms. Byers explained to me that those statements were prepared by Mr. Smith's wife. Further, Ms. Byers explained that Mr. Smith's wife was the bookkeeper for the Smith entities and she had no formal expertise in accounting. I subsequently dismissed these financial statements in my further analysis.

The second set of financial information I reviewed was accompanying a fax cover sheet from Mr. Harold Young to Kelly Baxter at The Peoples Bank of Coffee County, dated June 22, 2006 (only 10 days later). They are titled M & B Smith Construction Mgt., Inc., Profit and Loss, January 1 through June 20, 2006 (accrual basis), page 1 (SCA – 0035), M & B Smith Construction Mgt., Inc., Balance Sheet, As of June 30, 2006, (accrual basis), page 1 (SCA – 0036), S & S Construction, LLC, Profit and Loss, January 1 through April 15, 2006, (cash basis), pages 1 and 2 (SCA – 0037 and SCA – 0038).

These statements reflect M & B Smith Construction Mgt., Inc. had a net loss of approximately ($150,000) for the period ended June 20, 2006 and a net equity of approximately $285,000 as of June 20, 2006. And, the Profit and Loss statement of S & S Construction, LLC, reflects net income for the period ended April 15, 2006, of approximately $461,000. At the same subsequent meeting with Ms. Byers in November of 2011 in her office, I asked her about these statements and their validity.

[10]

Ms. Byers did not respond as to who prepared these statements. But, she offered that she only prepared tax returns for the Smith entities, not financial statements. She said that once she learned the Smith entities required formal financial statements, she referred them on to Ms. Kim Enikeieff, CPA.

It appeared to me these statements were incomplete. As a result, I subsequently dismissed these financial statements in my further analysis as well.

I noticed in the next set of financial information I reviewed, which accompanied a fax cover sheet from Mr. John Tomberlin to Mr. James House, dated July 10, 2006, the same financial information was attached as discussed in the above paragraph. These statements reflect M & B Smith Construction Mgt., Inc. had a net loss of approximately ($150,000) for the period ended June 20, 2006 and a net equity of approximately $285,000 as of June 20, 2006. And, the Profit and Loss statement of S & S Construction, LLC, reflects net income for the period ended April 15, 2006, of approximately $461,000. I also noted on the fax cover sheet that Mr. Tomberlin asked Mr. House, "...please let me know the bonding limits that we could approve if these Profit and Loss Statements are justified with a reviewed financial statement by their CPA." As before, due to their incomplete presentation, I dismissed these financial statements in my further analysis.

I then reviewed a set of financial information accompanying a fax cover sheet from Ms. Kim Enikeieff, CPA, to Mr. Harold Young, dated August 1, 2006. These statements accompany a Review report prepared by Ms. Kim Enikeieff, CPA. These statements are presented for M & B Smith Construction Management, Inc., d/b/a S & S Construction (SCA – 0107 through SCA – 0116). These statements reflect a Stockholders' Equity of approximately $1.0 million as of June 30, 2006, and net income of approximately $1.0 million for the six months ended June 30, 2006.

NPCI has carefully analyzed this report, and based on information procured from the general ledger and the internal recordkeeping of S & S, found these statements to be accurate as of the report date.

## NPCI Compiled Balance Sheet as of December 31, 2006

Utilizing the same records of S & S, NPCI has found the financial condition of the principal as of December 31, 2006 is markedly different from the financial condition as portrayed in the CPA Reviewed Financial Report as of June 30, 2006. Despite this fact, the June 30, 2006 financial report was again used as part of the same bond application for a different bond requirement for the Drywall subcontract, Subcontract Agreement No. 21084-152.

[11]

NPCI has compiled a Comparative Balance Sheet as of June 30, 2006 and December 31, 2006. Balance Sheet accounts with significant balances and changes are detailed below:

1. Cash

   a. Balance June 30, 2006  $6,615
   b. Balance December 31, 2006  $446,052

By utilizing the bank statements for 2006 and the general ledger from M & B Smith Construction Management, Inc., NPCI compiled a Schedule of Cash detailing the December 2006 bank reconciliation for Vision Bank. NPCI also included a $200,000 certificate of deposit with The Peoples Bank which was pledged as collateral on the $1 million line of credit. It is important to note that the source of the funds for the $200,000 certificate of deposit, are proceeds from the $1 million line of credit. (The Schedule of Cash is included in the accompanying exhibits. Please see Exhibit #21.)

2. Contracts receivables

   a. Balance June 30, 2006  $851,894
   b. Balance December 31, 2006  $1,246,087

A Schedule of Accounts Receivable was compiled by NPCI using amounts billed on the NAS Subcontract Nos. 21084-106 and 21084-132, and receipts in early 2007 marked as Accounts Receivable on other projects. Retainage for the NAS subcontracts is included in the schedule. (The Schedule of Accounts Receivable is included in the accompanying exhibits. Please see Exhibit #22.)

3. Inventories

   a. Balance June 30, 2006  $290,476
   b. Balance December 31, 2006  $-0-

According to the 2006 Income Tax Return for M & B Smith Construction Management, Inc., Inventory is $-0-. (A copy of U.S. Income Tax Return for an S Corporation, Form 1120S for 2006 is included in the accompanying exhibits. Please see Exhibit #23.)

4. Costs and estimated earnings in excess of billings on uncompleted contracts, and Billings in excess of cost and estimated earnings on contracts in progress

   a. Balances June 30, 2006  $6,532 and $-0- respectively
   b. Balances December 31, 2006  $3,605 and $1,719,333 respectively

A Schedule of Contracts in Progress as of December 31, 2006 was compiled by NPCI utilizing analyses of revenue and costs excerpted from the bank statements and the general ledger for 2006.  (The Schedule of Contracts in Progress is included in the accompanying exhibits.  Please see Exhibit #24.)

5. Other assets

   a. Balance June 30, 2006  $161,035
   b. Balance December 31, 2006  $-0-

. Through analysis of the cash receipts for 2006, NPCI noted M & B Smith Construction Management, Inc. sold a rental property unit it refurbished for resale in 2006.

6. Accounts payable and accrued expenses

   a. Balance June 30, 2006  $74,879
   b. Balance December 31, 2006  $472,125

NPCI analyzed disbursements in compiling the Schedule of Accounts Payable and Accrued Expenses as of December 31, 2006.  The schedule includes all expenses incurred in 2006 and not paid as of December 31, 2006.  (The Schedule of Accounts Payable and Accrued Expenses is included in the accompanying exhibits.  Please see Exhibit #25.)

7. Current portion of long term debt and Long term debt, net of current maturities

   c. Balances June 30, 2006  $7,775 and $256,491 respectively
   d. Balances December 31, 2006  $1,102,500 and $239,000 respectively

NPCI has reviewed all bank lending documents available and has found the following two debt lines:

1.) Unknown line as shown in June 30, 2006 CPA Review – $253,005.00. No documentation. Monthly installments through September 2006 of $1,666.00 including interest at 6.875%. Secured by real estate. This line of credit appears to have been negotiated with Vision Bank. Since there is a check written on June 16, 2006 for $2,125.16 to Vision Bank showing an entry in memo line – Loan #82864.

2.) The Peoples Bank Line of Credit - $1,000,000.00. The only documents available were two letters dated July 10, 2006, one on bank letterhead, and one on plain paper, addressed to James House, Senior Bond Underwriter with Auto-Owners stating that M & B Smith Construction Management Inc., Michael Smith, d/b/a S & S Construction had been approved for this line of credit. Collateral is unknown, but M & B Smith transferred $200,000 for a CD on August 15, 2006. The Memo description was: CD to secure loan. Known draws were:

|       |             |          |
|-------|-------------|----------|
| i.    | $400,000.00 | 08/15/06 |
| ii.   | $100,000.00 | 09/05/06 |
| iii.  | $100,000.00 | 09/06/06 |
| iv.   | $100,000.00 | 10/26/06 |
| v.    | $100,000.00 | 11/06/06 |
| vi.   | $ 50,000.00 | 11/13/06 |
| vii.  | $ 50,000.00 | 11/21/06 |
| viii. | $ 50,000.00 | 11/23/06 |
| ix.   | $ 50,000.00 | 11/28/06 |

No payments appear to have been made on this loan during 2006. (A copy of The Peoples Bank of Coffee County Official Check No. 4486006736 dated August 15, 2006 for the first draw on the line of credit, and a copy of the letter addressed to Auto-Owners regarding this line of credit are included in the accompanying exhibits. Please see Exhibit #'s 20 and 26.)

The Comparative Balance Sheet of S & S as of June 30, 2006 and December 31, 2006 is thus prepared and submitted. (It is presented and included in the accompanying exhibits. Please see Exhibit #3.)

We have determined the major differences between the accounting for and presentation of the financial condition of S & S as of June 30, 2006 and December 31, 2006 are as follows: an increase of approximately $400,000 in Assets, an increase in Liabilities of approximately $3.2 million, and a resulting decrease in Stockholders' Equity from an approximate $1 million positive equity to an approximate $1.8 million negative equity, a net decrease of $2.8 million.

This and other analyses we present in this report are based upon my personal knowledge, education, training, and experience, and upon the documents and information provided for my review by counsel for Auto-Owners.

## Other Related Facts

There are a number of times prior to the inception of the bonds or shortly after the inception of the bonds issued by Auto-Owners on behalf of S & S on the Drywall subcontract, where the agent knew of the strained financial condition of its client, S & S. Specific facts which relate to these circumstances are:

1. On August 15, 2006, shortly after the $1,000,000 line of credit was approved by The Peoples Bank, S & S drew $400,000 for cash flow. (A copy of the Official Check No. 4486006736 for the Loan Draw is included in the accompanying exhibits. Please see Exhibit #26.) The application for that line of credit was submitted by John Tomberlin of South Central Agency to Kelly Baxter with The Peoples Bank. According to Michael Smith in his deposition of July 22, 2009 on page 58 of Volume II, S & S had to have "money for the Workmen's Comp and general liability". The insurance agent was aware of cash flow issues arising out of non-payment of premiums due. Prior to the inception of the bonds on the Drywall subcontract, the entire $1,000,000 line of credit with The Peoples Bank had been drawn. The last draw occurred on November 28, 2006. (See Draws Listed and included in Item No. 7, 2) above under NPCI Compiled Balance Sheet.)

In the deposition of James Edward House dated December 16, 2011, Mr. House was asked, "And the other information is the financial statements submitted to the bank?" His answer followed: "Yes, sir." Question: "What else?" Answer: "The fact that the work was in progress, the bills were not being paid. They were at least in default stage if not technically in default. That the line of credit that we were referring to in the original application had not actually been applied for until later and then was immediately used up. That the agent was aware of these things and many other things that would have caused us to question this submission." (James Edward House deposition - page 114 - lines 2 through15.)

Further in Mr. House's deposition, the following was asked, "Okay. And I don't see anything on here about the 1 million dollar debt resulting from the original bank line that had already been exhausted, do you see that anywhere?" Mr. House answered, "No, sir." Question: "Did Mr. Tomberlin not mention that to you during your phone conversation?" Answer: "No sir, he did not." Question: "Amount of line being used, and you have inserted none and why did you insert none?" Answer: "Because Mr. Tomberlin told me that none was in use at that time." Question: "Okay. Were you aware as of the time you filled out this document on December 18, 2006 that S&S was having cash flow problems?" Answer: "No, sir." Question "Were you aware that S&S was applying for a letter of credit in favor of Dick Corporation with the Peoples Bank?" Answer: "No, sir." (James Edward House deposition - page 282 – lines 1 through 23.)

Mr. Michael Smith, in his deposition of December 13, 2011, was asked, "And what did you tell John ?" (Tomberlin). Mr. Smith answered, "I just told him that we was having – you know, it was pretty tight and I was needing some more money. And he told me about Kelly that had – you know, we could get a line of credit. And they asked me if I had a line of credit, and I said the only one I had was with Visions Bank." Further questioned, "As of about August the 1st, '06, is it fair to say that without a cash infusion, you would not be able to continue working on the project?" Answer: "Yeah, That would be – be safe to say." Question: "Fair to say you were broke?" Answer: "Yeah." Question: "And you communicated that to Mr. Tomberlin?" Answer: "Yes." Question: "Now, who introduced you to Mr. Baxter at the bank?" Answer: "Mr. Harold Young introduced me to him." Question: "And did you attend a meeting with him and Tomberlin or –" Answer: "The day that we – John had set up the meeting, and John was – had to go somewhere else. I don't know. He had some other appointments that he had. So Mr. Harold took me to the bank over in Coffee County, the Peoples Bank of Coffee County at that time." Question: "And he introduced you to Mr. Baxter?" Answer: "Uh-huh" (positive response.): Question: "And that day that you were there, did you apply for a line of credit?" Answer: "We'd already filled out all the paperwork, and it was already – we had talked before then, but that was the day that I met him. And we signed the paperwork that day and got the – got the line of credit that day." Question: "Okay. After you received the approval on the line of credit, did you get – take a drawdown that day?" Answer: "Yes, we did." Question: "And that amount was $400,000?" Answer: "That's correct." Question: "And that was dated on or about August 15,'06?" Answer: "Yeah, I would say." Question "Can you tell me what you did with that check?" Answer: "Just paid the bills with it, yeah." (Michael Smith deposition - page 61- line 2 through page 63 - line 7.)

[16]

It is apparent Mr. Tomberlin had knowledge of the information Mr. House expected. Mr. Tomberlin was involved in the procurement of a line of credit at Peoples Bank for his client. Mr. Tomberlin knew S & S was late in paying their insurance premiums for Workmen's Comp and general liability. And we know the $1 million line of credit was fully drawn as of November 28, 2006, only three months after its inception. Yet, we see no evidence where Mr. Tomberlin disclosed any of this information to Mr. House.

2. On March 27, 2007, S & S issued payment which was not supported by sufficient funds for its commercial insurance coverages. Shortly after that date on April 2, 2007, insurance coverages were cancelled for non-payment of premium. Coverage was reinstated on April 11, 2007. The insurance agent was obviously aware of these events, and, accordingly, was aware of a critical cash-flow financial issue shortly after the inception of the bonds on the Drywall subcontract. (A copy of the Itemized Statement from Auto-Owners for the period from December 7, 2005 through February 13, 2008 is included in the accompanying exhibits. Please see Exhibit # 27.)

3. Mr. James House, in his deposition dated December 16, 2011, was asked, "So the only reporting requirements following the issuance of the bond then would be upon the obligee to complete the General Status Inquiry?" He responded, "No, sir. No, sir. If our agent, who is our local representative, had any information that would lead us to believe that there were issues with the work, we would ask them – not necessarily ask them, we would expect them to inform us that there are difficulties with the work." Further, Mr. House was asked, "I understand you might expect that, but where did you communicate that to the agents?" His response: "Don't communicate that." Question: "You don't communicate that?" Answer: "No. sir. We expect that as a rule of common sense." (James Edward House deposition - page 45 - lines 1 through19.)

I agree with Mr. House. "A surety's relationship with a contractor does not end upon the issuance of surety bond;... The relationship should be one of continuous communication..."[1]

NPCI has found no supporting documentation which shows that South Central Agency informed Auto-Owners when the owner of the NAS Subcontracts, Dick Corporation, began paying costs on behalf of S & S in April 2007. Nor have we found any information where Auto-Owners was informed that S & S was having difficulty cash-flowing the projects, or when Dick Corp. threatened and finally declared S & S in default of the subcontract.

---

[1]Construction Contractors Audit Manual, American Institute of Certified Public Accountants, Volume 1, New York, 1995.

Yet, Mr.Tomberlin stated in his deposition that a meeting was held in summer 2007, prior to the draw of the letter of credit, attended by Mr. Tomberlin, Harold Young, Michael Smith, Kelly Baxter with The Peoples Bank, and Shelby Gardner with Dick Corp.  Mr. Tomberlin stated various concerns and issues were discussed, such as the potential draw of the letter of credit, slow receipt of contract funds from the owner, cash flow problems of S & S, and potential mis-handling of funds by Dick Corp. (John S. Tomberlin deposition – page 196 - line 10 through page 209 - line 7.)

4.  On February 13, 2007, Irrevocable Letter of Credit No. 326 in the amount of $1 million was issued by Peoples Bank, with Dick Corporation as the beneficiary. It is our understanding from the testimony of Michael Smith, that Mr. John Tomberlin was aware of the letter of credit. We see no evidence where South Central Agency made Auto-Owners aware of this potential $1 million liability. (A copy of the Letter of Credit issued by Peoples Bank is included in the accompanying exhibits. Please see Exhibit # 28.)

It is my opinion that this is a material subsequent event. Recall from the June 30, 2006 Review financial statements submitted to the surety by the South Central Agency, total Stockholders' Equity (assets less liabilities) was just under $1.0 million. Included in this presentation as of June 30, 2006, is approximately $264,000 in debt liabilities.

Also recall that neither the $1.0 million line of credit issued by The Peoples Bank, or the $1.0 million Irrevocable Letter of Credit issued by The Peoples Bank was included on these June 30, 2006 financial statements. As a result, we have an increase of potentially $2.0 million in liabilities, to an entity that only had approximately $1.0 million in net worth. Depending upon how the proceeds of the funds from these two subsequent debt instruments was utilized, the potential exists for S & S to develop a material deficit net worth, within just approximately 45 days of the issuance of the bonds by Auto-Owners.

5.  At the time the letter of credit was pulled by Dick Corp., the subcontract balance on the Drywall subcontract was $1,014,989.90 ($1,364,558 total subcontract less $349,568.10 payment applications paid). Had the surety been informed of the transaction involving the draw of the letter of credit, these subcontract balance funds would have been available to the surety.

[18]

## Opinions and Conclusions

Consistent with the methodology detailed in the preceding section, we have concluded our initial analysis.

It is important to understand, "A surety company is an integral part of the contractor's business and is one of the primary users of the contractor's financial statements. Most contractors need a surety company and bonding in order to operate."[2] "The first user of the financial statements is generally not the surety but a bonding agent who represents several sureties. The contractor's financial statements are used mostly to evaluate the third of the three Cs, Capital."[3] "Capital: Does the contractor have the necessary working capital, or access to working capital, to finance the project or work program and, if needed, to be able to absorb a reasonable loss on one or more projects?"[4] "...when underwriting a surety bond application, the surety is looking for indications that the contractor may be unable to complete the contract for any reason, including: a. Financial difficulties."[5] "In short, the surety evaluates the odds that it will be forced to step in and complete the project. The surety makes this evaluation by assessing the contractor's ability to meet current and future financial obligations."[6] "The surety agent, the surety company, and the contractor share a similar goal: to maximize surety credit. Surety credit is determined based on working capital and net worth."[7]

"The surety is primarily concerned with analyzing the contractor's solvency."[8] It is my opinion S & S was insolvent at the time South Central Agency was presenting S & S to Auto-Owners for bonding consideration. It is also my opinion that South Central Agency knew S & S was insolvent.

---

[2] A CPA's Guide to Accounting, Auditing, and Tax for Construction Contractors," AICPA by Michael J. Ramos, CPA. New York, 2000, page 10.

[3] A CPA's Guide to Accounting, Auditing, and Tax for Construction Contractors," AICPA by Michael J. Ramos, CPA. New York, 2000, page 69

[4] A CPA's Guide to Accounting, Auditing, and Tax for Construction Contractors," AICPA by Michael J. Ramos, CPA. New York, 2000, page 67

[5] PPC's Guide to Construction Contractors – Volume 1, by Douglas R. Carmichael, Ph.D., CPA, CFE, Everett A. Roberts, PE, and J. Clifford Griffith, MPA, CPA. Thomson Reuters, Twenty-third Edition. Fort Worth, Texas. (June 2011), page 204.1

[6] PPC's Guide to Construction Contractors – Volume 1, by Douglas R. Carmichael, Ph.D., CPA, CFE, Everett A. Roberts, PE, and J. Clifford Griffith, MPA, CPA. Thomson Reuters, Twenty-third Edition. Fort Worth, Texas. (June 2011), page 204.2

[7] A CPA's Guide to Accounting, Auditing, and Tax for Construction Contractors," AICPA by Michael J. Ramos, CPA. New York, 2000, page 74

[8] PPC's Guide to Construction Contractors – Volume 1, by Douglas R. Carmichael, Ph.D., CPA, CFE, Everett A. Roberts, PE, and J. Clifford Griffith, MPA, CPA. Thomson Reuters, Twenty-third Edition. Fort Worth, Texas. (June 2011), page 204.23

"Solvency is the ability to pay debts as they become due. Unless a firm can produce satisfactory earnings and pay its debts as they become due, any other objectives a firm may have will never be realized simply because the firm will not survive."[9] As presented in our report, we have numerous references where Mr. Tomberlin knew of the financial insolvency issues with S & S. Further, in our report we have numerous references where Mr. Tomberlin also actively participated in efforts to address and resolve those solvency issues.

As a result, it is my opinion that South Central Agency presented S & S as a solvent contractor for surety bonding to Auto-Owners, when in fact they knew S & S was insolvent and having significant cash flow problems. The analysis of all of the documentation provided to us to date supports this position. After Auto-Owners' declination for bonding in 2006, South Central Agency continued to present S & S to Auto-Owners as a solvent contractor, knowing that S & S's financial condition had markedly declined from its original condition as initially presented to Auto-Owners. Further, after procurement of bonding for the NAS Drywall project, South Central Agency continued to withhold information regarding the continuing degenerating financial condition of S & S.

Respectfully submitted,
Nicholson Professional Consulting, Inc.

Jack Nicholson, CPA, CFF

enclosures (28)

---

[9] *Accounting Principles*, by Roger H. Hermanson, PhD., CPA, James Don Edwards, Ph.D., CPA, and R. F. Salmonson, Ph.D., CPA.  Business Publications, Inc., Plano, Texas. 1983, page 14

**DeWitte Thompson, Esquire**                                    **1**

Page 3

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

AUTO-OWNERS INSURANCE
COMPANY,
    Plaintiff,

v.       NO.
       2:11-cv-00468-WHA-SRW

TOMBERLIN, YOUNG &
FOLMAR INSURANCE CO.
d/b/a
SOUTH CENTRAL AGENCY,
JOHN S. TOMBERLIN
and
HAROLD W. YOUNG,
    Defendants.

_____

TOMBERLIN, YOUNG &
FOLMAR INSURANCE CO.
d/b/a
SOUTH CENTRAL AGENCY,
JOHN S. TOMBERLIN
and
HAROLD W. YOUNG
    Counterclaimants

v.

AUTO-OWNERS INSURANCE
COMPANY,
    Counterclaim Defendant

1 APPEARANCES CONTINUED:
2
3
4
5    LAW OFFICES OF MARTIN WEED, LLC
6    (BY: Edward M. Weed, Esq.)
      100 Union Hill Drive
7    Suite 150
      Birmingham, Alabama 35209
8
9
10       Attorneys for the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24 REPORTED BY:
      TAMMY L. GARDNER
25    CERTIFIED COURT REPORTER

Page 2

1      Deposition of DEWITTE THOMPSON,
2 taken at 12000 Findley Road, Suite 250, Johns
3 Creek, Georgia, 30097, on Tuesday, March 27, 2012,
4 beginning at 10:00 A.M. and concluding at 1:25
5 P.M.
6
7
8
9 APPEARANCES:
10
11
12    LAW OFFICES OF ALBER CRAFTON PSC
13    (BY: Thomas Crafton, Esq.)
      9300 Shelbyville Road
      Suite 1300
14    Louisville, Kentucky 40222
15
16
17      Attorneys for Auto-Owners
      Insurance Company
18
19
20    LAW OFFICES OF MORROW, ROMINE & PEARSON P.C.
      (BY: Roger S. Morrow, Esq.)
21    122 South Hull Street
      Montgomery, Alabama 36104
22
23
24      Attorneys for the Defendant
      (PRESENT BY TELEPHONE)
25

Page 4

1    E X A M I N A T I O N   I N D E X
2
3
4
5 MR. EDWARD M. WEED      6
6
7
8
9
10      E X H I B I T   I N D E X
11
12
13 EXHIBIT 165      7
14 EXHIBIT 166      61
15 EXHIBIT 167      68
16
17
18
19
20
21
22
23
24
25

**DeWitte Thompson, Esquire**

Page 129

1  do -- I do think there is correspondence that
2  provides that, either something that Tomlin (sic)
3  passed along to the surety from the bank or was
4  sent directly to the bank; but, anyway, I believe
5  that Tomlin was aware of it, where they said they
6  had a million dollar line of credit.
7      Q.  M'mm-H'mm.
8      A.  Somebody testified, I think, or, again,
9  maybe it's in the documents, that Tomlin was going
10  to the bank without even advising Smith, trying to
11  increase his line of credit.  I don't know why an
12  agent would do that, unless he thought his
13  contractor was desperately in trouble.  I
14  understand Mr. Tomlin has other legal difficulties
15  that may have something to do with that, but my
16  assumption would be that he wouldn't do that
17  unless he thought it was necessary.  If he
18  thought it was necessary for an agent, surety
19  agent, to go to the bank on behalf of a contractor
20  that they're considering issuing a bond for, that
21  would be something I -- he should pick up the
22  phone and tell the surety.
23      Q.  Somebody has testified to, is how you
24  started that sentence, that Tomlin (sic) was going
25  to the bank, you mean --

Page 130

1      A.  Or -- or --
2      Q.  -- or you read a deposition somewhere
3  where John Tomlin went into the bank and met with
4  somebody without his contractor?  What are you
5  saying?
6      A.  Oh, it was Smith's testimony.  Smith had
7  said that.
8      Q.  Right.
9      A.  Yeah.  He said that he -- that Tomlin
10  had gone to the bank.  Apparently learned this
11  after the fact, without him even knowing about it.
12      Q.  Gone to the bank physically?
13      A.  That's the way I took it.
14      Q.  Okay.
15      A.  Dealt with the bank.  Gone to the bank.
16      Q.  Okay.
17          But your opinions are generally all
18  based upon John Tomlin knowing of Michael Smith's
19  company, according to you, being in a bad
20  financial state or broke?
21      MR. CRAFTON:
22          Objection.
23      THE WITNESS:
24          I don't know that I would say all
25          of them are.  Whatever it says in the

Page 131

1          report is in the report, but that is
2          a primary thrust of the report, that he
3          was aware they were in financial
4          trouble, and he didn't tell the surety.
5          And as he said in his own deposition, he
6          understood that he was responsible for
7          telling the surety material information,
8          and any of the things that he knew that
9          are listed in my report, Items 1 through
10          15, would be material.
11      MR. WEED:
12          Okay.
13      THE WITNESS:
14          I'm not saying he knew all 15 of
15          those.
16  EXAMINATION BY MR. WEED:
17      Q.  Some general questions.
18          Have you ever been a licensed general
19  contractor or subcontractor?
20      A.  No.
21      Q.  Ever held any form of insurance license?
22      A.  No.
23      Q.  Ever sold any kind of insurance?
24      A.  No.
25      Q.  Ever been registered or licensed with

Page 132

1  any professional or governmental body within the
2  State of Alabama, other than as pro hac vice
3  counsel?
4      A.  Not that I can remember.  I don't know
5  what it would have been.
6      Q.  Have you consulted with any insurance
7  agent licensed within the State of Alabama or
8  Florida concerning your opinions in this case?
9      A.  I don't think so.
10      Q.  You recall ever consulting with any
11  insurance agent licensed within the State of
12  Alabama or Florida regarding surety agent
13  obligations?
14      A.  Ever about anything?
15      Q.  Yeah.  As far as what a licensed agent
16  in Alabama or Florida might be required to do in
17  terms of reporting a surety in the course of
18  applying for a bond?
19      A.  That's a totally different question.
20  M'mm, you mind either repeating that or having her
21  read it back?
22      Q.  Yeah.  Well, I think -- actually, since
23  you -- we've dealt with it on this case, and I
24  know you've got broad legal experience in several
25  issues, so I think we can move on, but I'll be

Page 133

1  happy to re --
2      A.  No.  That's okay.
3      Q.  Okay.
4      A.  Any question you don't want to ask is
5  okay with me.
6      Q.  NASBP, have you ever been a member of
7  that?
8      A.  No.
9      Q.  Or asked to join?
10         You ever thought about -- you ever talk
11  to any of its members about this case?
12     A.  I don't know, because I don't know who
13  all their members are.  Off the top of my head, I
14  don't recall speaking to any surety bond producer
15  about this case, unless it was someone in the
16  case.  I don't know who that would have been.
17     Q.  You just used a phrase, I want to make
18  sure I understand, surety bond producer.  Do you
19  consider that to be a different type of agent than
20  a life insurance agent?
21     A.  Yes.
22     Q.  How is it different?
23     A.  If you're going to be a surety agent,
24  you should know some about surety.
25     Q.  Okay.

Page 134

1          Other than the publications you have
2  listed in your resume, are there any other
3  publications that you can recall having authored?
4      A.  No.
5      Q.  Once you had prepared your opinions, in
6  addition, did you have any of your partners or
7  anybody else review them to check for their
8  accuracy?
9      A.  M'mm, yes.  I had my partner, Jeff
10  Slagle, do a little editorial --
11  editorialization.  He's a little better writer
12  than I am.
13     Q.  Does he have experience in surety agent
14  matters?
15     A.  Yes.  Similar to mine.  Just not quite
16  as long.  He's been doing it for 29 years.
17     Q.  Do you recall the comments he had when
18  he reviewed it --
19     A.  No.
20     Q.  -- for the --
21     A.  Lot of his stuff was structural based,
22  you know.  You ought to have a paragraph here,
23  change this sentence a little bit.  He was kind of
24  my grammar teacher.
25     Q.  Lawyers.

Page 135

1      A.  Yeah.
2      Q.  Have you ever represented an insurance
3  agent licensed in the State of Alabama?  And when
4  I say that, not a big agent who might be listed as
5  licensed everywhere, but an agent who is licensed
6  only in Alabama?
7      A.  I don't know.  I don't think so.
8      Q.  What about your pro hac vice admission
9  in Alabama, did any of that involve agent issues?
10     A.  (No response)
11     Q.  If you don't recall, that's fine.
12     A.  I don't.  I don't recall.
13     Q.  Okay.
14         I know you travel a lot of places for
15  litigation, and I'm -- this is -- again, this is
16  not a memory test, and I don't know is a perfectly
17  good answer, just like you probably told --
18     A.  Yes, many, many witnesses.
19     Q.  -- many witnesses many times.
20     A.  Yes.
21     Q.  As far as the agreement you talked about
22  in your agent standard of care expert report,
23  m'mm, did you happen to look into what law might
24  govern that particular agreement?  Do any research
25  on that?

Page 136

1      A.  The Agency Agreement?
2      Q.  Right.
3      A.  No.  I found that the standards for the
4  conduct of a surety agent throughout the United
5  States are largely, if not completely, uniform.  I
6  mean, the surety's write a book of business
7  nationwide.  They expect the same things
8  everywhere, and I guess that's an explanation of
9  why I didn't look into that.
10     Q.  Just want to make sure, again, it's my
11  last opportunity to ask you questions prior to
12  trial, I've got that you were retained as an
13  expert in this case by Auto-Owners, you testified
14  at a hearing for them down in Florida, and you had
15  one other case where you represented them.
16         Has Auto-Owners ever hired you for
17  anything else?
18     A.  No, unfortunately.
19     MR. WEED:
20         Mr. Thompson, I believe that's all
21     I have.
22     THE WITNESS:
23         All right.  Thank you very much.
24     MR. CRAFTON:
25         I don't have anything.

**DeWitte Thompson, Esquire**

4

Page 13

1 cases --
2    Q. There was.
3    A. -- that were consolidated, and if I
4 remember correctly, they were sued by somebody in
5 a separate underlying Little Miller Act case,
6 which originated the claimant against Dick
7 Corporation.
8    Q. M'mm-H'mm.
9    A. Same thing happened with our Carolina
10 Realty case, and maybe a couple of them. Whether
11 their underlying Little Miller Act payment bond
12 claim was filed in their case before or after
13 ours, I don't know, so I can't really tell you.
14    Q. Okay.
15    A. It was largely contemporaneous. I doubt
16 there was more than a three- to six-month gap
17 between whoever got involved first in the
18 litigation --
19    Q. True.
20    A. -- m'mm, but -- and at the end, I
21 believe that our case settled fairly shortly
22 before theirs did. I'd say in less than a month.
23    Q. Do you remember the date your case
24 settled?
25    A. No. It was in the Spring of --

Page 14

1    Q. Not the exact date.
2    A. -- 2011.
3    Q. Spring of 2011. That's close enough.
4    A. I believe the case was set for trial in
5 April or May, and I think we settled about a month
6 before the trial date. Maybe six weeks.
7    Q. Was your case, as well, before Judge
8 Casey Rogers?
9    A. Yes. It was all consolidated.
10    Q. You remember when the default was
11 declared against your principal?
12    A. No.
13    Q. October 2007 doesn't ring a bell?
14    A. I really don't know. I think that it
15 was -- I'm reasonably sure it was in 2007. Beyond
16 that --
17    Q. Okay. Fair enough. And this is not a
18 memory test, and you know that from having been in
19 deposition, if you don't remember, that's fine.
20    A. All right.
21    Q. I'm not going to press that.
22    But as far as the necessity of the time
23 spent, and I guess what you're saying is that your
24 opinion as to the amount of time required is based
25 on part on your own personal experience in that

Page 15

1 litigation or very closely related litigation
2 involving another surety?
3    A. That's correct.
4    Q. Okay.
5    And as far as Wade, Palmer & Shoemaker,
6 generally would the same conclusions we have
7 talked about for Alber, Crafton apply to that
8 firm?
9    A. Yes.
10    Q. And did you consider the reasonableness
11 of the hourly fee charge using the same factors as
12 you did for Alber & Crafton?
13    A. Yeah. Well, except that Wade, Palmer's
14 rates seemed like a go-broke rate, but -- they
15 were really inexpensive.
16    Q. Yeah.
17    A. But, yes, I applied the same criteria.
18    Q. What was his rate?
19    A. 150 for the part, if I remember
20 correctly, yeah. And before that, it looks like
21 it was 135.
22    Q. M'mm-H'mm.
23    And there's actually a 125 --
24    A. Right.
25    Q. -- amount on there. Okay.

Page 16

1    M'mm, and I think you go into the basis
2 and the reasons for your opinions on Page 4 of
3 your report, is that right?
4    A. Yes.
5    Q. And you've been litigating construction
6 disputes for 36 years, approximately?
7    A. A little over that.
8    Q. Okay.
9    A. Not much, but a little.
10    Q. When did you start practicing law?
11    A. M'mm, summer of 1975.
12    Q. And then you also point out on Page 4
13 that your experiences included, without
14 limitations, actions against former agents of a
15 surety, is that right?
16    A. That's correct.
17    Q. How many cases would you say you've done
18 that in?
19    A. I knew you were going to ask me that,
20 and I don't know the answer. I think about five.
21    Q. About five.
22    Have you ever defended agents in actions
23 brought by sureties?
24    A. I don't recall, but I don't think so.
25    Q. Okay.

**DeWitte Thompson, Esquire**                                    **10**

Page 37

1  Orlando.
2     Q.  What about Tina Caraballo?
3     A.  I assume at that time, again, she was
4  also in Orlando, as best as I recall.  I remember
5  the case was in Orlando.  Whether there was --
6  their office was in Kissimmee, you know, an
7  outlying area from Orlando, I don't remember
8  that.
9     Q.  M'mm-H'mm.
10       Regarding your earlier comment about the
11  lack of lawyers in the Florida Panhandle area or
12  South, Alabama, would these be the type of
13  lawyers, aside from this conduct in this case,
14  that should have been handling the surety claims?
15     A.  That would be my opinion.
16     Q.  And they were in Orlando?
17     A.  Oh, oh, you mean -- I'm sorry.  You mean
18  the Hayes --
19     Q.  Ms. Hayes?
20     A.  -- folks?  No.  No.  She was not a
21  surety specialist.  No, I don't think she should
22  have been.  I misunderstood the question.
23     Q.  Yeah.  Any idea how she originally came
24  about to represent Auto-Owners then?
25     A.  I'm pretty sure that she was originally

Page 38

1  retained by the principal, and under certain
2  circumstances sureties are willing to essentially
3  tender their defense to the principal to provide
4  counsel for not only the principal but also the
5  surety, and I think that's how this came about.
6     Q.  Understood.  Okay.
7       Do you want to check on your invoice
8  while I'm getting ready for the next one?
9     A.  Sure.
10       (Off the record to check on invoice.)
11  EXAMINATION BY MR. WEED:
12     Q.  Mr. Thompson, I'd like to turn to
13  Exhibit C, which appears to be your resume.  And,
14  again, this is to your report -- Exhibit C to your
15  report on the reasonableness of attorneys' fees
16  marked as Exhibit 165 to your deposition.
17     A.  Yes.
18     Q.  M'mm, your partner, DeWitte Thompson,
19  correct?  I'm sorry.  DeWitte Thompson, to me,
20  looks like a law firm name, and I just asked that
21  question stupidly.
22       What is the name of the firm you're a
23  partner at?
24     A.  Thompson & Slagle, LLC.
25     Q.  Thompson & Slagle, LLC.

Page 39

1     Q.  How many lawyers are here in your firm?
2     A.  Eight, I think.
3     Q.  How long have you been a partner of
4  Thompson, Slagle?
5     A.  M'mm, since 1976.  You know, it's been
6  through a couple of iterations.
7     Q.  M'mm-H'mm.
8     A.  Then it was DeWitte Thompson, PC.  We
9  had another partner at one point in time named
10  Michael Hannon, so went from DeWitte Thompson to
11  Thompson & Slagle, to Thompson, Slagle, and then
12  back Thompson & Slagle, but I've been the senior
13  partner in all of those entities.
14     Q.  Since 1976?
15     A.  Yes.
16     Q.  So you really founded this what, one
17  year after graduated from law school?
18     A.  M'mm, 14 months.
19     Q.  14 months after graduating from law
20  school.  Well, good.  You're not like some
21  witnesses where we're going to have to go through
22  about 20 jobs to figure out how they got there.
23       From 1975, until you started Thompson,
24  Slagle in 1976, what did you do in that 14 months?
25     A.  I was a -- well, I was in private

Page 40

1  practice with a law firm called Dollar &
2  Dettemering, D-E-T-T-E-M-E-R-I-N-G.  We did all
3  sorts of stuff.
4       M'mm, after that, I was in a
5  partnership, and I left that firm, became a
6  partner --
7     Q.  Where are they located, before we move
8  on?
9     A.  They're long gone.
10     Q.  Where were they located?
11     A.  They were located in Douglasville.  Tim
12  Dollar's retired now, and Neil Dettemering's a
13  judge.
14     Q.  And for the people in Alabama who may be
15  ultimately hearing this testimony, Douglasville is
16  where?
17     A.  About 20 miles west of Downtown
18  Atlanta.
19     Q.  Okay.
20       And then you were about to tell me about
21  your next stop?
22     A.  Yeah.  Then I established a partnership,
23  m'mm, Palmer & Thompson, and, m'mm, we stayed
24  together for about ten months, and then I
25  established my firm.

**DeWitte Thompson, Esquire**                                              **30**

Page 117

1   liability insurance, particularly like
2   builders risk and things like that, yes,
3   but in terms of how to be an agent or
4   what an agent needs to do, I haven't
5   attended courses that reflected that --
6   MR. WEED:
7       Okay.
8   THE WITNESS:
9       -- or that taught that.
10  EXAMINATION BY MR. WEED:
11      Q.  Just to clarify, then, other than the
12  risk management class you had in college and
13  seminars that you may have attended as a lawyer,
14  you had no formal insurance training?
15      A.  I believe that's correct.
16      Q.  And this is your first expert
17  deposition?
18      A.  M'mm, as I said, unless that one back in
19  the '70s about the recall thing was considered an
20  expert deposition, yes.
21      Q.  Your first expert deposition involving
22  insurance and surety issues?
23      A.  Yes.
24      Q.  And, I'm sorry, the other question I
25  have to ask you, because, as I explained to Mr.

Page 118

1   Nicholson the other day, you know, once had a case
2   were somebody pointed out afterwards that they
3   flew over the property because they were a
4   licensed pilot and had all these other opinions
5   they wanted to render.
6       Do you have any sort of skill that we
7   haven't talked about, such as being a scuba diver
8   or airline pilot or something like that you think
9   are ultimately going to help you provide opinions
10  in this case that you might want to supplement on,
11  such as your connections you made at the Hague
12  Academy and intelligence issues?  And I say that
13  facetiously.
14      A.  I have a blue belt in Brazilian Jiu
15  Jitsu.  You got me sidetracked.  Do you mind
16  asking that question again?
17      Q.  Yes.
18      Are you a pilot or scuba diver or
19  anything like that where you have special skills
20  that you're going to intend to go out there and do
21  some sort of extra work on this case involving
22  these special skills?
23      A.  No.
24      Q.  And, again, I ask that question because
25  I had somebody that went out and flew over a

Page 119

1   property case one time, and I just want to make
2   sure I've covered all the potential basis for
3   expertise and things like that.
4       If you could flip back to 167 for a
5   minute.
6       A.  (Witness complies.)  Okay.
7       Q.  If you'll bear with me just a second, I
8   want to see if I can find it.  Item No. 13, is
9   that a typo there?  Tomlinson?  Should that be
10  Tomberlin?
11      A.  Yes.
12      Q.  Okay.
13      A.  And it's repeated later in the next
14  line.
15      Q.  Sure.
16      A.  That was probably -- at that point I was
17  probably pretty tired on the dictation.
18      Q.  I understand.  I just wanted to clarify
19  that.
20      And, just in general, those Points 1
21  through 15 are things that you're saying the
22  agents knew that the surety did not?  And feel
23  free to look over those, if you need to, and
24  answer that question.
25      A.  I am.  And also that the agent should

Page 120

1   have disclosed, and had they done so, the bonds
2   would not have been issued.
3       Q.  I understand.
4       But your opinion is that the agents knew
5   all of the items in 1 through 15?
6       A.  Well, I don't know that I can express an
7   opinion on that.  Those are the underlying facts
8   that I understood exist.  That's not necessarily
9   my opinion.  Either those facts are proven or they
10  aren't, but from what I read, I understood those
11  facts to be -- those statements to be true
12  statements of fact, and relied upon each of them
13  separately in reaching my conclusions.
14      Q.  Okay.
15      And you pointed out that any one of
16  those 15 you thought would be sufficient to
17  justify not issuing the surety bond?
18      A.  Yes.
19      Q.  And your opinion further was that each
20  of those 15 were not known to the surety partner
21  at Auto-Owners?
22      A.  That's my understanding.
23      Q.  Is there any other factual information,
24  again, understand you might flush out more details
25  at trial or if things should change for any

Page 89

1    A.  Okay.  And what was the question again?
2    Q.  What are these industry standards, if
3  there -- are they different from -- there's two
4  questions, what are they, and the second one is
5  are they different from the items you talk about
6  based upon your experience on Page 2 and 3 and
7  part of 4?
8    A.  Well, I wouldn't want to limit them to
9  Pages 2 and 3, but those are examples of industry
10  standards.
11    Q.  M'mm-H'mm.
12    A.  Does that answer your question?
13    Q.  Well, I want to know specifically.  You
14  say a duty based upon industry standards.
15    A.  Right.
16    Q.  What industry standards are you
17  referring to there?
18    A.  I'm referring to the ones that I list in
19  Pages 3, 4, 5, 6 -- well, no, 5 --
20    Q.  Okay.  3, 4 and 5 -- 1, 2 -- what about
21  the ones on Page 2?
22    A.  I wasn't really finished.
23    Q.  I'm sorry.
24    A.  7.  Bottom of 7, 8, 9, 10, 11.
25    Q.  Just let me know when you're through.

Page 90

1    A.  I'm almost finished.  And the bottom
2  of -- I don't know whether Page 2 actually sets
3  forth standards or not.
4    Q.  Okay.
5    A.  I stand by those statements.  Whether
6  they qualify as standards of conduct, maybe, maybe
7  not.
8    Q.  Okay.
9      And just so we are clear on that, that's
10  basically the entirety of your report why you
11  expressed opinions, isn't it?
12    A.  It's -- virtually.
13    Q.  Okay.
14    A.  It doesn't include Page 1 --
15    Q.  And -- go ahead.
16    A.  -- or Page -- yeah, technically Page 1.
17    Q.  Within your report is there -- are there
18  any cited standards of text other than your
19  opinion based on experience?
20    A.  I don't -- I mean, I don't think so.  I
21  mean, the document speaks for itself, but --
22    Q.  Certainly.
23    A.  -- I'll be glad to look and see, if
24  you'd like.  It refers to FRCP Rule 26, but I
25  don't think that's really what you're asking me.

Page 91

1  I don't see anywhere else where a source of a
2  publication referred to as an industry standard in
3  the report.
4    Q.  Okay.
5      So those industry standards, then, are
6  based on your experience as it appears in your
7  report?
8    A.  Yes.
9    Q.  How did you personally become familiar
10  with the NASBP Code of Conduct?
11    A.  Looked at it on the internet.
12    Q.  Okay.
13      Was that recently in connection with
14  this case or did you have some familiarity with it
15  beforehand?
16    A.  I don't remember whether I looked -- I
17  imagine that I have looked at it before, but I
18  looked at it in connection with preparing our
19  report on this case, as well.
20    Q.  Specifically did you know about
21  Subparagraph M before this case?
22    A.  I can't say.  I'm not sure.  I knew that
23  I believed that that was a standard.  Whether it
24  was in Subparagraph M within the NASBP or not, but
25  I can't say one way or the other whether I saw

Page 92

1  that publication before recently.
2    Q.  And then you mentioned at the top of
3  Page 5 significant material information was known
4  to the three defendant surety agents, and I just
5  want to make sure I understand something there.
6  When you say three defendant surety agents, you're
7  talking about two individuals and one business?
8    A.  Correct.  A corporation and Tomberlin &
9  Young.
10    Q.  Okay.
11      Not three individuals?
12    A.  Correct.
13    Q.  And then you go on to no reasonable
14  prudent Underwriter or surety would have approved
15  issuance of performance and payment bonds that
16  were issued by AOIC for S&S and which ultimately
17  resulted in a loss to AOIC of over $3.3 million,
18  after having been apprised of the material
19  information that was known by the defendant surety
20  agents, but was not disclosed to them by AOIC.
21    A.  By them to AOIC.
22    Q.  Oh, yeah, disclosed by them to AOIC.
23      M'mm, couple of questions about that
24  sentence.  Is that your opinion or is that you as
25  far as -- let me break that down a little

**DeWitte Thompson, Esquire**                                    **22**

Page 85

1  agents seem to be, if not familiar with the
2  organization, members of it. Beyond that, no, I
3  don't.
4      Q.  When you say surety agent, how do you
5  distinguish between a surety agent and an
6  insurance agent?
7      A.  A surety agent is someone who procures
8  the issuance of a bond from a surety.
9      Q.  So somebody that's procured one bond is
10  held to the same standard that somebody's prepared
11  a hundred bonds a year?
12  MR. CRAFTON:
13          Object to form.
14  THE WITNESS:
15          Yes. Of these type bonds,
16      certainly.
17  MR. WEED:
18          Okay. Okay.
19  EXAMINATION BY MR. WEED:
20      Q.  And as far as the population of the
21  Florida insurance agents who are members of the
22  NASBP, you have any idea of the percentage there?
23      A.  I have no idea either percentage or
24  total number.
25      Q.  Okay.

Page 86

1          And then your next sentence you indicate
2  that you think an ordinary reasonable and prudent
3  surety agent is aware that there are several broad
4  criteria the surety considers in connection with
5  the underwriting of a bond.
6          How would the surety agent become
7  aware?
8      A.  M'mm, experience, seminars, specific
9  training by -- within their organization or by a
10  surety. M'mm, I don't know. Self-study.
11      Q.  And what's your understanding of the
12  defendants in this case experience, seminars,
13  training, and self-study with respect to --
14      A.  I don't know anything about that.
15      Q.  Okay.
16          And then further down you say while the
17  home office underwriter also underwrites the bond,
18  the home office underwriter relies heavily upon
19  the surety agent to provide material information,
20  and then go on to say, you know, what that
21  information pertains to, but home office
22  underwriter, for the ladies and gentlemen of the
23  jury, again, what do you mean by home office?
24      A.  Well, that would be where the office --
25  where the main office of the surety is as opposed

Page 87

1  to say a branch office or an agent's office.
2      Q.  In this case, did you understand that to
3  be Lansing, Michigan?
4      A.  Yes.
5      Q.  And as far as the home office
6  underwriter in this case, who would that have
7  been?
8      A.  Who was the home office underwriter?
9      Q.  Right.
10      A.  My understanding, Mr. House was.
11      Q.  Okay.
12          And then the next paragraph you say in
13  this particular case the defendants, as surety
14  agents for AOIC, had a duty based upon industry
15  standards, okay, and that's when I had asked you
16  about the industry standards that you refer to
17  there.
18          What industry standards? The ones that
19  are referred to in prior parts of your report?
20      A.  Well, industry standards that may have
21  been referred to previously in my report, but also
22  for those who are familiar with what's expected of
23  people within the insurance agency, those are
24  standards. For example, you know, there's certain
25  standards for driving a car. Well, if you get

Page 88

1  behind the wheel of a car, I would expect someone
2  driving that car to comply with those standards or
3  not get behind the wheel of the car.
4      Q.  Okay.
5      A.  And those standards are -- I don't know
6  where they're written, but I know we are all
7  supposed to stop at red lights and not speed and
8  all that stuff.
9      Q.  Well, in Alabama they call them rules of
10  the road. Do you have that in Georgia?
11      A.  (Witness holds up hands.)
12      Q.  Is that a code -- part of Alabama code
13  that tells you, you know, you got to stop at red
14  lights, stop at stop signs. Is that --
15      A.  Right, and don't drive reckless, but
16  there's a broad -- you know, what's reckless, you
17  know. Yeah. Yeah. There is -- there is a
18  statutory provision for that in Georgia.
19      Q.  And I guess that's what I'm asking, on
20  the industry standards, m'mm, are you referring to
21  something specifically in a code or are you
22  referring to what you talked about on Pages 2 and
23  3, and then I guess Page 4 of your report? And
24  this is the fourth line up from the bottom of Page
25  4, the specific phrase industry standards.

**DeWitte Thompson, Esquire**

**8**

Page 29

1    Q.  I'm not sure it's dated.
2    A.  The one clever thing I did is not date
3  it.
4    Q.  You signed it.
5    A.  Yeah.
6    Q.  That's all that really matters, huh?
7    A.  And usually the date would be right over
8  the signature.
9    Q.  M'mm-H'mm.
10    A.  I don't -- I just don't remember.  I'm
11  pretty sure --
12    Q.  Share with you, I think they were
13  produced February 10th.
14    A.  I was going to say I'm pretty sure I
15  prepared it in January and February, but that's
16  consistent with it.
17    Q.  Okay.
18        And I had asked in the Notice for
19  Request for Production, I don't know if you saw
20  that or -- primarily geared more toward Mr.
21  Nicholson than you, but just a standard request
22  for production of your experts and your file and
23  things like that.
24    A.  I think -- pretty sure within the last
25  what?  Couple or three weeks, I sent to Mr.

Page 30

1  Crafton a copy of our file.  There wasn't a
2  duplicate of -- I mean, some of it -- a lot of it
3  is duplicated.
4    Q.  Yeah.
5    A.  Okay.  There aren't -- I'm not sure
6  there are any independently created documents that
7  I created, other than the --
8    Q.  Invoices?
9    A.  Well, invoices, yes, but other than
10  invoices, other than the two reports.
11    Q.  Okay.
12    A.  For example, I don't think I even wrote
13  a letter to Mr. Crafton confirming the terms of my
14  representation, which I customarily do.  I don't
15  think I did.
16    Q.  Okay.
17        The invoices and the reports would be
18  the only two things that have been created by you,
19  I guess?
20    A.  I think that's fair.
21    Q.  And I did get those from Mr. Nicholson.
22  I just don't remember receiving them for this
23  witness, so --
24    MR. CRAFTON:
25        I thought they had been produced.

Page 31

1        Haven't they not?
2    MR. WEED:
3        I got a disk, and it had Nicholson
4        on it, but it -- we can go off the
5        record.
6    (Off-the-record discussion.)
7    MR. WEED:
8        Thank you for that.  Just to
9        confirm our discussion off the record,
10        we're going to try to get an invoice,
11        and I understand we may have some
12        logistical issues which we will work
13        around.
14    THE WITNESS:
15        Okay.
16  EXAMINATION BY MR. WEED:
17    Q.  The final thing on Page 8 I wanted to
18  ask you about is listing of other cases in which
19  the witness has testified as an expert at trial or
20  by deposition within the preceding four years --
21    A.  Right.
22    Q.  -- and you've got a case there styled
23  Auto-Owners Insurance Company versus Haynes and
24  Caraballo (pronounced KA-ROB-A-LOE)?  Caraballo
25  (pronounced KARA-BELLA)?  I don't want to

Page 32

1  pronounce that wrong.  Do you know how it's
2  pronounced?
3    A.  Caraballo (pronounced CAB-A-LAR-OE).
4    Q.  Caraballo (pronounced CAB-A-LAR-OE)?
5    A.  I mean Caraballo (pronounced
6  CAR-A-BALLOW).  I'm sorry.  And that's a typo
7  there.  Should be Hayes and Caraballo.
8    Q.  Okay.  Not Haynes?
9    A.  Right.  And you see later --
10    Q.  M'mm-H'mm.
11    A.  -- the next party is Rosemary Hayes,
12  which is the Hayes of Hayes and Caraballo.
13    Q.  Okay.
14        Tell me a little bit about that case.
15    A.  M'mm, that was a case involving a very
16  substantial condominium development -- she's
17  gesturing to me.
18    Q.  Go ahead.
19    A.  In a minute.  Okay.  I'm so sorry.  In
20  Ponce Inlet, Florida.
21    Q.  Where is Ponce Inlet, Florida?
22    A.  It is just a little south of Dayton
23  Beach.
24    Q.  Okay.
25    A.  M'mm, that was also a project that I was

**DeWitte Thompson, Esquire**                                             9

Page 33

1  already involved in when I was asked to be a
2  witness in this case. M'mm, I'm a little fuzzy
3  about the overall details, but in our case --
4      Q.  How about this, how about if we talk
5  about your involvement in it.
6      A.  Okay.
7      Q.  What did you do?
8      A.  Okay.  This case or that project?
9  Remember I had a dual involvement, just like I did
10  in this one.
11      Q.  Right.  As it's listed here.  How about
12  that?
13      A.  Okay.  That case I was asked to be an
14  expert witness concerning the conduct of Ms. Hayes
15  and her law firm in connection with their
16  representation of Auto-Owners.
17      Q.  So Auto-Owners was suing its own
18  lawyers?
19      A.  Yes.
20      Q.  Was that a, m'mm, I'm guessing surety
21  case?
22      A.  It was.
23      Q.  And these were the lawyers who had
24  defended Auto-Owners on surety claims?
25      A.  Yes.

Page 34

1      Q.  What was the basis for the lawsuit
2  brought by Auto-Owners?  Was it just general legal
3  malpractice or were there specific torts alleged?
4      A.  No.  M'mm, I'm not sure how you would
5  classify it.  M'mm, Auto-Owners fired Ms. Hayes,
6  and she refused to be fired, and there was
7  apparently a lawsuit.  Now, I only, you know, was
8  involved in this one small segment of it.  I don't
9  recall if there was an overall malpractice claim
10  against her.  I believe there was.
11      Q.  M'mm-H'mm.
12      A.  But what I was asked to testify about,
13  and this is prob -- this is a bit of an
14  oversimplification, was if you fire your lawyer
15  you're entitled to have -- make your lawyer quit.
16      Q.  Okay.
17      A.  Which it seems like a fairly fundamental
18  proposition, but Ms. Hayes refused to accept that.
19      Q.  And this was an '06 lawsuit, it looks
20  like?
21      A.  Correct.
22      Q.  2006?
23      A.  Right.
24      Q.  When did you give a deposition or trial
25  testimony?

Page 35

1      A.  I gave testimony at a hearing in I
2  believe it was '09.  Could have been '08.
3      Q.  And your testimony and opinions were
4  that they had -- Auto-Owners had the right to fire
5  this lawyer, and she should have --
6      A.  Immediately withdrawn when they -- or,
7  as I recall, one of her objection was if you fire
8  me, you won't have a lawyer then.
9      Q.  Well, did Auto-Owners have substitute
10  counsel?
11      A.  They had someone they wanted to
12  substitute.
13      Q.  Okay.
14          But that person hadn't entered an
15  appearance?
16      A.  I don't remember how it worked.
17      Q.  Okay.
18      A.  I mean, the -- what I just described was
19  the nature of the dispute, but the detail --
20  procedural details, I don't recall.
21      Q.  I got you.
22          And was she actually representing
23  Auto-Owners Insurance Company?
24      A.  Yes.
25      Q.  Not an insured or somebody like that?

Page 36

1      A.  Both.
2      Q.  Oh!
3      A.  Except not an insured, a bond principal.
4      Q.  Exactly.  Big difference.
5      A.  It is.
6      Q.  And what was the outcome of that?  Do
7  you remember?
8      A.  The court said, if I remember, I do not
9  remember anything about the details, the court
10  said pretty much sure, you're entitled to fire
11  your lawyer, and then I think ultimately the
12  overall case would resolve in favor of
13  Auto-Owners, but I didn't really have anything to
14  do with it after that hearing.  Very much of
15  anything.
16      Q.  How did you come to understand the case
17  was resolved in favor of Auto-Owners?
18      A.  M'mm, I think -- I don't know whether I
19  saw -- I saw an opinion or Mr. Crafton told me or
20  he told me and then I looked up an opinion.
21  Some -- one of those combinations.
22      Q.  Okay.
23          And, m'mm, where is Rosemary Hayes
24  located?
25      A.  I don't know.  At that time she was in

**DeWitte Thompson, Esquire** 10

Page 37

1 Orlando.
2    Q. What about Tina Caraballo?
3    A. I assume at that time, again, she was
4 also in Orlando, as best as I recall. I remember
5 the case was in Orlando. Whether there was --
6 their office was in Kissimmee, you know, an
7 outlying area from Orlando, I don't remember
8 that.
9    Q. M'mm-H'mm.
10    Regarding your earlier comment about the
11 lack of lawyers in the Florida Panhandle area or
12 South, Alabama, would these be the type of
13 lawyers, aside from this conduct in this case,
14 that should have been handling the surety claims?
15    A. That would be my opinion.
16    Q. And they were in Orlando?
17    A. Oh, oh, you mean -- I'm sorry. You mean
18 the Hayes --
19    Q. Ms. Hayes?
20    A. -- folks? No. No. She was not a
21 surety specialist. No, I don't think she should
22 have been. I misunderstood the question.
23    Q. Yeah. Any idea how she originally came
24 about to represent Auto-Owners then?
25    A. I'm pretty sure that she was originally

Page 38

1 retained by the principal, and under certain
2 circumstances sureties are willing to essentially
3 tender their defense to the principal to provide
4 counsel for not only the principal but also the
5 surety, and I think that's how this came about.
6    Q. Understood. Okay.
7    Do you want to check on your invoice
8 while I'm getting ready for the next one?
9    A. Sure.
10    (Off the record to check on invoice.)
11 EXAMINATION BY MR. WEED:
12    Q. Mr. Thompson, I'd like to turn to
13 Exhibit C, which appears to be your resume. And,
14 again, this is to your report -- Exhibit C to your
15 report on the reasonableness of attorneys' fees
16 marked as Exhibit 165 to your deposition.
17    A. Yes.
18    Q. M'mm, your partner, DeWitte Thompson,
19 correct? I'm sorry. DeWitte Thompson, to me,
20 looks like a law firm name, and I just asked that
21 question stupidly.
22    What is the name of the firm you're a
23 partner at?
24    A. Thompson & Slagle, LLC.
25    Q. Thompson & Slagle, LLC.

Page 39

1    How many lawyers are here in your firm?
2    A. Eight, I think.
3    Q. How long have you been a partner of
4 Thompson, Slagle?
5    A. M'mm, since 1976. You know, it's been
6 through a couple of iterations.
7    Q. M'mm-H'mm.
8    A. Then it was DeWitte Thompson, PC. We
9 had another partner at one point in time named
10 Michael Hannon, so went from DeWitte Thompson to
11 Thompson & Slagle, to Thompson, Slagle, and then
12 back Thompson & Slagle, but I've been the senior
13 partner in all of those entities.
14    Q. Since 1976?
15    A. Yes.
16    Q. So you really founded this what, one
17 year after graduated from law school?
18    A. M'mm, 14 months.
19    Q. 14 months after graduating from law
20 school. Well, good. You're not like some
21 witnesses where we're going to have to go through
22 about 20 jobs to figure out how they got there.
23    From 1975, until you started Thompson,
24 Slagle in 1976, what did you do in that 14 months?
25    A. I was a -- well, I was in private

Page 40

1 practice with a law firm called Dollar &
2 Dettemering, D-E-T-T-E-M-E-R-I-N-G. We did all
3 sorts of stuff.
4    M'mm, after that, I was in a
5 partnership, and I left that firm, became a
6 partner --
7    Q. Where are they located, before we move
8 on?
9    A. They're long gone.
10    Q. Where were they located?
11    A. They were located in Douglasville. Tim
12 Dollar's retired now, and Neil Dettemering's a
13 judge.
14    Q. And for the people in Alabama who may be
15 ultimately hearing this testimony, Douglasville is
16 where?
17    A. About 20 miles west of Downtown
18 Atlanta.
19    Q. Okay.
20    And then you were about to tell me about
21 your next stop?
22    A. Yeah. Then I established a partnership,
23 m'mm, Palmer & Thompson, and, m'mm, we stayed
24 together for about ten months, and then I
25 established my firm.

**DeWitte Thompson, Esquire**   **13**

Page 49

1   Q.  Really?
2   A.  It was really interesting.
3   Q.  M'mm, one of the things you indicate in
4   your specific area of practice in the surety
5   field, you point out that investigation includes a
6   financial analysis of the surety's potential
7   exposure.
8   A.  M'mm-H'mm.
9   Q.  Neither this opinion or the one
10  involving the agents standard of care did you do
11  financial analysis yourself?
12  A.  Only to the extent that -- this
13  phraseology in the resume is broader than this,
14  but what I did do was a forensic underwriting of
15  the bond.
16  Q.  M'mm-H'mm.
17  A.  Which would be part of financial
18  analysis of a surety's potential exposure, except
19  it's no longer potential in this case.
20  Q.  When you say forensic underwriting, you
21  mean after the fact?
22  A.  Yes.
23  Q.  You ever heard that referred to as
24  reverse underwriting?
25  A.  I have not.

Page 50

1   Q.  Okay.  I think we may have about covered
2   this first report.  Before we move on to the
3   second one, I would like to see if I could get the
4   printout of the invoices, so we can get some
5   follow-up questions in.
6       (Off the record to check on invoices.)
7   EXAMINATION BY MR. WEED:
8   Q.  Mr. Thompson, we were talking off the
9   record.  We have got some information that we are
10  waiting on, and when we do get it, I'd like to go
11  back into some of the questions about Exhibit 165
12  and the attorneys' fees and things like that, but
13  we will move on for now, and did you get copies
14  made of the -- or we're waiting on those, too?
15  A.  They -- she will have them any minute.
16  Q.  Okay.  I'll ask some questions, and we
17  will do without this.
18      You mentioned that you had done forensic
19  underwriting of the finan --
20  A.  Correct.
21  Q.  Of the underwriting file?
22  A.  Yes.
23  Q.  Did that include the financial
24  underwriting file?
25  A.  Yes.

Page 51

1   Q.  Did you understand there were two
2   separate files involved?
3   A.  M'mm, most sureties have a, quote,
4   unquote, "underwriting file and a financial file."
5   Q.  When you say most, how many underwriting
6   files would you say you've looked at in the past?
7   A.  Approximately?
8   Q.  Yeah.
9   A.  I would say somewhere between eight and
10  1,200.
11  Q.  Eight to 1,200?
12  A.  Yes.
13  Q.  Okay.
14      Did all of those involve claim
15  situations?
16  A.  Vast majority.  Once in a while we're
17  consulted by a surety in anticipation of writing a
18  bond about an underwriting issue, but it's fairly
19  rare.
20  Q.  When you say consulting underwriting
21  issue, what might that involve?
22  A.  It's more -- more, I should have said
23  underwriting/legal issues, but not always.  Like,
24  for example, m'mm, an underwriter might call up
25  and say I'm considering writing a bond for ABC

Page 52

1   Concrete, and the obligee is Jack Jones
2   Construction.  They're supposed to be a big
3   construction contractor out of Georgia.  What can
4   you tell me?  Or they've been provided with an
5   unusual bond form.  What do you think about our
6   potential exposure on this bond form?  Or probably
7   a number of other circumstances.  Those are the
8   only two things that come to mind, you know.  Very
9   isolated involvement in the early stage.
10  Q.  What about the contract?
11  A.  Sometimes we will be asked to look at
12  something that they found that they find unusual
13  in the contract.
14  Q.  As part of your review of the
15  underwriting file in this case, did you review the
16  contract?
17  MR. CRAFTON:
18      Object to form.
19  THE WITNESS:
20      I reviewed the contract, but it --
21      I didn't consider it in doing my
22      underwriting analysis.
23  MR. WEED:
24      Okay.
25  EXAMINATION BY MR. WEED:

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

AUTO-OWNERS INSURANCE )
COMPANY, )
)
      Plaintiff, )  Civil Action
)  File No: 2:11-cv-00468-WHA-SRW
v. )
)
TOMBERLIN, YOUNG & FOLMAR )
INSURANCE CO. d/b/a SOUTH )
CENTRAL AGENCY, JOHN S. )
TOMBERLIN and HAROLD )
W. YOUNG, )
)
      Defendants. )

## PLAINTIFF AUTO-OWNERS INSURANCE COMPANY'S EXPERT REPORT OF DEWITTE THOMPSON CONCERNING SURETY AGENT STANDARD OF CARE

The following is a report of my expert opinion regarding surety issues in the

above-styled lawsuit, specifically including the standard of care owed by the agent

for a commercial surety company with respect to collecting information from and

about an applicant for a surety bond and reporting that information to the surety

company for consideration by the company in deciding whether to undertake

issuance of a requested surety bond. My opinion further addresses whether the

defendants in this action met the applicable standard of care with respect to an

application for issuance of a bond by Plaintiff Auto-Owners Insurance Company

EXHIBIT

167

("AOIC") for a company called S&S Construction Company ("S&S"), and the consequences of the defendants' actions.  This report is intended to comply with the procedures outlined in Fed. R. Civ. Proc., Rule 26(a)(2)(B) regarding expert testimony and other disclosures.

## I.     COMPLETE STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS FOR THOSE OPINIONS.

### A.     EXPERT   OPINION   REGARDING   SURETY   AGENT STANDARD OF CARE

The defendants in the above-styled action, Tomberlin, Young & Folmar Insurance Co. d/b/a South Central Agency, John S. Tomberlin and Harold W. Young  ("Defendants," or, respectively, "South Central Agency," "Tomberlin," and "Young") acted institutionally and individually as agents for AOIC with respect to AOIC's business of issuing surety bonds for a premium as a commercial surety.  (The business and practice of acting as an agent for a commercial surety in the marketplace for surety bonds, particularly for bonds issued in connection with construction contracts, is hereinafter referred to as being a "Surety Agent.")   The role of a Surety Agent in the process of underwriting surety bonds is critically important to any commercial surety.  A Surety Agent is responsible to the surety he represents for procuring the clients (bond principals) and presenting them to the surety for underwriting.  Surety companies have a high degree of trust in the

information about the clients that their Surety Agents present. Surety is a credit risk business and a performance and payment bond carries a substantial financial obligation for the surety. Surety companies must depend upon their Surety Agents to present a fair, balanced, and complete financial picture of the client to them for underwriting. The Surety Agent is the primary point of contact between the surety and the prospective principal on the bond. It is the obligation of the Surety Agent to develop a direct and personal relationship with the prospective principal, in part, to develop material information concerning the prospective risk undertaking which the surety is considering in connection with the issuance of the particular bond in question. The Surety Agent is required to be familiar with underwriting standards of the particular surety that he represents for the type of bond which is being considered by the surety. The Surety Agent's obligation is to collect material information concerning the risk undertaking that is involved in any bond requested by the prospective principal on that bond. Perhaps most importantly, the Surety Agent must convey to the surety all of the information that is within the knowledge of the Surety Agent which appears to be material to the surety's risk undertaking in connection the issuance of the particular bond. Failure to disclose adverse material facts to the surety is an especially egregious violation of the duties and obligations that the Surety Agent has to the surety company.

An ordinary reasonable and prudent Surety Agent will convey to the surety (normally to the underwriting department) all important and material information of which the agent is aware and which may affect the surety's risk and therefore the surety's decision whether or not to issue the bond.

An ordinary reasonable and prudent Surety Agent is aware that there are several broad criteria the surety considers in connection with the underwriting of a bond. These criteria include character, capacity, capital and credit. The Surety Agent is responsible for making a preliminary determination as to whether or not a prospective principal for a bond application meets the criteria necessary and appropriate in each of these four (4) categories in order to qualify for a bond. While the home office underwriter also underwrites the bond, the home office underwriter relies heavily upon the Surety Agent to provide material information to the home office for review and evaluation, and particularly to provide information that may not be set forth in the documentation provided to the surety.

In this particular case, the Defendants, as Surety Agents for AOIC, had a duty based upon industry standards to convey all material information to AOIC which South Central Agency possessed or was aware of regarding the potential risk undertaking for AOIC as a surety in connection with the issuance of the bond which is the subject of this litigation, and to provide that information to AOIC

-4-

prior to the issuance of the bond by the surety. Significant material information was known to the three (3) Defendant Surety Agents that was not disclosed by the Defendant Surety Agents to AOIC or its underwriters. No reasonable, prudent underwriter or surety would have approved issuance of the performance and payment bonds that were issued by AOIC for S&S and which ultimately resulted in a loss to AOIC of over $3.3 million dollars, after having been apprised of the material information that was known by the Defendant Surety Agents but which was not disclosed by them to AOIC. Because I presume that AOIC would have acted in its own best interests, as a reasonable, prudent surety, in evaluating and acting upon information provided to AOIC by the Defendant Surety Agents, I therefore conclude that, but for the failure of Defendant Surety Agents to disclose to AOIC the material information that was known to them concerning S&S prior to issuance of the S&S bonds, AOIC would have declined to issue the bonds in question and would not have suffered the consequent loss of over $3.3 million dollars.

Material information that the Defendant Surety Agents were aware of that should have been revealed prior to the issuance of the bonds, but which the Defendant Surety Agents did not disclose to AOIC, includes but may not be limited to the following:

(1)     That, as early as August, 2006, that S&S' financial condition was such that S&S would not be able to continue work on the Naval Air Station Project without a cash infusion from an outside source.

(2)     That, as of August, 2006, the indemnitor, Michael Smith, had encumbered all of his houses, property and equipment, but that the encumbrances were not reflected in the financial statements of Michael Smith or of S&S provided to the surety.

(3)     That between June and August, 2006 S&S was having cash flow problems.

(4)     That, from June through August, 2006 and beyond, S&S was having trouble making all of its payments, and meeting its financial obligations.

(5)     That S&S was attempting – unsuccessfully – to obtain a new line of credit (an effort that Tomberlin and Young attempted to assist) at the time that the Surety Agents were seeking issuance of the bond in question.

(6)     That, by December, 2006, S&S was still having financial difficulties and having difficulty obtaining payment from the general contractor, Dick Corp., on its largest project.

(7)     That, by late 2006, Dick Company was making direct payments to S&S' subcontractors and suppliers, and was not making normal interim monthly payment to S&S.

(8)     That by December, 2006, S&S had exhausted its line of credit at Peoples Bank and was applying for a $1,000,000 letter of credit to provide to Dick from the bank in order to continue operations at that time.

(9)     That Smith/S&S considered himself "broke" as of August, 2006 (and he so advised Tomberlin).

(10)   That, as of the summer of 2006, there were two or more separate and distinct financial statements for S&S which were materially different from each other.

(11)   That S&S was already performing masonry work on the Naval Air Station Project for the contract amount of approximately $4.3 million in June, 2006.

(12)   That throughout the last six (6) months of 2006 that S&S was unable to pay its continuing obligations for the masonry work prior to the issuance of the bond.

(13)   That work on the masonry subcontract was already ongoing at the time that the application was made for the bond and continued during the time that the bond was actually issued. Further, representatations were made by Defendant Tomlinson to S&S that Tomlinson would assure that S&S would be able to obtain a bond for the project.

(14)   That for months prior to issuance of the bond S&S was not being paid by Dick Corp. for the masonry work being performed.

(15)   That the line of credit with the bank that S&S obtained had already been exhausted by the time the final underwriting of the bond was taking place in December, 2006 before the actual execution of the bond.

It is my opinion that the Surety Agents negligently failed to perform their responsibilities in accordance with industry standards. They further failed to perform their duties in an ordinary reasonable and prudent manner by failing to provide the surety, AOIC, with material information of which they were aware (and listed above) that, undoubtedly, would have resulted in AOIC's refusal to

-7-

issue the bond in question, and therefore would have eliminated the loss incurred by AOIC of over $3.3 million.

It is my opinion that, if the surety had been aware of existence of any one of the above-described facts, that an ordinary reasonable and prudent surety would not have issued the bond in question nor, would any surety. All of the above facts are understood by the undersigned to have been within the knowledge of the Defendant Surety Agents, and that information could have been conveyed to the home office of AOIC and its underwriting department by the Defendant Surety Agents prior to the issuance of the bonds in question. The Defendant Surety Agents did not convey this information to AOIC, and as a result, AOIC issued performance and payment bonds in question which resulted in a loss to AOIC. A Surety Agent is responsible for making sure that he has an understanding of the information that is material and important to a surety for a proper and complete analysis of a decision as to whether to issue a surety bond. The Surety Agents in this case either did not know what information was important or material or were negligent in their failure to convey that information o the Surety.

The letter of instructions provided by AOIC to the Surety Agents on or about September 20, 2005 provided in part "the discretionary authority granted hereby shall be exercised with respect to any particular bond ONLY WHEN YOU ARE

-8-

THOROUGHLY SATISFIED after thorough investigation of all facts surrounding the case, THAT IS IT A PROPER RISK FOR THE COMPANY TO ASSUME." While the surety did in fact approve this specific undertaking, it is clear from the letters of instruction that it was the intention of the parties that Defendants' Surety Agents assess the risk which the Surety Agents propose that AOIC may undertake (as it is customarily in the industry). The failure on the part of the Surety Agents to advise AOIC that they were not thoroughly satisfied that the surety bonds to be issued for S&S were a "proper risk for the company to assume fails to comply with standards within the industry. The failure to properly advise the surety was inconsistent with the conduct of an ordinary reasonable and prudent Surety Agent. The failure to advise to surety that this risk should not be undertaken, given all the facts that the Surety Agents were aware of was negligence and a violation of their duty to comply with the letters of instructions provided by AOIC to the Surety Agents.

As described above, two (2) of the primary requisites for issuance of a bond are the evaluation of the prospective principal's credit and capital. Credit is another way of saying or describing the principal's history of satisfying his continuing financial obligations on a regular basis. That is the say: Has the principal typically paid his bills in a timely manner? Capital is another way of

summarizing whether the prospective principal has the capacity, that is, the money or access to money to satisfy his continuing obligations. It is evident that the circumstances of S&S had dramatically changed from the date of the preparation of the June, 2006 financial statements for S&S (which were provided to AOIC), and the time of the last request for issuance of the bond in December, 2006 and early January, 2007, or the Surety Agents were aware that the financial statements were materially inaccurate. In either event, the surety should have been advised of these facts. The Surety Agents were aware of this change or inaccuracy, but did not alert AOIC to that material fact that S&S considered itself "broke" and was apparently effectively "broke" before the bond was issued.

Capital is probably the first and foremost consideration by a surety in determining whether or not to issue a bond. Regardless of the respective principal's capabilities, regardless of the adequacy of his price, if the principal does not have the ability to fund continuing operations for the project and pay his outstanding contractual obligations to subcontractors and material suppliers, then the principal will inevitably fail on the project.

The Surety Agents were fully aware that the principal was having significant and material financial difficulties as a result, in part, of the failure of Dick Corporation to make payments to S&S. Regardless of the cause of the financial

-10-

difficulties, if a Surety Agent is aware that a principal is having material and substantial financial difficulties and difficulties paying outstanding obligations, that information should be conveyed by the Surety Agent to the surety's home office underwriting department.

**II. DATA OR OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING THE OPINIONS.**

    A.    Deposition of Harold Young

    B.    Deposition of Michael Smith

    C.    Deposition of Thomas Froman

    D.    Deposition of James House

    E.    By-Laws and Ethical Standards of NASBP

    F.    Deposition of John Tomberlin

    G.    First Amended Complaint of Auto-Owners Insurance Company

    H.    Fidelity & Surety Department Letter of Instructions

    I.    Agency Contract Between Defendants and AOCI

    J.    Power of Attorney and Bonds

    K.    Various emails concerning the subject matter

    L.    AOIC underwriting file

    M.    Depositions of Shelby Gardner

    N.    Various Depositions in the underlying case

    O.    Documents produced by parties and non-parties in the underlying case.

[In the United States District Court for The Middle District of Alabama, Northern Division, Auto-Owners Insurance Company v. Tomberlin, young & Folmar Insurance Co., d/b/a South Central Agency, John S. Tomberlin and Harold W. Young; Civil Action File No. 2:11-cv-00468-WHA-SRW - Plaintiff Auto-Owners Insurance Company's Expert Report of DeWitte Thompson Concerning Surety Agency Standard of Care]

This __7__ day of March, 2012.

THOMPSON & SLAGLE, LLC

DeWitte Thompson

12000 Findley Road
Suite 250
Johns Creek, GA 30097
Telephone: (770) 662-5999
Email: dthompson@tandslawfirm.com

**Dan McCurdy** 1

**Page 1**

```
1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF ALABAMA
2              NORTHERN DIVISION

3    AUTO-OWNERS INSURANCE
     COMPANY,
4          Plaintiff,    CIVIL ACTION
             vs.      FILE NO. 2:11-CV-00468
5    TOMBERLIN, YOUNG & FOLMAR   -WHA-SRW
     INSURANCE CO. d/b/a SOUTH
6    CENTRAL AGENCY, JOHN S.
     TOMBERLIN and HAROLD W.
7    YOUNG,
          Defendants.
8    ~~~~~~~~~~~~~~~~~~~~~~~~
     TOMBERLIN, YOUNG & FOLMAR
9    INSURANCE CO. d/b/a
     SOUTH CENTRAL AGENCY,
10   JOHN S. TOMBERLIN and
     HAROLD W. YOUNG,
11             Plaintiffs,
               vs.
12   AUTO-OWNERS INSURANCE
     COMPANY,
13             Defendant.
14   ~~~~~~~~~~~~~~~~~~~~~~~~

15          DEPOSITION OF

16          DANIEL T. McCURDY

17

18          10:08 a.m.

19          March 28, 2012

20

21   THOMPSON, SLAGLE & HANNAN, LLC

22   1200 Findley Road, Suite 250

23        Duluth, Georgia

24

25   Colleen B. Seidl, RPR, CRR, CSR-B-1113
```

**Page 2**

```
1      APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff, Auto-Owners Insurance
     Company:
4       ALBER CRAFTON, PSC,
        THOMAS CRAFTON, ESQ.
5       9300 Shelbyville Road, Suite 1300
        Louisville, Kentucky 40222
6       502.815.5000
        502.815.5005 (Facsimile)
7
        MORROW, ROMINE & PEARON, P.C.
8       ROGER S. MORROW, ESQ. (Via Telephone)
        122 South Hull Street
9       Montgomery, Alabama 36104
        334.262.7707
10      334.262.7742 (Facsimile)
        rsmorrow@mrplaw.com
11

12

13   On behalf of the Defendants/Counterclaimants:
     Tomberlin, Young & Folmar Insurance Co. d/b/a
14   South Central Agency, John S. Tomberlin and
     Harold W. Young:
15      MARTIN WEED, LLC
        EDWARD M. WEED, ESQ.
16      100 Union Hill Drive, Suite 150
        Birmingham, Alabama 35209
17      205.443.6661
        emweed@martinweedllc.com
18

19

20          - - -

21

22

23

24

25
```

**Page 3**

```
1         INDEX OF EXAMINATION

2

3    WITNESS: DANIEL T. McCURDY

4    EXAMINATION                    PAGE

5    EXAMINATION BY MR. WEED            4

6

7         INDEX TO EXHIBITS

8    Defendants/Counterclaimants
9    Exhibit     Description       Page

10

11   168    Résumé of Daniel T. McCurdy     7

12   169    Expert Report of Daniel T. McCurdy   7

13

14        (Original Exhibits 168 and 169 have been
     attached to the original transcript.)
15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1    DEPOSITION OF DANIEL T. McCURDY

2          March 28, 2012

3        (Reporter disclosure made pursuant to
     Article 8.B. of the Rules and Regulations of the
4    Board of Court Reporting of the Judicial Council
     of Georgia.)
5

6       MR. WEED:  Usual stipulations?

7       MR. CRAFTON:  Yes.

8          DANIEL T. McCURDY,

9    having been first duly sworn, testifies as follows:

10            EXAMINATION

11   BY MR. WEED:

12   Q.   Would you, please, state your name for the

13   record.

14   A.   Daniel T. McCurdy, M-c-C-u-r-d-y.

15   Q.   And the second C is capitalized?

16   A.   Yes, like McDonald's.

17   Q.   Mr. McCurdy, we met before the deposition,

18   and my name is Butch Weed.  I represent the

19   Defendants/Counterclaimants in the case, John

20   Tomberlin and Harold Young, South Central Agency, and

21   I'm going to be taking your deposition here today

22   about the case that Auto-Owners has filed against

23   them.

24   A.   Yes.

25   Q.   Have you given a deposition before?
```

**Daniel T. McCurdy**



Winter Park, FL

March 6, 2012

Thomas E. Crafton, Esq.
ALBER CRAFTON, PSC
9300 Shelbyville Road
Suite 1300
Louisville, Kentucky 40222

Re:    Auto-Owners Insurance Company ("AOIC")
       Tomberlin, Young & Folmar Insurance Company, d/b/a South Central Agency ("SCA")

Dear Tom:

I have reviewed information concerning the litigation between AOIC and Agents John Tomberlin and Harold Young, Owners of the South Central Agency. You contacted me to provide an expert opinion based on my years of surety underwriting and management which began in 1958. Those years working with contractors and agents provided me with the background to give an evaluation of an agent's responsibilities and expectations in their relationship with the company.

In the Fall of 1974 I joined The Cincinnati Insurance Company as Bond Manager of a Department writing $200,000 in bond premiums with a staff of six people. I developed a team in the Home Office and Field of 90. This included adding to the product line of Bank Bonds and Executive Risk with the premium for the Department reaching $110,000,000.00 when I retired in January 2007. We were always profitable, and we considered the agents a very important factor in our profitable growth. Although their skill levels varied, they were our most important asset.

A copy of my resume is attached. My report, with exhibits, upon which I based my opinion, is also attached.

Very truly yours,

Daniel T. McCurdy

Enclosures



# QUALIFICATIONS / EXPERT WITNESS

Daniel T. McCurdy



Winter Park, Florida

1974 – 2007
Cincinnati Insurance Company - Cincinnati, Ohio
Senior Vice President - Manager Bond & Executive Risk
Board of Director:  Cincinnati Insurance Co., Cincinnati Indemnity Co.
Cincinnati Casualty Co.

1966 – 1974
Seaboard Surety Company – New York, N.Y.
Branch Manager - Baltimore, Md.
Assistant Secretary & Contract Underwriting Manager – New York, N.Y.

1958  - 1966
C N A Insurance Company -  Chicago, Il.
Surety Underwriter  - Chicago, Il.

Degree:    Loyola  University – Chicago, Il.  BSC  -  1958
Military:  U S  Army  10th. Mountain Division  1953 – 1955
Associations:  Surety & Fidelity Association of America
                        National Association of Independent Sureties and
                        Chair:  1979

Continue

Responsibilities at Cincinnati Insurance Co. from 1974 to 2007:
Manager of surety, fidelity and professional liability products.
Setting standards and requirements for documents and conditions for
underwriting for all contract and miscellaneous surety.
Entire career ( 48 + years ) engaged - hands on - with contractors providing
performance and payment bonds involving thousands of  contractors and
bonds throughout the United States.
Surety Staff of 60 surety underwriters, field and clerical.

The Cincinnati Financial  Corporation is a Fortune 500 Company, and the
major operating insurance company is The Cincinnati Insurance Company
which has an A M Best rating of A+.  It writes property, casualty and surety
bonds through approximately 1200 independent insurance agencies located
in 42 states.

DANIEL T. McCURDY

**Daniel T. McCurdy**



Winter Park, FL

### EXPERT OPINION

**Re:    AOIC v. South Central Agency/Young & Tomberlin**

The purpose of my engagement as an expert Surety witness is to identify the obligations an Agent has to the Surety Company to whom the Agent has submitted and procures surety bonds. That obligation exists during the submission process and through the bond exposure on the bond to the surety.

I will use the following terms interchangeably throughout my opinion:

**South Central Agency** or **Agency** or **SCA;**

**Harold Young, President** or **Young** or **Agent;**

**John Tomberlin, Vice President** or **Tomberlin** or **Agent;**

**Auto-Owners Insurance Company** or **AOIC** or **Surety Company** or **Surety;**

**S&S Construction** or **Michael Smith** or **Smith;**

**Dick Corporation, the General Contractor** or **Dick;** and

**Shelby Gardner, the Manager of Dick's on the Project.**

It will be assumed that bond and issues associated with it are known.

The foundation of the relationship between AOIC and SCA is the Agency Agreement dated October 1, 2004 and the Fidelity and Surety Department Letter of Instructions dated September 20, 2005.  These contracts were both signed by Young and Tomberlin as Officers of SCA. (Exhibit #1)

1

It is also appropriate to establish the definition of two words that are at the heart and soul of the obligations of the Agents appointed by AOIC, Messrs. Young and Tomberlin. **Agent** and **Trust**. The Webster Dictionary of the English language, which can be found in the Library of Congress Catalogue Card #73 – 1877, defines the words as follows:

> **Agent:** A person entrusted with the business of another.

> **Trust:** A reliance or resting of the mind on the integrity, veracity, etc. of another person; confident expectation; reliance or belief without examination.

In the case of a contract surety account, an agent is responsible for obtaining underwriting data which includes, but is not limited to information of:

- The business organization, and other investments.
- Financials: All businesses and personal statements of owners.
- Bank Information: Businesses and personal.
- Contracts outstanding and planned and status of all.
- All information the agents know of the account – both good and bad.
- Express and informed opinion based on what the agent knows or should know about the account, owner(s) and their investments, as highlighted in the F&S Department letter of Instruction.
- If a specific contract bond request, the related contract documents or projects to be bonded, or the account's work program for a future bond program.

We see evidence in the depositions taken of Young and Tomberlin that neither performed in the best interest of AOIC, but rather violated the trust AOIC had a right to expect of their agents. Specifics concerning the subject are in the following paragraphs.

2

What I consider as the first act of violation of trust is the letter of May 23, 2006 (Exhibit #2) which was authored and signed by Young as attorney-in-fact. It is what we call the "To Whom It May Concern" letter regarding S&S Construction Company. Young states that "The surety is Auto-Owners Insurance Co." That statement was a clear misrepresentation of fact, and it was faxed to Kelly Baxter on June 12, 2006, which was prior to the account being accepted for surety credit by AOIC. AOIC reviewed information submitted by Tomberlin in June and through November of '06 and declined to approve a bond until December '06, and that was a conditional approval that was not consummated until January '07.

In a deposition of Young, (Exhibit #3), Young explains that he wrote the letter because "Michael was a very good customer of ours and just wanted – a quality guy, and I was trying to help him in any way I could." That letter was faxed to Kelly Baxter, Vice President, Peoples Bank of Coffee County, to help the account obtain a bank line of credit. Certainly, this was self-serving for Agent Young. A good account is another way of saying that it pays me/the Agency a lot of money.

During the following months, Agent Tomberlin appears to be the Agent focused on the account to persuade and plead with AOIC to write the bond being required by the Dick Corporation. He also had contact with Kelly Baxter as a part of that effort.

By December '06, Smith had performed various parts of the very large project, which, in the effort to assist in approval of the surety bond request of AOIC, and to protect its interest, Dick divided the contract into sections. After what turned out to be the final submission by Tomberlin to AOIC, AOIC approved the writing of the bond based on the condition it receive an irrevocable

3

standby letter of credit (ILOC) for $100,000.00.  That ILOC was issued by Baxter/Peoples in January '07.  (Exhibit #4)

In the deposition of Dick Corporation's Project Manager, Shelby Gardner (Exhibit #5), Gardner spoke of paying Smith's suppliers early in S&S's performance of the 152 work which would have been April-May '07, which was a technical breach of contract by Dick.  When asked by Attorney Crafton, "Is there any reason why you didn't notify the bonding company?"  Gardner replied, "We notified John Tomberlin, the agent, I guess the insurance agent."  It is obvious that even the contractor considered the agent to be the same as the company whom he represented, AOIC.  Yet, Tomberlin did not provide this information to AOIC.

Continuing with Exhibit 5, Gardner also indicated that he had conversations (note plural) with Tomberlin, the agent in the "Winter '06" while Gardner was still making an effort to help Smith secure a bond for Gardner's employer, Dick Corporation, through Tomberlin, the AOIC Agent. Not revealing this information to AOIC was clearly a violation of the obligation the Agent had to AOIC.

Contractor, Banker and Agent were all connected in their efforts to get the bond written.  Kelly Baxter, Vice President of the Peoples Bank of Coffee County, had been introduced to Smith by the Agents, and had, as stated earlier, received the "To Whom It May Concern" letter from Young via fax.  Smith became an account of Baxter/Peoples Bank in June '06. On February 13, 2007, in the same time window that the surety bond was being released with Peoples $100,000.00 ILOC as collateral to AOIC, the Peoples Bank was also issuing the Irrevocable Standby Letter of Credit No. 326 for $1,000,000.00 for S&S to the benefit of Dick.  This

4

involved all of the four subcontracts including 21084-152. In Exhibit 6 Smith states Tomberlin worked with the Bank to secure the $1,000,000.00 Letter of Credit with Dick as the Beneficiary. Information of the $1,000,000.00 ILOC was not conveyed to AOIC by Tomberlin. Securing that letter obviously affected the financials of S&S while Tomberlin executed the bond.

Within months, on June 11, 2007, (Exhibit #7) Dick called on the ILOC and the Peoples Bank of Coffee County issued an official check for $1,000,000.00 payable to Dick. The basis was that S&S was in default on the four subcontracts. That is a huge amount to release, regardless of the collateral Peoples held. In Smith's Deposition (Exhibit #6) he tells us that he told Tomberlin of it being drawn upon. Again, AOIC was not made aware of this significant event which, I know from experience, would have alerted them to investigate the status of their bonded contractor and the project. Action at that time may have mitigated their eventual loss. Again, another failure of Tomberlin to do what is expected of a Surety Agent.

Thomas Froman is the Surety Claim Representative for AOIC. In his deposition, he refers to a meeting in August '07 (Exhibit #8) and references Shelby Gardner's deposition about a meeting held in Pensacola attended by Tomberlin, Young, Gardner and Baxter. "Gardner intended to notify Auto-Owners of the fact that they were in default. And based on Mr. Tomberlin's assurance and urgings, Mr. Gardner did not identify [meaning notify] Auto-Owners." This is yet another example of Tomberlin not meeting his obligation as AOIC's Agent.

In summary, both Harold Young and John Tomberlin clearly have violated their obligations and the expectations of an Agent by not notifying AOIC of significant financial events, both prior to the execution of the bond, and while AOIC had outstanding liability.

My compensation is as follows:

| | |
|---|---|
| **Hourly Rate** | **$200.00** |
| **Testimony Rate** | **$250.00** |
| **Expenses** | **At Cost** |

This completes my report.

Daniel T. McCurdy

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT FOR THE

2       MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5  CIVIL ACTION NO: CV 2:11-CV-00468-WHA-SRW

6

7  AUTO-OWNER'S INSURANCE GROUP,

8       Plaintiff,

9  vs.

10  TOMBERLIN, YOUNG & FOLMAR INSURANCE COMPANY

11  D/B/A SOUTH CENTRAL AGENCY, JOHN S. TOMBERLIN

12  and HAROLD W. YOUNG,

13       Defendants.

14

15            DEPOSITION

16               OF

17            JAMES HOUSE

18       MONTGOMERY, ALABAMA

19       DECEMBER 16, 2011

20

21  REPORTED BY: Caila Bonds

22       Court Reporter

23

**Page 2**

1       S T I P U L A T I O N S

2

3       IT IS STIPULATED AND AGREED by and

4  between the parties through their respective

5  counsel that said deposition may be taken before

6  Caila Bonds, Court Reporter;

7       That the signature to and the

8  reading of the deposition by the witness is

9  waived, the deposition to have the same force

10  and effect as if full compliance had been had

11  with all laws and rules of Court relating to the

12  taking of depositions:

13       That it shall not be necessary for

14  any objections to be made by counsel to any

15  questions, except as to form or leading

16  questions, and that counsel for the parties may

17  make objections and assign grounds at the time

18  of trial, or at the time said deposition is

19  offered in evidence or prior thereto.

20

21

22

23

**Page 3**

1       A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:

4       MR. TOM CRAFTON

5       Alber, Crafton, PSC

6       Suite 1300

7       9300 Shelbyville Road

8       Louisville, Kentucky 40222

9

10       MR. ROGER S. MORROW

11       Morrow, Romine & Pearson, P.C.

12       122 South Hull Street

13       Montgomery, Alabama 36104

14

15  FOR THE DEFENDANT:

16       MR. EDWARD M. WEED

17       Martin Weed, LLC

18       2700 Highway 280 South

19       Suite 290

20       Birmingham, Alabama 35223

21

22  ALSO PRESENT:

23       MR. THOMAS FROMAN

**Page 4**

1       EXAMINATION INDEX

2

3  JAMES HOUSE

     DIRECT BY MR. WEED              8

     CROSS BY MR. CRAFTON          246

     REDIRECT BY MR. WEED          283

     RECROSS BY MR. CRAFTON          289

8

9       EXHIBIT INDEX

10
Exhibit
11  68  Notice of Deposition for James    24
         House
12
13  69  30(B)(6) Notice of Deposition     24
14
     70  The Complaint            28
15
     71  Document from SFAA web site      80
16
     72  Missouri Department of Insurance  91
         Printout
17
     73  Printout from Department of      93
         Missouri web site
18
     74  Printout from SFAA          95
19
     75  Information Provided in the      97
         Prequalification Process
20
21  76  Letter from Ms. Byers          125
22  78  Information Provided in the      129
         Prequalification Process
23
     79  Letter to Mr. House          132

**James House** 13

Page 49

1  MR. CRAFTON: Objection.
2  A. If they reviewed the form that is
3  provided to them, our general rule and rate
4  manual does have a list of items also in it,
5  which are identical to the prequalification
6  form.
7  Q. When you say form provided to them,
8  would that be the contractor's application for
9  bonding?
10  A. The contractor's application for
11  bonding that is in this file does not provide
12  that.
13  Q. Okay.
14  A. It is an old form.
15  Q. What was the old form you are
16  referring to?
17  A. Excuse me?
18  Q. You mentioned if they review the form
19  provided they will know what to send, what form
20  are you talking about?
21  A. The prequalification form that has
22  been provided to the agents either in paper or
23  online for a number of years.

Page 50

1  Q. Okay. I would ask if you would, at
2  this time, turn back to the complaint, Exhibit
3  G, which is at the very end. Those are the two
4  applications submitted here.
5  A. Yes, sir.
6  Q. Are either one of those the form that
7  you are referring to here as we are talking?
8  A. The prequalification form or the
9  application for contract bond?
10  Q. Either one of these forms that have
11  been labeled the application in this case?
12  A. The application for contract bond
13  provided here is an old form. I don't know
14  whether it was still specifically in use at that
15  time. This form was provided at one time for
16  prequalification, but at the time of this, I
17  believe it was only used for specific projects.
18  Q. Okay. And if you'd flip through to
19  last page of that.
20  A. Yes, sir.
21  Q. It is actually this page that has
22  been labeled part of Exhibit G.
23  A. Yes, sir.

Page 51

1  Q. Is that an application form?
2  A. Yes, sir
3  Q. Okay. Is that the form you are
4  referring to that would tell them what they
5  needed?
6  A. No, sir, this is not an application
7  for contract bond. This is for surety bonds
8  other than contract bonds.
9  Q. And what is this form called that you
10  have referred to that would tell the agent what
11  they need to submit?
12  A. What is the --
13  Q. You mentioned that there was a form
14  that would tell the agents what they needed to
15  submit.
16  A. I believe the form number is 29157.
17  This is the contract bond prequalification
18  program. That is not an application. It is
19  simply a questionnaire along with some other
20  information provided to the agent.
21  Q. In this case we are here about today,
22  do you recall ever seeing a contract bond
23  prequalification form?

Page 52

1  A. No, sir.
2  Q. So that was not done in this case?
3  A. No, sir.
4  Q. You understand that this bond was for
5  a particular -- or excuse me, this request was
6  for a particular project?
7  A. Initially it appeared that it was,
8  yes, sir.
9  Q. Was there a form that would have told
10  them what they needed for a particular project
11  as opposed to a contract bond program?
12  A. In this -- in the application for
13  contract bond?
14  Q. Uh-huh.
15  A. There is no list of items that would
16  be specifically required. I believe in the form
17  there may be some, but I do not recall
18  specifically.
19  Q. Okay. Would that be something you
20  would have communicated to the agent in a
21  letter?
22  A. That other items that might be
23  required?

**James House** **14**

Page 53

1 Q. Correct.
2 A. If we did not receive those items we
3 would communicate that, yes, sir.
4 Q. Okay. And as far as the other
5 factors you referenced earlier, that would also
6 be something that may require additional
7 information, I guess as well, is that correct?
8 A. Yes, sir.
9 Q. And is it true that different
10 underwriters and, I guess, including within the
11 same company and maybe in different companies
12 would require different things when underwriting
13 surety bonds?
14 A. Being human beings we would look at
15 things differently. Our job as management over
16 the years is to try to make that as consistent
17 as possible within the departments so that we
18 are not asking every agent different questions.
19 But yes, each underwriter has a specific style
20 and a specific depth of knowledge.
21 Q. So different underwriters might
22 require different things?
23 A. It is possible, yes, sir.

Page 54

1 Q. Whether they be within the same
2 company or elsewhere?
3 A. I would expect that, yes, sir.
4 Q. Are you aware of any surety companies
5 outside of Auto Owner's and their underwriting
6 requirements in a general sense?
7 A. In a general sense, yes, sir.
8 Q. Are there some surety companies that
9 require a lot more information than Auto Owner's
10 or a lot less information than Auto Owner's in
11 order to write bonds?
12 A. Depending on the size of the work
13 they may require much less or much more than was
14 required in this case.
15 Q. Are you familiar with the Surety
16 Association of America?
17 A. The name is actually now the Surety
18 and Fidelity Association of America, yes, sir.
19 Q. Okay. When did that name change?
20 A. Within the last few years.
21 Q. Does Auto Owner's participate in the
22 Surety and Fidelity Association of America?
23 A. I believe the term is we are a

Page 55

1 member.
2 Q. You are a member. As a member do you
3 adhere to the surety premium rates that they set
4 forth?
5 A. Those rates are filed -- no, they are
6 not rates. The loss costs are filed on our
7 behalf. It is up to us to determine whether we
8 want to accept them.
9 Q. Do you generally accept those?
10 A. Generally, yes, not always.
11 Q. As far as contract surety bonds and
12 what the Surety Association or Surety and
13 Fidelity Association of America accepts, puts
14 forth -- let me start over. What role do the
15 Surety and Fidelity Association of America
16 published guidelines provide in setting
17 premiums?
18 A. They publish loss cost. I am not
19 sure what those loss cost consistent of. That
20 is all they provide to us -- well, they provide
21 a general rule and rate manual that we can also
22 take and use all or in part.
23 Q. Do you generally use all or part of

Page 56

1 that document?
2 A. Those sections that would apply to
3 the type of surety bond -- and fidelity bonding
4 that we would write, yes, sir.
5 Q. As far as specifically contract
6 surety bonds like we are talking about here
7 today.
8 A. I don't recall that we use all of
9 it. I know there are types of contract bond or
10 types of contracts that we would not be
11 interested in, so we don't publish those in our
12 own online manual.
13 Q. As far as your own online manual, the
14 rates that you publish then for contract surety
15 bonds, are they based on part of the Surety and
16 Fidelity Association rates?
17 A. The loss costs are given to us by the
18 Surety Association. As I say, we determine
19 whether we are going to accept those loss costs
20 or stay with a old set of loss costs. And then
21 additional factors are added for expense profit
22 by our actuarial department. I am not involved
23 in that.