IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:11-cv-468-WHA |
| ) | |
| TOMBERLIN, YOUNG & FOLMAR ) | (wo) |
| INSURANCE CO. d/b/a SOUTH CENTRAL ) | |
| AGENCY,  JOHN S. TOMBERLIN, and ) | |
| HAROLD W. YOUNG, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| TOMBERLIN, YOUNG & FOLMAR ) | |
| INSURANCE CO. d/b/a SOUTH CENTRAL ) | |
| AGENCY, JOHN S. TOMBERLIN and ) | |
| HAROLD W. YOUNG ) | |
| ) | |
| Counterclaimaints ) | |
| ) | |
| v. ) | |
| ) | |
| AUTO-OWNERS INSURANCE COMPANY, ) | |
| ) | |
| Counterclaim Defendant ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause is before the court on the Motion for Summary Judgment on all Claims and

Counterclaims, filed by Defendants/Counter-claimants John S. Tomberlin; Tomberlin, Young &

Folmar Insurance Co.; and Harold W. Young (Doc. #112).

This case began with a Complaint filed in the Northern District of Florida by the United

States of America against the Dick Corporation and others.  *United States, etc. v. Dick Corp., et.*

*al.*, 3:08cv56/MCR/MD.  A Fourth-Party Complaint was filed by Auto-Owners Insurance Company ("Auto-Owners") against Tomberlin, Young & Folmar Insurance Company d/b/a South Central Agency ("South Central"), John S. Tomberlin ("Tomberlin"), and Harold S. Young ("Young") (collectively "the Tomberlin Defendants").   Auto-Owners and the Tomberlin Defendants jointly stipulated to a transfer of the action to the United States District Court for the Middle District of Alabama.

After the case was transferred to this court, Auto-Owners filed an Amended Complaint,[1] with leave of court.  Auto-Owners brings claims for breach of contract (Count I),  breach of fiduciary duty during the application process (Count II), breach of fiduciary duty following the application process (Count III), indemnification (Count IV), negligent misrepresentation (Count V), and suppression of material facts (Count VI).

The Tomberlin Defendants brought a counterclaim against Auto-Owners.

The Tomberlin Defendants have moved for summary judgment as to all claims against them, and as to their counterclaim against Auto-Owners.  The court held oral argument on the pending motion on May 17, 2012.

On June 14, 2012, the court issued a Memorandum Opinion and Order denying summary judgment to the Tomberlin Defendants only as to the voluntary payment rule and statute of limitations arguments raised in their motion and stating that the court would rule on the other grounds for summary judgment on a later date.

---

[1]  The complaint is labeled the First Amended Complaint, but there was a First Amended Complaint filed before the case was transferred to this court. *See* Doc. #11. Therefore, the court will refer to the most recent complaint as the Amended Complaint.

For reasons to be discussed, based upon the briefs in support of and in opposition to summary judgment, and oral argument, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in part as to the remaining grounds for summary judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III.  FACTS

The facts, taken in a light most favorable to the nonmovant, are as follows:

Plaintiff Auto-Owners is an insurance company.  Among other tasks, Auto-Owners issues performance and payment bonds related to construction projects.  In September of 2005, Auto-Owners provided South Central Agency, an independent insurance and bonding agency in Andalusia, Alabama, a contract to solicit surety bonds on behalf of Auto-Owners.  South Central Agency was owned and operated by Tomberlin and Young.   The Tomberlin Defendants had previously entered into a contract with Auto-Owners to solicit policies of insurance.

The September 2005 agreement included a Letter of Instructions ("LOI") which authorized the Tomberlin Defendants to solicit bonding business if, after a thorough investigation, they were satisfied that it was a proper risk for Auto-Owners to assume.   The LOI limited the use of the Power of Attorney which was also issued, stating that the instructions contained the Tomberlin Defendants's entire authority, and "you should not execute any bond not specifically covered herein unless you have express authorization."  (Doc. #79-5).   The LOI sets out limitations on bonds which may be issued by the Tomberlin Defendants, but for "Bid, Contract, and Supply Bonds," the Tomberlin Defendants are given "No Authority," and no bond

can be executed "without first obtaining the approval of the Home Office or Branch Office." (Doc. #79-5 at p.3).

Michael Smith ("Smith") approached the Tomberlin Defendants about a surety bond on a construction subcontract in Pensacola, Florida.   Smith had started S&S Construction ("S&S") in 2004.  S&S signed on to perform four subcontracts at the Naval Air Station for a total of $9,402,964.  The Dick Corporation was the general contractor on the project.

The Tomberlin Defendants had Smith complete an application for bonds, which they submitted to Auto-Owners.  Auto-Owners rejected these bond requests by the Tomberlin Defendants on behalf of S&S.  Auto-Owners's bond underwriting manager, Jim House ("House"), stated that Auto-Owners might bond the program for a smaller amount than the total proposed job, and needed to review financial statements.

Smith had retained a CPA for other reasons, and asked that CPA to prepare financial statements as required by Auto-Owners.   These materials were forwarded to Auto-Owners in June 2006.

S&S had started work at the Naval Air Station in May of 2006 on other subcontracts with the Dick Corporation.

Tomberlin wrote an e-mail to Sue Sweezey at Auto-Owners on June 13, 2006, stating that he would send a fax and a letter from S&S's banker stating that a $2,000,000 line of credit is available to S&S.  On July 10, 2006, a letter was sent to House at Auto-Owners from banker Kelly Baxter stating that a $1,000,000 line of credit had been approved, and that the bank would be willing to entertain new loan requests.  Smith has testified in his deposition that when the line of credit came though, Tomberlin had other appointments, so Young took him to the People's

5

Bank of Coffee County to meet with Kelly Baxter and sign the paperwork on the $1,000,000 line of credit.  Smith took a draw down of $400,000 at that time.   House has testified in his deposition that in December of 2006, Tomberlin told House that S&S had a $2,000,000 line of credit and that none of it had been used.

Auto-Owners agreed to provide performance and payment bonds for part of the total project in January 2007.  The parties dispute whether at the time of the issuance of the bonds in January of 2007, Smith's company was in default with the Dick Corporation by failing to receive bonds for other subcontracts with the Dick Corporation.  Shelby Gardner ("Gardner"), CEO of the Dick Corporation, has referred to this as a technical default, but also has stated that the bonding requirement was waived.  The parties are in agreement, however, that Smith's company had not been declared in default in January 2007.

In February 2007, S&S was issued a $1 million irrevocable letter of credit by Kelly Baxter of the People's Bank of Coffee County.

After the bonds were issued to Smith by Auto-Owners, Auto-Owners sent General Services Inquiry forms to Dick Corporation inquiring about the status of the projects.  None of these forms were answered by Dick Corporation.

Also after the bonds were issued, there were meetings between the Tomberlin Defendants and Gardner of Dick Corporation.  Auto-Owners contends that through these meetings, Gardner informed the Tomberlin Defendants of Smith's problems with performance of the contract.

In October of 2007, nearly ten months after the bonds were issued, Auto-Owners was provided with a written notice of a potential claim and attempt to formally declare a default on the bonds, by receiving a 72-hour notice to cure from Dick Corporation.   There was no attempt

6

to cure the default.   On October 19, 2007, Dick Corporation formally declared a default on the bond and sent Auto-Owners notice of the claim.

Tom Froman was the Auto-Owners Vice President in charge of the claim.

Auto-Owners was sued by Dick Corporation on the performance bond in *United States, etc. v. Dick Corp.*, 3:08cv56/MCR/MD.  After several years of litigation, Auto-Owners settled with Dick Corporation, with a mediator determining the amount Auto-Owners had to pay on the bond.  Auto-Owners seeks to recover losses it sustained from the Tomberlin Defendants on the basis that it would not have issued the bonds, and would have acted in light of knowledge of default, if it had not been for the Tomberlin Defendants's actions.

## IV.  DISCUSSION

A. Count I and Count II Breach of Contract and Breach of Fiduciary Duty Claims

In Count I of the Amended Complaint, Auto-Owners brings a breach of contract claim and in Count II a breach of fiducary duty claim, both arising from the Tomberlin Defendants's actions before the bond in question was issued by Auto-Owners.   The first contention the court must address with respect to these claims is the scope of the claims as pled in the Amended Complaint.  The court will then turn to the merits of these claims.

i. Scope of the Claims in Counts I and II

The Tomberlin Defendants maintain that Counts I and II of the Amended Complaint pled knowledge of and failure to report a default by S&S which existed prior to the issuance of the bonds at issue in this case on January 10, 2007, in the form of S&S's failure to obtain bonding on two other subcontracts with the Dick Corporation, and that any other bases for the claims in

7

Counts I and II which are relied on by Auto-Owners in opposition to summary judgment, such as Smith becoming insolvent by December 31, 2006, are not pled in the Amended Complaint.

In the fact section of the Amended Complaint, Auto-Owners states that at the time the Tomberlin Defendants requested a bond from Auto-Owners, "S&S had been unable to obtain bonding on two other subcontracts (21084-106 and 21084-132)," that the Tomberlin Defendants were aware that S&S had failed to obtain bonding on the subcontracts, that the inability to obtain bonding on those subcontracts "put S&S in default on those two subcontracts," and that Defendants "failed to disclose the existing default." (Doc. #79 at ¶¶ 10, 11, 12, 13).   The fact section of the Amended Complaint then goes on to discuss conduct during the performance of the bonded contract which was "also" a default or breach. (*Id.* at ¶ 15).

In Count I, the Amended Complaint states that Tomberlin "failed to disclose material information at the time of the application for the Bond, namely that S&S was already in default on another of its subcontracts with Dick Corp. on the same project."  (*Id.* at ¶ 33).  In Count II, the Amended Complaint alleges that the Defendants "failed to disclose information about the existing default by S&S during the bond application process. . . ."  (*Id.* at ¶ 44).  No default other than the failure to obtain bonds on the Dick Corporation subcontracts is referred to in the fact section, or within Count I or II.

When given the opportunity by Order of this court to respond to the Tomberlin Defendants's arguments regarding the scope of the claim, Auto-Owners argues that the federal pleading rules do not require a one-to-one correlation between claims and items of evidence. Auto-Owners distinguishes *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004), a case relied upon by the Tomberlin Defendants, on the basis that that case concerned a plaintiff's

attempt to prove a breach of contract claim when her complaint asserted only tort theories. Auto-Owners also cites to *Plumbers and Steamfitters Local No. 150 Pension Fund*, 932 F.2d 1443 (11th Cir. 1991), in which the court explained that "a complaint need not specify in detail the precise theory giving rise to recovery," as long as the defendant is on notice as to the claim being asserted and the grounds on which it rests.[2]   Auto-Owners states that its allegation in paragraph 35, that "South Central therefore obtained Auto-Owners' approval for the Bond without disclosing material information that would have shown S&S not to be a proper risk for the company to assume," is broad enough to cover evidence of default other than the failure to obtain bonds, as stated in the Amended Complaint.  Of course, paragraph 35 uses "therefore," and follows paragraph 34, which refers to "this default."  The default identified in the Amended Complaint is a failure to obtain bonding on two subcontracts. (Doc. #79 at ¶12).

    In *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006), the court rejected a plaintiff's argument that proof of interference with FMLA leave based on his mother's health condition, rather than his own as alleged in the complaint, was merely a different theory for proving his interference claim.  *Id.* at 1297.  District courts examining this issue have distinguished between the mere assertion of additional facts to support a claim, and the assertion of an additional, separate basis for recovery.  *See, e.g., Pandora Jewelers 1995, Inc. v. Pandora Jewelry*, No. 09-61490-Civ, 2011 WL 2174012 at *12 (S.D. Fla. June 2, 2011).

---

[2]   Auto-Owners also cites *Speaker v. U.S. Dept. of Health and Human Services*, 623 F.3d 1371 (11th Cir. 2010), but that case analyzes what materials can properly be considered outside of the pleadings on a motion to dismiss and is, therefore, not helpful in the resolution of the issue presented in the instant case.

In the instant case, Counts I and II of the Amended Complaint do not put the Tomberlin

Defendants on notice that Auto-Owners contends that there were other defaults before the bond

was issued.  Without notice, reliance on other alleged defaults as separate breach of contract and

breach of fiduciary duty claims is an unauthorized attempt to amend the Amended Complaint.[3]

For example, the evidence of alleged default in the form of financial status, ie., Smith stating that

he was "broke," would not be used to prove that the Tomberlin Defendants failed to disclose that

S&S had defaulted by failing to bonds on two subcontracts, which is the claim alleged in the

Amended Complaint.   Therefore, these additional facts will not be considered as separate bases

for relief in Counts I and II, and the court will only address the merits of the Count I and Count II

claims pled in the Amended Complaint.[4]

ii.  Merits of Pre-Bond-Issuance Breach of Contract and Fiduciary Duty Claims

There is no dispute in this case that S&S was not bonded on two of its subcontracts with

Dick Corporation.  The question before this court, therefore, is whether the lack of bonding on

those subcontracts was a default known to the Tomberlin Defendants such that failure to disclose

that default to Auto-Owners was a breach of contract or fiduciary duty.

Auto-Owners cites to the "Delay and Default" provision of one of the unbonded

subcontracts to support its argument that failure to obtain bonds for the subcontracts was a

---

[3]  The deadline for amending the pleadings passed before Auto-Owners filed its brief.
(Doc. #152).

[4]  The alternatively pled negligent misrepresentation and suppression claims in Counts V
and VI are broader in scope, and are not limited to defaults, but point to facts regarding
interactions with Kelly Baxter of the People's Bank of Coffee County.  Therefore, as discussed
below, the notice analysis for those claims is different, and additional evidence can be used to
prove claims fairly within the Amended Complaint.

10

default.  On page one of that subcontract, it states "100% Performance & Payment Bonds Required-Yes."  (Doc. # 119-16, p.2).   In another portion of the contract, it states that it is agreed as a material obligation under the subcontract that the subcontractor will provide the contractor with payment and performance bonds and that an irrevocable letter of credit will be supplied by the contractor.  *(Id.* at p.4).   Auto-Owners also cites to deposition testimony of Gardner, of Dick Corporation, which is as follows:  "Q.  Now, as of February 13, 2007, or at least prior to that date, S&S was technically in default of their masonry contract, because they had not provided a bond, right? A. Technically, I guess, legally, that's supported, yes."  (Doc. #119-15 at p. 234: 9-14).   When asked whether a February 2007 $1 million irrevocable letter of credit ("ILOC") cured the default, Gardner stated that the ILOC  was an "acceptable way to move forward."  (Doc. #129-1 at p. 60: 9-14).   Auto-Owners also cites Gardner's deposition testimony that he did not recall ever processing a bond waiver on behalf of S&S.  Auto-Owners states, therefore, that the failure to obtain bonding was a default.

The Tomberlin Defendants's argument in response is two-fold.  They argue both that the failure to obtain the bond was not a default because the bond requirement was waived, and that no default was ever communicated to the Tomberlin Defendants.   The Tomberlin Defendants point to the deposition testimony of Gardner of Dick Corporation in which he is asked whether there was an initial bond requirement, and whether it was waived, and Gardner answered, "yes."  (Doc. #112, Ex. Gardner Dep. at p. 696: 23-697: 1).  When asked when the requirement was waived, Gardner responded that he did not recall the exact time, but it was sometime afer execution when S&S revealed it was not able to provide a bond. *(Id.* at 697: 4-7).   Dick

Corporation allowed S&S to continue work on the contracts even though S&S was not approved for bonds.  (*Id.* at 697: 8-14).

The Tomberlin Defendants also cite to the deposition testimony of Smith that Dick Corporation had not declared him in default at the time he applied for the bond, and had waived bonding requirements.  (Doc. #112, Ex. Smith Dep. at p. 190: 19-191: 8).

Auto-Owners contends that there is a difference between a default and a written notice of default.  Auto-Owners contends, therefore, that S&S was in default, even though there had been no declaration of default, and that the Tomberlin Defendants were obligated to notify Auto-Owners of that default.

Even accepting that a default can exist even if no default is declared, to prove claims that the Tomberlin Defendants failed to tell Auto-Owners of an existing default, there must be evidence that the Tomberlin Defendants were aware that S&S had defaulted and failed to tell Auto-Owners.  Auto-Owners states in the Amended Complaint and in its brief that the Tomberlin Defendants knew of the default, but does not cite to any evidence to support that statement. (Doc. #129 at p.2).  The evidence cited in its brief following the statement of the Tomberlin Defendants's knowledge which relates to the failure to obtain the bond on other subcontracts is Gardner's testimony that the failure was a technical default, discussed above.  The portions of Gardner's testimony cited do not speak to the knowledge of the Tomberlin Defendants.[5]

The evidence before the court, viewed in a light most favorable to the non-movant, is that Smith's failure to obtain a bond was considered by the Dick Corporation to be a technical default,

---

[5]   There is also a reference in the brief to a conversation between Gardner and a Trevor Pant regarding the lack of a bond or letter of credit, for which Smith was also present, but that does not establish knowledge of an existing default on the part of the Tomberlin Defendants.

but that the bond requirement was not enforced, and Smith was performing those contracts. There is no evidence before the court that the Tomberlin Defendants were aware that there was a technical default, given that Smith had not been declared in default and was still the subcontractor on the contracts.  While Gardner has stated that the February ILOC was used to cure the lack of a bond, the February 2007 ILOC was issued after the Auto-Owners bond was issued.  In fact, the time at which S&S is said to have been in default, in the deposition question quoted above, was "as of" or "prior to" February 13, 2007.   Even assuming the Tomberlin Defendants were involved in attempting to secure the ILOC, there is no evidence before the court that the Tomberlin Defendants knew before, or even in January 2007, when Auto-Owners issued the bond in question, that the ILOC was required to cure an existing default.   In absence of sufficient evidence that the Tomberlin Defendants knew that S&S had defaulted on subcontracts with the Dick Corporation by failing to obtain bonds, summary judgment is due to be GRANTED as to the Tomberlin Defendants as to the claims in Counts I and II.

### B.  Count III

In Count III of the Amended Complaint, Auto-Owners brings a claim for breach of fiduciary duty following the application process.

The Tomberlin Defendants have moved for summary judgment on the basis that there was no fiduciary duty to monitor the progress of the construction contract once the bonds had been written.   The Tomberlin Defendants argue that Auto-Owners never entrusted a duty to agents to provide information on ongoing projects after the bonds are written.  They argue that the only language in the documents that refers to any type of fiduciary duty involves the safekeeping of "monies" in payment of premiums.  (*See* Doc. #11-4, p. 2).  The Tomberlin

Defendants argue that the contract should be construed in light of the maxim *expressio unius est exclusio alterius*, namely, that expression of one thing is the exclusion of another.

Auto-Owners states that the Tomberlin Defendants's view of their role as a conduit of information does not comply with contractual requirements under the LOI, is not consistent with standards in the industry, and is inconsistent with the role that the Tomberlin Defendants played in masterminding the bonds for the project.   Auto-Owners points out that the LOI uses words such as "trust" and "trust relationship," rather than "fiduciary," and argues that those terms establish that there are fiduciary duties.  In a section of the LOI pointed to by Auto-Owners, the document states that South Central Agency is in a trust relationship and that the discretionary authority granted to it

> shall be exercised with respect to a particular bond ONLY WHEN YOU ARE
> THOROUGHLY SATISFIED after thorough investigation of all facts surrounding
> the case, THAT IT IS A PROPER RISK FOR THE COMPANY TO ASSUME.

(Doc. #79-5 at p.1).  Auto-Owners also points the court to the website of a trade association, the National Association of Surety Bond Producers, www.nasbp.org, as stating that a bond producer must strive to provide all relevant information that impacts surety decisions, and not knowingly withhold negative information.  Finally, Auto-Owners argues that the Tomberlin Defendants were involved in promoting S&S to the People's Bank and Dick Corporation, as well as Auto-Owners.  Auto-Owners states that the Tomberlin Defendants were doing more than being mere conduits of information.

It appears to this court that the LOI does not control the Tomberlin Defendants's responsibilities toward Auto-Owners after the bond was issued.  The terms of the LOI define responsibilities in the "trust relationship" owed by the Tomberlin Defendants while evaluating

the risk Auto-Owners was "to assume."  The LOI does not, however, specify any duties beyond the point the bond is issued.  This reading of the plain language of the contract is consistent with the deposition testimony of Jim House, of Auto-Owners, in which he stated that Auto-Owners did not communicate to the agents an expectation that if there were difficulties with the work, they would inform Auto-Owners, but that Auto-Owners expected that as a matter of "common sense."  (Doc. #112 , Ex. House Dep. at p. 45:  6-19).

In addition to the lack of specification of duty beyond bond issuance, the contract and LOI agreed to by the parties in this case contain far fewer of the hallmarks of an agency relationship than those in cases in which a fiduciary duty was imposed.  *See, e.g., Auto-Owners Ins. Co. v. Midwest Agency, Inc.*, No. 4:07cv394, 2007 WL 2885345, at *4 (E.D. Mo. Sept. 27, 2007) (finding that an agency contract, letters of instruction, guaranty agreements, and power of attorney evidence an intent to confer agency status, that agents had the ability to alter the legal status of the principal, and principal had the right to exercise control over the agent so as to create fiduciary duties); *National Am. Ins. Co. v. J.R. Misken Ins. Services, Inc.*, 161 F. App'x 737, 738 (10th Cir. 2005) (noting that bond producer "had the authority to underwrite contract bonds . . . .").

Auto-Owners has relied on *Safeco Ins. Co. of Am., Inc. v. Zervos Group, Inc.*, No. 00-71518, 2002 WL 31548700 (E.D. Mich. Oct. 31, 2002) to support a finding of a fiduciary duty in this case.  In *Safeco Ins. Co. of Am.*, the court refers to the National Association of Surety Bond Producers's standards.  The case, however, demonstrates that there are additional considerations in finding that there is a fiduciary duty on the part of a bond producer, and the ultimate conclusion in that case regarding fiduciary duties actually undermines Auto-Owners's position in

15

this case.  In *Safeco Ins.*, there were two agreements at issue.  One agreement was a 1993 Safeco Surety Agency Agreement, pursuant to which the bond producer was prohibited from accepting risks that were deemed unacceptable under underwriting standards, but no underwriting guide was provided.  The second agreement was a 1997 Authority to Execute Bonds, pursuant to which the bond producer was authorized to execute payment and performance bonds to a certain amount of money without prior approval.   The court reasoned that the bond producer was an independent agent, pursuant to state law, who placed insurance with various agencies, and that the 1993 agreement did not modify that independent status.  *Id.* at *9.  The court concluded, therefore, that the bond producer had no fiduciary duty to Safeco when it originally presented the contractor to the surety.  *Id.*  The court further reasoned, however, that circumstances changed with the execution of the 1997 agreement, because the bond producer then became an agent of the surety.  The court concluded, however, that the fiduciary duty which resulted from the 1997 agreement did not include a duty to disclose information learned before the execution of the 1997 agreement.  *Id.* at 10.

Given that the Tomberlin Defendants undisputedly did not have the authority to issue any bonds without Auto-Owners's permission, this court cannot conclude that *Safeco Ins.* establishes that any post-bond-issuance fiduciary duty exists in this case.  *See also Lumbermans Mut. Cas. Co. v. Franey Muha Alliant Ins. Serv.*, 388 F. Supp. 2d 292, 302-03 (S.D. N.Y. 2005)(finding a question of fact as to fiduciary relationship based on on-going relationship of trust and confidence, but denying plaintiff's motion for summary judgment on the issue of express agency because bond broker was not authorized to bind surety without permission).

At the oral argument held on the pending motions, Auto-Owners also cited the court to *Crumpton v. Pilgrim Health & Life. Ins. Co.*, 46 So. 2d 848, 850 (Ala. App. 1950), in which the court stated that the relationship existing between a soliciting agent and principal is a fiduciary one by which the agent must act with the utmost good faith and loyalty.  That statement, however, does not answer whether the Tomberlin Defendants were the agents of Auto-Owners after the bond was issued.   The facts in *Crumpton* involved representations made at the time of the issuance of a life insurance policy.   Furthermore, in a concurrence later applying *Crumpton*, Justice Jones of the Supreme Court of Alabama differentiated between an agent who is employed by an insurance company and a broker who solicits contracts under no employment from any special company.  *Spears v. Colonial Bank of Ala.*, 514 So. 2d 814,  819-20 (Ala. 1987) (Jones, J., concurring).

Under Alabama law, "[a]hough there are instances in which an independent agent may be an agent for an insurer, typically '[a]n independent agent or broker is usually not an agent for the insurer at all; rather, he is the agent of the insured.' *Washington Nat'l Ins. Co. v. Strickland*, 491 So.2d 872, 875 (Ala.1985)."  *Zurich Am. Ins. Co. v. Specialty Foundry Products*, No., 7:08cv1412-LSC, 2009 WL 8612395, at *4 (N.D. Ala. July 30, 2009).

Auto-Owners has asked the court to find that, even in the absence of a contractual agreement which extends duties beyond the point of bond issuance, bond brokers have a continuing duty to report the conduct of all of the bonded subcontractors for which they have solicited bonds, but cites no case which so holds.  There is authority to the contrary.  *See State Sec. Ins. Co. v. Frank B. Hall & Co.*, 630 N.E.2d 940, 946 (Ill. App. 1 Dist.1994) (stating "[o]nce the limited purpose for which the broker's agency is established has been fulfilled, the broker

owes no on-going fiduciary duty to the ex-principal.").  This court cannot conclude that the law

extends to create such a continuing duty in this case.   Summary judgment is, therefore, due to be

GRANTED as to the Tomberlin Defendants as to Count III of the Amended Complaint.

### C.  Count IV

Auto-Owners brings a claim for indemnification on the theory that because the bond was

executed in violation of the LOI, it triggered an indemnification provision, and also based on

common law indemnity.  This claim is pled as relief tied to the previous claims of the Amended

Complaint.[6]  Having concluded that summary judgment is due to be GRANTED as to the Counts

I-III of the Amended Complaint, the court concludes that summary judgment is also due to be

GRANTED to the Tomberlin Defendants as to Count IV.

### D.  Counts V and VI

Auto-Owners states in the Amended Complaint that it pleads Count V for negligent

misrepresentation, in the alternative to Counts I through IV of the Amended Complaint, and

Count VI for suppression in the alternative to Counts I through V.

The Tomberlin Defendants moved for summary judgment as to Count V and VI primarily

on statute of limitations grounds and the doctrine of voluntary payment grounds, which have

previously been ruled on by the court.  (Doc. #148).  The Tomberlin Defendants also have

addressed the following alleged negligent misrepresentations:  declared defaults, financial

statements, and statements regarding the experience of Smith.  In a footnote in their brief, the

---

[6]  The Amended Complaint states that Count V is pled in the alternative to Counts I
through IV, so that Count IV appears to be tied to those counts, and separate from V and VI.

Tomberlin Defendants also argue that there are no allegations in the Amended Complaint regarding a letter of credit, so that no claim based on such evidence is pled.

While the Tomberlin Defendants acknowledge that the suppression count incorporates by reference other aspects of the Amended Complaint, they do not appear to otherwise differentiate between the negligent misrepresentation and suppression claims in moving for summary judgment.[7] Therefore, the court will only address the arguments raised by the Tomberlin Defendants, who bear the burden in moving for summary judgment, beginning with the issue of whether the line of credit evidence is fairly with the Amended Complaint in the context of these claims, and then turning to the arguments on the merits of the claims.

i. Scope of Claims in Counts V and VI of the Amended Complaint

As discussed above, a complaint cannot be amended through the response to summary judgment. Auto-Owners has presented evidence that Tomberlin told Auto-Owners in December 2006, before the Auto-Owners bond was issued, that Smith had a $2 million letter of credit which had not been used. The Tomberlin Defendants dispute that this claim was alleged in the Complaint.

The negligent misrepresentation and suppression claims in the Amended Complaint are not stated as narrowly as are the breach of contract and fiduciary duty claims in Counts I and II, previously discussed. That is, while there is an allegation that the Defendants knew of "the default" on S&S's other subcontracts in the misrepresentation claim in Count VI, Count V also

---

[7] If the Tomberlin Defendants intend to draw a distinction between these claims in advance of trial as a means for excluding any evidence, they are advised to file a Motion in Limine, supported by legal authority, no later than the deadline in the Revised Scheduling Order. (Doc. #152).

references other negligently misrepresented information, including financial information provided between Young and Kelly Baxter at the People's Bank of Coffee County.  In the suppression count, Count VI, Auto-Owners speaks in broad terms that the Tomberlin Defendants were in possession of material facts concerning the risks posed and failed to communicate those facts, without limiting the claim to knowledge of an existing default.  (*Id.* at p. 14).  The court concludes as to these claims, therefore, that the Tomberlin Defendants had adequate notice that claims regarding the Tomberlin Defendants's knowledge of and representations or suppressions of facts regarding S&S's include the line of credit provided by Kelly Baxter at the People's Bank of Coffee County.

### ii.  Merits of Claims

As stated above, Auto-Owners has presented several factual bases for its claims in Counts V and VI.  As discussed previously, the court concurs with the Tomberlin Defendants that the Tomberlin Defendants's knowledge of default in the form of a failure to obtain a bond on subcontracts, as pled in Counts I and II of the Amended Complaint, and incorporated into Counts V and VI, is not supported by the evidence in the case.

Auto-Owners also faults the Tomberlin Defendants for misrepresenting Michael Smith's prior construction experience, while the Tomberlin Defendants contend that Smith himself provided the information, the information was true, and therefore, it cannot be the basis for any recovery in this case.  The Amended Complaint alleges that Smith had been in construction for only two years and had worked in a paper mill before that.  (Doc. #79 at ¶ 70).  Auto-Owners responds to the Motion for Summary Judgment by stating that Smith's deposition reveals that his

20

experience in construction is vastly overstated because he worked in the paper mill for 15 years and worked as a homebuilder only part-time during that period.

The Tomberlin Defendants point to Smith's deposition testimony that he worked for BE&K, Brown &Root, Daniel, and Harbert construction companies on million dollar projects for 15 years doing concrete work before he was employed with paper mills and did home construction for 15 years.  (Doc. #112, Ex. Smith Dep. at p. 140:6-15).

The court has examined the bond applications attached as Exhibit G to the Amended Complaint.   The initial bond application submitted to Auto-Owners states that Smith has 20 years of construction experience and then states under "magnitude and type of work" the following:  "paper mills to HomeBuilder."  The second bond application states that Smith has 25 years of construction experience.   Smith's deposition testimony as to his 15 years of experience in concrete work and 15 years of paper mill and homebuilding experience is consistent with these representations.  This aspect of the evidence pointed to by Auto-Owners, therefore, does not support a claim of negligent misrepresentation or suppression.

Another factual basis for the misrepresentation and suppression claims involves information within financial statements.  The Tomberlin Defendants have stated that they merely forwarded financial information, and bore no additional responsibilities.   They also argue with respect to the line of credit from the People's Bank of Coffee County that no evidence exists that Tomberlin was provided an explanation of why the loan was less than what he understood it to be, and that the letter regarding the amount of the loan was actually mailed directly to Auto-Owners, not Tomberlin.  The Tomberlin Defendants have argued in support of their own Counterclaim that Auto-Owners, as a surety, had certain responsibilities which it did not fulfill,

21

and that failure was the cause of the loss it is claiming in this case.  The Tomberlin Defendants cite to *Magee v. Manhattan Life Ins. Co.*, 92 U.S. 93, 98-101 (1875), for the proposition that the "mere relation of principal and surety does not require the voluntary disclose of all material facts in all cases, " and a surety must ask for information.  In *Magee*, the court also stated, however, that if a surety fails to seek information within its reach, and a loss occurs, the surety cannot set up as a defense facts the surety should have learned "in the absence of fraud on the part of the creditor."  *Id.*

Auto-Owners has provided evidence that Tomberlin made representations of fact regarding S&S's line of credit which were not true.   Specifically, Auto-Owners has presented evidence that Tomberlin wrote an e-mail to Sue Sweezey at Auto-Owners on June 13, 2006, stating that he would send a fax on Wednesday and a letter from S&S's banker stating an additional $2,000,000 line of credit is available.  (Doc. #119-6).  Smith has testified in his deposition that when the line of credit came though, Tomberlin had other appointments, so Young took him to the bank to meet with banker Kelly Baxter.  (Doc. #119-1 at p. 62:6-12).  The line of credit had been approved, and Smith took a draw down of $400,000 at that time, (*Id.* at p. 62:21: 63:3), leaving $600,000.  (*Id.* at 88:9-13).

Jim House of Auto-Owners stated in his deposition that on December 18, 2006, he prepared a bond authorization request and on the "bank line" he inserted "$2 million" based on a phone conversation he had with Tomberlin.  (Doc. #119-8 at p. 277: 23-278:3; 281: 14-23).  Tomberlin also told House that none of the line had been used.  (*Id.* at 282: 10-13).

Auto-Owners has also presented evidence of a December 14, 2006 email from Tomberlin to House in which he stated that "[t]hey have reduced the job down to $1.2 million for the bond."

22

(Doc. #119-11).  Auto-Owners contends that this was a false representation because all four contracts were being performed at the same time, so the $1.2 million figure was not an accurate representation of the contract amount.

Viewing the evidence in a light most favorable to the non-movant, the court concludes that sufficient questions of fact have been raised to preclude summary judgment on these claims. There is evidence that the Tomberlin Defendants made representations of fact relied on by Auto-Owners which were not true.  The legal duty of a surety as pointed to by the Tomberlin Defendants, in view of the evidence of the affirmative representation by the Tomberlin Defendants as to the available line of credit, presents a question of fact for the jury as to the reasonableness of Auto-Owners's actions under the circumstances.

### E.  Counterclaim

 The Tomberlin Defendants have moved for summary judgment on the counterclaim they have asserted against Auto-Owners.  The Counterclaim seeks a declaration the Tomberlin Defendants were soliciting agents, that Auto-Owners was responsible for underwriting, that the Tomberlin Defendants had no duty with respect to underwriting or handling claims, that the Tomberlin Defendants's only duty was in reporting an actual claim, that Auto-Owners chose to voluntary settle its claims, and that the Tomberlin Defendants are entitled to relief under the indemnity clause of the Contract.

The Tomberlin Defendants argue that a surety has a duty to ask questions during the underwriting of a bond, citing *Magee v. Manhattan Life Ins. Co.*, 92 U.S. 93 (1875) and *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064 (5th Cir. June 4, 1981).  They also state that Auto-Owners's losses were caused by Auto-Owners's underwriting, through a

failure to ask for information, and claims management, through a failure to insist on the right to cure.  The Tomberlin Defendants argue that Auto-Owners decided to forego curing the default, and incur a completion cost of $80,000, and eventually spent more than $2,000,000 on a claim that could have been resolved for $80,000,[8] or the full penal sum of the bond of $1,200,000.

The court cannot conclude that the Tomberlin Defendants have demonstrated that they are entitled to judgment on their counterclaim in its entirety as a matter of law.  There is evidence before the court that Auto-Owners was affirmatively mislead by, and not just failed to inquire into, information upon which it based decisions, and that there are questions about the amount required to cure the default on the Auto-Owners bond.  Therefore, a jury will have to evaluate the evidence for the reasonableness of Auto-Owners's actions, both in evaluating the statute of limitations defense and in determining which party is responsible for Auto-Owners's losses.[9]

### V. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1.  The Motion for Summary Judgment (Doc. #112) is GRANTED and judgment is entered in favor of the Defendants and against Auto-Owners Insurance Company on Counts I, II, III, and IV of the Amended Complaint.

2.  The Motion for Summary Judgment (Doc. #112) is DENIED as to Counts V and VI of the Amended Complaint and the Counterclaim.

---

[8] Auto-Owners disputes this amount, relying on Gardner's testimony.

[9] If the Tomberlin Defendants should decide to modify their pending Motions in Limine (Doc. #133, 134) in light of this Memorandum Opinion and Order, they should do so by the deadline for filing motions in limine as provided for in the Revised Scheduling Order (Doc. #152).

The case will proceed to trial on Counts V and VI of the Amended Complaint and the

Defendants's Counterclaim.

DONE this 24th day of July, 2012.


   /s/ W. Harold Albritton\
W. HAROLD ALBRITTON\
SENIOR UNITED STATES DISTRICT JUDGE