IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| AUTO-OWNERS INSURANCE COMPANY | ) ) ) | No.  2:11-CV-00468-WHA-SRW |
| Plaintiffs, | ) ) ) ) | AUTO-OWNERS INSURANCE COMPANY'S RESPONSE TO HAROLD |
| v. | ) ) | YOUNG'S MOTION FOR SUMMARY JUDGMENT |
| TOMBERLIN, YOUNG & FOLMAR INS. CO. d/b/a SOUTH CENTRAL AGENCY et al. | ) ) ) ) | (SUPPLEMENTAL) |
| Defendants. | ) ) | |

## I.   THE BASIS FOR THE REMAINING CLAIMS

On July 24, 2012, this Court ruled (Doc. 154) on Defendants' Motion for Summary Judgment, granting it in part but leaving three claims to be decided at trial:  (1) Auto-Owners' Count V (negligent misrepresentation against all Defendants), (2) Auto-Owners' Count VI (fraudulent suppression against all Defendants), and (3) Defendants' Counterclaim (which asks for a declaration that Auto-Owners brought about its own losses through poor decisions in bond underwriting and claims handling and was therefore contractually obligated to indemnify Defendants).  This ruling spurred Defendant Harold Young to file a new, belated dispositive

motion (Doc. 155) entitled, "Defendant/Counterclaimant Harold Young's Motion for Summary Judgment (Supplemental) Based upon Order of July 24, 2012 (Doc 154)."[1]

The sole basis pled in Defendant Young's motion was the erroneous notion that the two remaining claims were "based solely upon alleged statements of co-defendant John Tomberlin . . . or information allegedly withheld by Tomberlin."   (Doc. 155 at p. 2.)   "Harold Young did not participate in such conduct," according to the motion, so the remaining claims against him individually should be dismissed.  Not true.

As this Court recognized in its July 24 Order (Doc. 154 at pp. 19-23), the claims for misrepresentation/suppression involved actions by both of the individual Defendants as well as the Agency they owned and operated. The Amended Complaint (Doc. 79) alleged actions and inaction by both Defendant Tomberlin and Defendant Young that showed the participation of both.  (See, for instance, ¶¶ 64, 74, and 83 for specific references to the

---

[1]   Defendant Young's Motion was belated because, according to Section 2 of the Uniform Scheduling Order (Doc. 76, filed July 18, 2011), dispositive motions were due 90 days before the pretrial conference, or February 17, 2012.  The deadline in this Section was not modified by Doc. 152 (the Revised Scheduling Order), despite the establishment of a new pretrial conference date, now set for November 28, 2012.  If the Court permits Defendant Young to file this dispositive motion, however, Auto-Owners respectfully requests the Court to recognize a new dispositive motion deadline of August 28, 2012 (90 days before the scheduled pretrial conference) and to permit Auto-Owners to file any further dispositive motions up to and including that date.

conduct of Defendant Young.)  But when the Amended Complaint was filed on September 20, 2011, Auto-Owners only suspected some of that involvement.  Thus, as the Court recognized, it addressed Counts V and VI in broad terms, leaving room for proof that "the Tomberlin Defendants [Tomberlin, Young, and the Agency] were in possession of material facts concerning the risks posed and failed to communicate those facts."  (Doc. 154 at p. 20.)

Since the Amended Complaint was filed, discovery has provided ample evidence to support Counts V and VI.  The picture emerging from numerous depositions is of a Defendant Young heavily involved in concealing the risks of bonding Smith's Company—risks he even helped to create.   As shown below, such evidence establishes all of the facts Auto-Owners needs to satisfy the requirements of Alabama law for either the misrepresentation count or the suppression count.

## II.   THE REQUIREMENTS OF ALABAMA LAW

Fraudulent suppression is a common law claim that that has been codified as § 6-5-102, Ala. Code 1975.  A prima facie case requires proof of four elements:

(1) that the defendant had a duty to disclose a material fact; (2) that the defendant concealed or failed to disclose that material fact; (3) that the defendant's concealing this material fact, or failing to disclose it, induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered actual damage as a proximate result of acting or not acting.[2]

In its July 24 Order, this Court noted that the Defendants' summary judgment motion failed to differentiate between the negligent misrepresentation and fraudulent suppression claims (Doc. 154 at p. 19). Under Alabama law, the two claims require similar proof, with only a couple of exceptions.  As shown in the very recent decision of *McClung v. Mortgage Electronic Registration Systems, Inc.*, both require injury to the plaintiff due to his having acted upon a material fact that either was falsely represented to him (the misrepresentation claim) or was not disclosed to him despite the defendant's duty to disclose it (the suppression claim).  For the misrepresentation claim, the plaintiff's reliance on the falsely represented fact must have been reasonable; for a suppression claim, it is enough that the nondisclosure induced the plaintiff to act.[3]

---

[2] *Military Insurance Specialists, Inc. v. Life Insurance Co. of Georgia*, 810 So.2d 732, 737-738 (Ala. Civ. App. 1999), *citing State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834 (Ala. 1999).

[3] *McClung v. Mortgage Electronic Registration Systems, Inc.*, No. 2:11-CV-03621-RDP, 2012 U.S. Dist. LEXIS 63834, at *37 & *39 (N.D. Ala. May 7, 2012).

When a material fact has been misrepresented, Alabama courts follow § 533 of the *Restatement (Second) of Torts* and do not require that the plaintiff be the actual recipient of that misrepresentation.  As this Court recognized in *Chase v. Kawasaki Motors Corp., U.S.A.*, "under Alabama law it is not always required that a plaintiff prove that a misrepresentation was made directly to him, so long as his injuries resulted from the misrepresentation."[4]  It is sufficient if "the deceiver contemplated that the third party would be induced to act by the deceiver's misstatements made to someone else."[5]  The Supreme Court of Alabama has relied on this point from the *Chase* opinion, quoting at length from it in *Ex parte DaimlerChrysler Corp.*[6]

When the claim is fraudulent suppression, duty is required.  The Alabama Supreme Court has held that the existence of such a duty is a question of law for the court to decide.[7]  To determine whether the defendant had a duty to disclose the suppressed fact, an Alabama court

---

[4]   *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp. 2d 1280, 1291 n.8 (M.D. Ala. 2001), *citing Thomas v. Halstead*, 605 So.2d 1181, 1184 (Ala. 1992).

[5]   *Chase, supra*, 140 F. Supp. 2d at 1293, *citing Restatement (Second) of Torts*, § 533.

[6]   *Ex parte DaimlerChrysler Corp.*, 952 So. 2d 1082, 1090-91 (Ala. 2006).

[7]   *State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 839 (Ala. 1999).

applies a six-factor test: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact suppressed; (4) the plaintiff's opportunity to discover the fact; (5) the customs of the particular trade; and (6) other relevant circumstances." *Military Ins. Specialists, Inc. v. Life Ins. Co. of Georgia.*[8]

The *Military Insurance* court found such a duty based on the defendant's superior knowledge of a fact of great value that the plaintiff learned about only through the rumor mill. Upon hearing rumors that defendant was about to sell a line of business for which the plaintiff had an exclusive marketing agreement, plaintiff inquired of the defendant but was assured that "you all are going to be okay." *Id.* at 740. Plaintiff also had an expert witness who testified that an insurance company had an obligation to deal fairly with its general agent, including a duty to tell of the impending sale. *Id.* at 739. Such evidence led the appellate court to reverse the summary judgment for the defendant and remand the case for a trial.

Yet another basis for finding a duty to disclose is the legal principle that one who undertakes to provide information—even without an initial

---

[8] *Military Insurance Specialists, Inc. v. Life Insurance Co. of Georgia*, 810 So.2d 732, 738 (Ala. Civ. App. 1999), *citing State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 840 (Ala. 1999).

obligation to speak—must do so truthfully.  As the Fifth Circuit explained years ago in *First Virginia Bankshares v. Benson*,[9] "[E]ven though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure."

Here, of course, Defendants had an agency relationship with Auto-Owners, and they acknowledged the foundation of that relationship—trust—when they signed the Letter of Instructions.  Alabama courts have long recognized that a principal has a right to presume that what an agent says is truthful and that there is a confidential or fiduciary relationship owed by the agent to the principal.[10]  Defendants are not arguing that Defendants had no duty to disclose; they merely contend that Defendant

---

[9]   *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1313 (5th Cir. 1977) (citing *Jackson Co. v. Faulkner*, 55 Ala. App. 354, 315 So.2d 591 (1975)).  Applying Alabama law, the Fifth Circuit found that the jury could find from the evidence that defendant lending institution's statement to broker representing prospective purchaser was fatally incomplete, that defendant had duty to make affirmative disclosure, including disclosure of information that subsequently came to its attention, that defendant intended plaintiff to act on its statement, and that any misrepresentation or actionable silence was "in connection with the purchase or sale of securities."  In *Bonner v. City of Prichard*, 661 F.2d 1206,1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all decisions of the former Fifth Circuit issued before October 1, 1981, as binding precedent.

[10]   *Crumpton v. Pilgrim Health & Life Ins. Co.*, 35 Ala. App. 363, 46 So.2d 848, 850 (1950).

Young did not participate in the alleged conduct on which these two claims are based.  So the requirements for "participation" under Alabama law are key to this Court's ruling.

Participation was also a key issue in this Court's *Howell v. J&J Wood, Inc.* decision.  There the Court granted summary judgment to the defendant, a corporate officer and part owner of J&J Wood, for claims based solely on his status in the corporation (because there was no basis for piercing the corporate veil), but ruled that claims on which defendant was alleged to be personally involved had to be determined by a jury.[11]

One of the leading Alabama Supreme Court decisions on this issue, cited in *Howell*, is *Crigler v. Salac*.[12]  That decision concerned the alleged fraud and negligence of the officer of a warehouseman who had allegedly accepted grain from farmers although he knew the warehouseman was insolvent and would be unable to pay for the grain.  The Court began its discussion by citing to *Fletcher's Cyclopedia of Corporations,* § 1135, at 202-03 (1975), ending with this quotation:

---

[11]  *Howell v. J&J Wood, Inc.,* No. 3:06-CV-417-WHA, 2007 U.S. Dist. LEXIS 48947 (M.D. Ala. July 6, 2007).

[12]  *Crigler v. Salac,* 438 So.2d 1375 (Ala. 1983).

Corporate officers are liable for their torts, although committed when acting officially.  In other words, corporate officers, charged in law with affirmative official responsibility in the management and control of corporate business, cannot avoid personal responsibility for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, *or such acquiescence on their part as warrants inferring such consent or approval.*[13]

The Court went on to rule that a corporate officer would be liable for participating in the wrongful or negligent acts if he had breached his duty in such a way as to **contribute to** or to **help bring about** the defendant's injury.  *Id.*  Circumstantial evidence was sufficient to show that Crigler knew the company was going broke when he accepted the grain for storage—enough, according to the Court, to support the jury's finding that he had actively participated in the fraud.  *Id.* at 1382.

In a nutshell, then, Defendant Young, who was part-owner and president of South Central Agency,[14] could be liable for the alleged torts if his own actions contributed to or helped bring about Auto-Owners' injury, or if there was evidence that he consented to or approved of such actions

---

[13]  *Crigler,* 438 So. 2d at 1380 (emphasis added).

[14]  See Mr. Young's testimony at page 9 (lines 21-22) & page 20 (line 21) of the deposition he gave on November 8, 2011.  Relevant excerpts from that deposition are attached here as **Exhibit A** and will be cited hereafter as "Young Depo. at ___."

by Defendant Tomberlin.  At his deposition—the first taken in this action—Defendant Young claimed ignorance of the bonding process and total non-involvement in it.  But later depositions have amply demonstrated the falsity of this picture, evidencing instead that Young was deeply embroiled every step of the way:  (1) from helping Smith's Company to get the first subcontracts with Dick Corporation at the Pensacola Naval Air Station; (2) to assisting Smith with the credit needed to bail his company out when it was admittedly "broke" not far into the first two subcontracts; and (3) to making repeated appeals to Auto-Owners until at last it agreed to bond one subcontract, bringing South Central Agency the commissions that resulted from procuring that bond.  Finally, when Auto-Owners' initial fears proved accurate and Smith's Company went into default on the subcontracts, Defendant Young was once again part of the efforts to keep the gravity of the situation hidden from the Surety as long as possible.

## III.   WHAT YOUNG DID TO MISLEAD AUTO-OWNERS

In chronological order, here is what Auto-Owners expects the evidence to show at trial, based on what has already been learned through discovery:

### A.    Helping Smith's Company Get the Subcontracts

The first documentation of Defendant Young's involvement in the conduct giving rise to this litigation is a "To Whom It May Concern" letter dated May 23, 2006.[15]   Young's testimony was confused about this document,[16] but the concluding paragraph reveals it to be a reference designed to help Smith's company procure work:

> S&S CONSTRUCTION CO. IS AN EXCELLENT CONTRACTOR AND WE HOLD THEM IN THE HIGHEST REGARD.  WE FEEL EXTREMELY CONFIDENT IN OUR CONTRACTOR AND ENCOURAGE YOU TO OFFER THEM THE OPPORTUNITY TO EXECUTE ANY UPCOMING PROJECTS.

Much clearer testimony about this document came from Trevor Pant, the headhunter who helped Smith procure the subcontracts in Pensacola.[17] He recognized it for what it is—a reference letter showing the bondability

---

[15]  The letter, actually addressed "To Whom It May Condcern," was used at various depositions as "Plaintiff's Exhibit 6" and "Exhibit 195."  A copy is attached here as **Exhibit B.**

[16]  See Young Depo. at page 68 (line 22) to page 72 (line 22) for the discussion of this exhibit, which Young seemed to think had been prepared to help Smith obtain a line of credit from People's Bank. The request for "the opportunity to execute any upcoming projects" does not fit that explanation, nor does the timing, as the line of credit did not become an issue until later that summer.  Additionally, Defendant Young knew the president of People's Bank, Kelly Baxter, well and wrote to him by name, so a letter to the Bank would not likely be addressed 'To Whom It May Concern."

[17]  See Mr. Pant's testimony about this exhibit from page 36 (line 20) to page 38 (line 21) of the deposition he gave on April 9, 2012.  Relevant excerpts from that deposition are attached here as **Exhibit C** and will be cited hereafter as "Pant Depo. at ___."

of Smith's Company.   In fact, he provided the sample letter[18] that Defendant Young copied verbatim, only changing the names of the company Young was touting (from McBride Construction, Inc. to S&S Construction Co.) and of that company's supposed surety (from Lincoln General Insurance Company to Auto-Owners Insurance Co.).  According to Mr. Pant, South Central Agency needed a sample "letter of bondability" to follow because Dick Corporation was requesting that.[19]

Despite Young's confusion about this letter and who requested it, he did remember one thing:  It was not true when it was sent, on May 23, 2006.  At his deposition he was specifically asked about the letter's opening paragraph ("THIS IS TO ADVISE YOU THAT THIS OFFICE PROVIDES BID, PERFORMANCE AND PAYMENT BONDS FOR S&S CONSTRUCTION CO.  THEIR SURETY IS AUTO-OWNERS INSURANCE CO.").  He admitted that was not true, because the bond was not provided until months later, in January of 2007.[20] Still, he signed the letter as Attorney-in-Fact for Auto-Owners.  Asked why he was representing that his Agency had authority it did not have, he

---

[18] See the attached **Exhibit D**, which was Exhibit 195 at Trevor Pant's deposition and is discussed at page 37 (lines 8-23) of that deposition.  Note that Exhibit D also shows that Young faxed his letter back to "Treavor," saying, "I trust this is o.k.  If not, please let us know."

[19] See Pant Depo. at page 38 (lines 2-6).

[20] See Young Depo. at pages 69 (line 11) to 70 (line 5).

ducked the question, later explaining that "I was just trying to help Michael.  Whatever I could—Michael was a very good customer of ours."[21] Obviously, the untrue letter worked, as Michael Smith signed the first two Pensacola subcontracts, totaling $4,260,000.00, just two days later, on May 25, 2006.[22]

Before Defendants attempt to argue that the falsehoods in this letter may have misled **Dick Corporation** but cannot be used to show a misrepresentation to **Auto-Owners**, they need to recall the lesson of § 533 of the *Restatement (Second) of Torts*,[23] cited in this Court's *Chase v. Kawasaki* decision.[24]  As the *Chase* opinion explained, it is enough if "the deceiver [here, Defendant Young] contemplated that the third party [Auto-Owners] would be induced to act by the deceiver's misstatements made to someone

---

[21] See Young Depo, at pages 70 (lines 6-14) and 72 (lines 10-14).

[22] As the subcontracts are voluminous and the date of their signing is uncontested, Auto-Owners will not attach copies for the Court but will gladly provide copies upon request.  Adding credence to Trevor Pant's explanation of the reference letter is the fact that Pant was the witness to Smith's signature on each subcontract.

[23] "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."  See **Exhibit E** for the whole section, including comments; comments *e* and *f* are particularly apropos.

[24] *Chase, supra,* 140 F. Supp. 2d at 1293, *citing Restatement (Second) of Torts,* § 533.

else [Dick Corporation]."[25]  Defendants should find it difficult to argue that Young never contemplated that his misstatement would induce Dick Corp. to act—by executing the subcontracts—which would, in turn, induce action by Auto-Owners (supposedly already the Surety for Smith's Company), who would then bond one or more of those subcontracts, putting money in the form of premiums in South Central Agency's pocket.

It should go without saying that if Dick Corp. had never subcontracted with Smith's Company, there would have been no need for the bond that led to the losses at issue here, and Auto-Owners would never have filed this litigation.  So Defendant Young's misrepresentations that led directly to the subcontracts with Dick Corp. also led—as Defendant Young hoped they would—to Auto-Owners' issuance of the bond and eventually to Auto-Owners' losses.

## B.    Assisting Smith To Obtain Credit

When he was deposed in this action on December 31, 2011, Michael Smith stressed how helpful "Mr. Harold" had been to him in the early stages of the Pensacola project, when he started experiencing financial

---

[25]    *Chase, supra,* 140 F. Supp. 2d at 1293.

difficulties.[26]  Smith's explanation of the problems is a good one and bears

repeating at some length:

> Q:      . . . [I]s it fair to say that as of June 22, '06 that Mr. Young knew you weren't being paid on the Dick project and you were broke and you needed cash flow?
>
> MR. WEED:  Object to the form
>
> Q:      Is that fair to say?
>
> A:      They knew that I was having problems with getting the money.
>
> Q:      Okay.
>
> A:      Whether me being broke was, you know, what they thought—I don't know what they thought.
>
> Q:      Let me rephrase it.  Was it your understanding that without the line of credit, you would not be able to complete the job?
>
> A:      They knew that—what I had told them was that we started the job. And with the 90 days payouts—with that far advanced, we were having problems.   And this is what I told the Dick Corporation, and they wouldn't—they would not help me with it at all.
>
> The 90 days was the problem.   They were increasing—the Dick Corporation was behind on the project, so they wanted us to increase more and more and get more people in.  And by doing that, it put me in a financial bind because I was paying labor for—you know, on money that I received that I was doing labor for 90 days before.  So 90 days, we may have had 50 people working, doing work that we—we had put out.  You put out so much work with 50 people.  You have 150 people, you put out a lot more work, so—but I was getting paid for what I was putting out with 50 people and I had 150 people.  So I had to pay the—I was trying to pay the 150 on what I was making off of 50 people, so that was a problem.

---

[26]  See Mr. Smith's testimony from pages 59 (line 5) through 79 (line 4).  Relevant excerpts from that deposition are attached here as **Exhibit F** and will be cited hereafter as "Smith Depo. at ___."

> So I went to the Dick Corporation and asked them this.  I said, I'm not asking for any money that I don't already—am owed.  I just need to move it from the 90 days to the 60 days—to 60 days.   The Dick Corporation wouldn't do it.  They were wanting me to go—to default is what they were doing.

> And I could not—I couldn't make the pay—you know, I couldn't pay everything.  So that's when I asked Mr.—you know, I asked Mr. Harold and them if they knew any—anything that I could do, and that's when they advised me about Kelly.[27]

Although "Mr. Harold" (Defendant Young) could not recall, at his deposition, when Michael Smith had told him about the pay problem,[28] he fully understood the problem caused by the rapid growth of Smith's Company.  Discussing Smith's Workers' Compensation policies (which he handled personally), Defendant Young testified that "[a]t one time, Michael had 200 and something people working for him.  He didn't start out with us that big.  Okay?  He started out, I think, about six or eight people working for him.  And then, as he got these contracts, he employed more people."[29]

It is obvious that Young understood, early on, Smith's need for money, as two documents from June 2006 (more than six months before

---

[27]   See Smith Depo. at pages 75 (line 1) through 77 (line 5); see also pages 59 (line 5) through 61 (line 16), and page 113 (lines 5-21).

[28]   See Young Depo. at page 73 (lines 3-6).

[29]   See Young Depo. at pages 85 (line 20) through 86 (line 2).

Auto-Owners finally issued the bond) demonstrate.[30]    These financial statements for Smith personally and for his company were sent by Defendant Young to Kelly Baxter, the president of People's Bank of Coffee County.   While Mr. Baxter recalled being introduced to Michael Smith by both Young and Tomberlin, he had no recollection of receiving the financial statements.[31]    (There has been testimony that a third set of financial statements (the CPA reviewed financials and aging of accounts receivable faxed to Sue Sweezey of Auto-Owners on August 2, 2006) while allegedly sent by "John Tomberlin," were actually sent by Defendant Young.[32])

---

[30]    The first, attached as **Exhibit G** here, was Plaintiff's Exhibit 17 in depositions; it shows Defendant Young transmitting Smith's Personal Financial Statement (dated 5/31/2006) from Vision Bank to Kelly Baxter at the People's Bank of Coffee County.  The second, **Exhibit H** here, was Plaintiff's Exhibit 19 in depositions and is a facsimile dated 6/22/2006 from Harold Young to Kelly Baxter, this time transmitting "updated P&L's" on Smith's Company.

[31]    See Mr. Baxter's testimony at pages 22 (line 6) through 24 (line 18) and pages 25 (line 23) through 27 (line 13).  Relevant excerpts from the deposition of Kelly Baxter, taken April 5, 2012, are attached here as **Exhibit I** and will be cited hereafter as "Baxter Depo. at ___."

[32]    See Ms. Young's testimony at page 45 (line 10) to page 46 (line 4) of deposition she gave on April 13, 2012.   Relevant excerpts from that deposition ("Daphne Young Depo.") are attached here as **Exhibit M** and include the first page of what was Exhibit 10 at her deposition, the fax transmittal under discussion here.  Ms. Young also recalls Defendant Young working to obtain credit for Smith's Company from Kelly Baxter.  See Daphne Young Depo. at page 29 (line 14) to page 30 (line 10).

When John Tomberlin testified, on February 6, 2012, he recalled the reason for introducing Smith and Baxter a bit differently.[33]  According to Defendant Tomberlin, Smith needed a million dollar line of credit on which he could draw to finance the job because "Mr. House [of Auto-Owners' underwriting department] said that he had to have a million dollar line of credit for him to feel favorable on issuing the bond."[34]  Without that, House turned the bond down.

Regardless of the motivation for bringing Smith and Baxter together, it was Defendant Young who drove Michael Smith to Baxter's bank (about an hour from the South Central office, according to Baxter)[35] to initiate the million-dollar line of credit and obtain the first draw.  Michael Smith testified that, in the summer of 2006, he told Defendant Tomberlin that he was "broke" and needed money to continue with the Pensacola project.[36] Tomberlin set up a meeting with Baxter at the bank, but it was Defendant Young who actually took Smith to the bank in Elba, because Tomberlin had

---

[33]   Relevant excerpts from the deposition of John Tomberlin are attached here as **Exhibit J** and will be cited hereafter as "Tomberlin Depo. at ___."

[34]   See Tomberlin Depo. at page 104 (lines 12-22).

[35]   See Baxter Depo. at pages 93 (line 19) through 94 (line 10); see also Smith Depo. at page 60 (lines 6-11) and page 216 (lines 6-8).

[36]   See Smith Depo. at page 61 (lines 10-18).

18

other appointments.[37]   Because the paperwork had already been done,

Smith was able to activate the line of credit that day and to take the initial

draw, $400,000.00.[38]

## C.      Repeatedly Requesting a Bond from Auto-Owners

The line of credit for $1,000,000.00 may have helped Smith's

Company to weather the early rough spots on the masonry subcontracts,

but it was not enough to convince Auto-Owners to provide the bonding

needed before Dick Corporation would contract for Smith's Company to

take on the drywall work, too.

Trevor Pant stressed the importance of getting a bond.  He testified

that he told both Michael Smith and the Defendants that "this contract is

going to go to somebody else if you're not able to pull this bond off."[39]  He

recalled a meeting with Harold Young, John Tomberlin, Michael Smith,

and Kelly Baxter in which he explained that securing the contract would

require either payment and performance bonds or an irrevocable letter of

---

[37]   See Smith Depo. at page 62 (lines 1-13).

[38]   See Smith Depo. at pages 62 (line 14) through 63 (line 3).

[39]   See Pant Depo. at pages 20 (line 4) to page 21 (line 16).  The cited language is from page 20 (lines 23-25).

credit in the amount of the contract.[40]  Pant considered the deal "dead in the water" without one of these.[41]

Still, it took another four+ months, from mid-August to late December of 2006, to accomplish that goal.  And it involved numerous applications from Defendants, denials by Auto-Owners, and more and more phone calls to plead Smith's case with the bonding company. According to Defendant Tomberlin, Young was involved in soliciting bond sales.[42]  It was Young who told him that Smith needed a bond, and they both handled the bond for Smith's Company together.  ("It was both me and Harold.")[43]  This statement is supported by the testimony of Defendant Young's daughter, Daphne Young, who worked at South Central Agency in 2006 to 2008 and recalls that both John Tomberlin and Harold Young were working to get the bond for Smith's Company.[44]  And it is supported by the testimony of Mellisa King, who also worked in the office at South

---

[40]  See Pant Depo. at page 26 (line17) to page 28 (line 2).

[41]  See Pant Depo. at page 41 (line 7) to page 42 (line 4).

[42]  See Tomberlin Depo. at page 21 (lines 6-13).

[43]  See Tomberlin Depo. at page 64 (lines 15-19); see generally page 61 (line 13) through page 65 (line 14).

[44]  See Daphne Young Depo. at page 12 (lines 17-19), page 25 (lines 13-19), and page 54 (lines 5-9).

Central Agency and who recalls Defendant Young as the primary person who handled the bond business.[45]

Defendant Young was right in the thick of things, repeatedly calling Sue Sweezey, Auto-Owners' Senior Underwriting Specialist, who was often the first point of contact for agents seeking bonding for their customers' projects.[46]  At his deposition, Defendant Young identified Ms. Sweezey as the person who processed bond applications, and he admitted having talked with her "on occasion."[47]

As Ms. Sweezey attests, she was contacted at various times, starting in June of 2006, with requests that Auto-Owners consider bonding Smith's Company.[48]  These contacts came from both Defendant Tomberlin and Defendant Young, and they continued until the bond was finally issued in

---

[45]  See Ms. King's testimony at page 13 (line 14) to page 14 (line 1).  See also page 18 (lines 1-12), page 20 (lines 11-22), and pages 40 (line 19) to page 41 (line 2).  Relevant excerpts from her deposition, taken April 13, 2012, are attached as **Exhibit N**.

[46]  See the Affidavit of Sue Sweezey, signed August 10, 2012, at ¶ 1.  A copy of this affidavit ("Sweezey Aff.") is attached here as **Exhibit K**.

[47]  See Young Depo. at page 62 (lines 11-21).

[48]  See Sweezey Aff. at ¶ ¶ 5-6.

January of 2007.[49]   Ms. Sweezey recalls the phone calls from Defendant Young as somewhat abrasive, almost amounting to "badgering."[50]

Finally, Auto-Owners agreed to issue a bond for what it thought was a much smaller project—a subcontract for $1.2 million, just for drywall installation and some ceiling materials.  It was Harold Young who signed the bond as attorney-in-fact because, as he explained, he was the agent who was licensed to execute bonds in Florida.[51]

The promise of a bond was enough for Dick Corporation to sign the third and fourth subcontracts on December 28, 2006—adding another $4,705,000.00 and the drywall to the scope of Smith's Company's work. Ironically, these may have sealed the fate of the once-small company.  As Michael Smith has testified, "I thought I was strong enough to do it, but I was not strong enough to hold—hold the whole job throughout.  And I think that one contract I could have probably held out, but doing the two contracts [masonry and drywall], that was what got me—got me behind."[52]

---

[49]  See Sweezey Aff. at ¶ 8.

[50]   See Sweezey Aff. at ¶ 9.

[51]  See Young Depo. at page 98 (line 22) to page 99 (line 7).

[52]  See Smith Depo. at page 218 (lines 17-23).

### D.    Assisting with the Cover-up

When Smith's Company fell far enough behind, Dick Corporation began meeting with various interested parties in an attempt to get the project done.   In the past five or six years, memories have faded, and recollections differ, but there has been testimony about at least two meetings that apparently occurred in 2007—well before the October notification to Auto-Owners that Smith's Company was in default—and involved both Defendant Tomberlin and Defendant Young as representatives of the bonding company.

The clearest testimony about the first of these came from Kelly Baxter, who described it as a meeting to discuss how to avoid having Dick Corporation call the $1,000,000.00 letter of credit.[53]   He testified that it occurred perhaps as early as March 2007 (a couple of months before he received  Dick Corporation's May 23, 2007 letter announcing a breach of contract by Smith's Company that supposedly justified Dick in drawing

---

[53]  See Baxter Depo. at page 64 (line 8) to 66 (line 10).

down the whole $1,000,000.00 on the Irrevocable Letter of Credit Baxter's bank had just issued earlier that year, in January).[54]

Both Tomberlin and Young attended the meeting, which took place at the office of Dick Corporation's Shelby Gardner.  Michael Smith was there, too, and perhaps Trevor Pant as well.[55]  The result of the meeting was an agreement that the Bank would lend Smith's Company another $557,000.00 (increasing Smith's potential debt to the Bank to $2,557,000.00), and Gardner would monitor the funds to be sure the suppliers were getting paid.[56]  Baxter remembered this well, as he was "very surprised" to get the May 23, 2007 letter.[57]  How could Smith have fallen another $1,000,000.00 behind so quickly, so that Dick Corporation now needed to exhaust the letter of credit?

Baxter testified that both Defendant Tomberlin and Defendant Young attended this meeting,[58] and that statement was confirmed by another

---

[54]  For the May 23, 2007 letter, see the attached **Exhibit L**, which was Exhibit 120 at Baxter's deposition and was discussed at Baxter Depo. from page 64 (line 3) to page 68 (line 1).

[55]  See Baxter Depo. at page 64 (lines 8-17) and page 65 (lines 4-23).

[56]  See Baxter Depo. at page 64 (lines 11-21) and from page 68 (line 10) to page 70 (line 10).

[57]  See Baxter Depo. at page 67 (lines 20-22).

[58]  See Baxter Depo. at page 65 (line 17) to page 66 (line 5) and page 70 (lines 14-18).

24

attendee, Trevor Pant.  According to Pant, the meeting was called because "the irrevocable letter of credit [was] being threatened because of Michael not being able to keep up with the schedule and finish the job."[59] Defendant Young has also testified to attending a meeting about the letter of credit being called, but he could not recall the timing or many of the details.[60]

Baxter returned to the Bank and immediately reported on the meeting.[61]  Should Defendant Young have likewise informed the Surety that issued the bond?  He did not, although he admitted in his deposition that if, after a bond was executed, a bond principal (such as Smith's Company) was having problems paying its suppliers, he thought that indicated an increased risk to the surety.[62]

The spring 2007 meeting to find a way to avoid drawing down the letter of credit was not the only strategy session that took place that year before Dick Corporation finally announced—to Auto-Owners' surprise—

---

[59]   See Pant Depo. at page 48 (line 21) to page 50 (line 18).  The quotation is from page 49 (lines 13-15).

[60]   See Young Depo. at page 39 (line 3) to page 40 (line 23).

[61]   See Baxter Depo. at page 108 (lines 3-16).

[62]   See Young Depo. at page 50 (line 16) to page 51 (line 10).

that Smith's Company had defaulted on its subcontracts.  There has also been testimony about a second meeting at Gardner's office sometime in August of 2007.  According to Michael Smith, Dick Corporation once more needed money to finish Smith's subcontracts and "were wanting to pull the bond."[63]  When Smith heard that, he "called Mr. Harold," and he and John Tomberlin called Kelly Baxter, and they all sat down with Dick Corporation to see what could be done to avoid getting the bond pulled.[64]  But it was not enough, as just a couple of months later, in October of 2007, Dick Corporation did indeed "pull the bond," leading first to the long-drawn-out litigation where Dick brought Auto-Owners in as a third party and then to this litigation.

## IV.   WHY DEFENDANT YOUNG'S MOTION MUST FAIL

Defendant Young's attempts to argue that the remaining claims are based solely on the misconduct of John Tomberlin are simply not believable.   There is just too much evidence—both documentary and testimonial—that Young was not one of the three blind monkeys, able to hear no evil, see no evil, and speak no evil as far as Tomberlin was

---

[63]  See Smith Depo. at page 12 (lines 9-22).

[64]  See Smith Depo. at page 12 (lines 12-22).

26

concerned.   He was instead an equal partner with Tomberlin in their attempts to hoodwink Auto-Owners and get it to issue a bond it was at first loath to issue.

Like Tomberlin, he knew significant, material facts about a bond applicant, Smith's Company, that he failed to disclose to the bonding company.  He knew that the company had only a handful of employees but was hoping to contract for some $9,000,000.00 in work at the Naval Air Station.  He knew that Smith's Company had started on much of that work without the required bond and soon ran into serious financial difficulties—difficulties that he himself attempted to ameliorate by personally putting Smith in touch with a friendly banker who was willing to provide a one million-dollar line of credit.

He realized that such information would be valuable to a Surety considering bonding that company, but still he kept it to himself.  It was not anything he shared in the telephone calls he repeatedly made to Auto-Owners in an unsuccessful attempt to pressure Sue Sweezey into authorizing the bond.   When he and Defendant Tomberlin finally convinced the Surety that the project had been cut down to a manageable size—it had not—he signed the bond, but did he wash his hands of the

whole problem at that time?  No, he continued to be involved in what can only be described as the quickly worsening financial condition of Michael Smith's Company—a condition he himself had contributed to by the false testimonial letter that assisted the company in getting the work in the first place and by the continued pressure to procure the bond required to increase that work from two subcontracts to four.

Did all of these efforts, aimed at lining the Agency's pockets by bringing in bigger premiums, contribute to or help bring about Auto-Owners' losses?  Certainly.  Without the repeated efforts of both Defendant Tomberlin and Defendant Young, Auto-Owners would have stuck with its original denial of bonding to Smith's Company, and none of these losses would have occurred.  Such evidence clearly meets the tests of *Crigler v. Salac, supra*, and shows the personal involvement required by *Howell v. J&J Wood, supra.*  Whether Defendant Young's misrepresentations were made to Dick Corporation or to Auto-Owners (they were made to both), they satisfy the requirements of *Chase v. Kawasaki Motors Corp., U.S.A., supra*, as Young surely contemplated that Auto-Owners would act by agreeing to bond the subcontract Dick Corporation was about to execute.

Alabama law provides clear precedent for denying Defendant Young's motion and none for granting it. Auto-Owners respectfully requests this Court to follow such precedent and deny the motion, keeping Defendant Young in this litigation for trial.

Respectfully submitted,

*/s/ Thomas E. Crafton*

THOMAS E. CRAFTON
MAUREEN P. TAYLOR
ALBER CRAFTON, PSC
Hurstbourne Place, Suite 1300
9300 Shelbyville Rd.
Louisville, KY  40222
Telephone: (502) 815-5000
Facsimile: (502) 815-5005
tcrafton@albercrafton.com
mtaylor@albercrafton.com


*/s/  Roger S. Morrow*

ROGER S. MORROW
WESLEY ROMINE
MORROW, ROMINE & PEARSON, PC
P.O. Box 4804
Montgomery, AL 36103-4804
Telephone: (334) 262-7707
Facsimile: (334) 262-7742
rsmorrow@mrplaw.com

*Counsel for Auto-Owners Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August, 2012, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


*/s/ Maureen P. Taylor*

*Attorney for Auto-Owners Insurance Company*


L:\Docs\1014\0043\RESP\K0369370.DOCX

30